# In The Matter Of:

*Rosa Hampton v.*
*Thomas Atzert, Jr. and the City of Atlanta*

---

*Thomas Atzert, Jr.*
*November 8, 2013*

---

## PAYNE
### COURT REPORTING, LLC

4811 Galloways Farm Court
Acworth, Georgia 30101
T (770) 596-0804  F (770) 529-7837
info@paynereporting.com
www.paynereporting.com

*Original File 110813Atzert.txt*
*Min-U-Script® with Word Index*



EXHIBIT

A

Rosa Hampton v.
Thomas Atzert, Jr. and the City of Atlanta

Thomas Atzert, Jr.
November 8, 2013

---

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ROSA HAMPTON, Individually
and as Administrator of the
Estate of MAURICE HAMPTON,
and on behalf of the minor
children of the ESTATE OF
MAURICE HAMPTON,

          Plaintiffs,

     vs.                        CIVIL ACTION NO.
                                1:13-CV-00584-TWT
THOMAS ATZERT, JR.,
Individually and in his
capacity as a City of
Atlanta Police Officer, and
the CITY OF ATLANTA,
GEORGIA,

          Defendants.

DEPOSITION OF

THOMAS ATZERT, JR.

November 8, 2013

11:05 a.m.

2024 Beaver Ruin Road
Norcross, Georgia

John P. Payne, RDR, CRR, CCR A-1006

---

Page 2

APPEARANCES OF COUNSEL

On behalf of the Plaintiffs:

    MAX C. RICHARDSON, JR., Esq.
    Max Richardson, Jr., P.C.
    2024 Beaver Ruin Road
    Norcross, Georgia 30071
    (770) 209-7999

On behalf of Defendant Thomas Atzert, Jr.:

    JOSHUA A. MILLICAN, Esq.
    Law Office of Joshua A. Millican, P.C.
    The Grant Building, Suite 607
    44 Broad Street, N.W.
    Atlanta, Georgia 30303
    (404) 522-1152

On behalf of Defendant City of Atlanta, Georgia:

    LASHAWN W. TERRY, Esq.
    City of Atlanta Law Department
    68 Mitchell Street, Suite 4100
    Atlanta, Georgia 30303
    (404) 330-6838

- - -

---

Page 3

TABLE OF CONTENTS

Examination                                    Page

Examination by Mr. Richardson                    7

                  - - -

Plaintiffs'

Exhibit          Description                    Page

  1      Individual Officer Profile             37
         Thomas Atzert, Jr.

  2      Officer Disciplinary History           91
         Officer Thomas Atzert

      (Original exhibits have been attached to the
original transcript.)

                  - - -

---

Page 4

1          (Reporter disclosure made pursuant
2     to Article 10.B. of the Rules and
3     Regulations of the Board of Court
4     Reporting, Judicial Council of Georgia.)
5          THOMAS ATZERT, JR.,
6     having been first duly sworn, was examined and
7     testified as follows:
8          MR. RICHARDSON: Let the record
9     reflect that my name is Max Richardson,
10    Jr.  I am the attorney for Rosa Hampton.
11    She is the administrator of the estate of
12    Maurice Hampton.
13         This will be the deposition of
14    Officer Thomas Atzert.  This deposition
15    will be taken pursuant to the Federal
16    Rules of Civil Procedure, for all
17    purposes, to cross -- for
18    cross-examination and -- and discovery.
19         At this point in time, I would
20    assert to counsel that any objections
21    except to the form of the question and
22    the responsiveness of the answer be
23    reserved until the time of trial or at
24    some other evidentiary hearing, if that's
25    fine with you.

---

Rosa Hampton v.
Thomas Atzert, Jr. and the City of Atlanta

Thomas Atzert, Jr.
November 8, 2013

---

Page 5

1     MR. MILLICAN: It is except to the
2  extent that there will be an objection
3  based on -- once we get into the Fifth
4  Amendment stuff, I'll probably --
5     MR. RICHARDSON: Okay.
6     MR. MILLICAN: -- object the one
7  time and then --
8     MR. RICHARDSON: And let the record
9  reflect that -- that Joshua Millican, the
10  attorney for Thomas Atzert, and I have
11  had detailed conversations with regards
12  to certain questions that he anticipates
13  I'll be asking his client. We've already
14  discussed that he will be asserting a
15  Fifth Amendment privilege as to certain
16  questions. I understand he's going to be
17  doing that. When the appropriate time
18  comes, then he'll -- he'll make that
19  noted on the record.
20     Also, let the record reflect that I
21  am reserving my right to cross-examine
22  this officer at some point in time in the
23  future when it's apparent that that --
24  that that privilege may no longer exist.
25     Do you have a problem with that, or

Page 6

1  does either counsel have a problem with
2  that?
3     MR. MILLICAN: I think the Federal
4  Rules allow you to suspend the
5  deposition. I just -- I don't want to
6  agree that we're going to --
7     MR. RICHARDSON: Okay. That's
8  fine.
9     MR. MILLICAN: -- make him
10  available.
11     MR. RICHARDSON: That's fine.
12     MR. MILLICAN: But I think what
13  you're trying to do you're allowed to do.
14  I'm just not -- I can't agree to it --
15     MR. RICHARDSON: Okay.
16     MR. MILLICAN: -- if that makes any
17  sense.
18     MR. RICHARDSON: That's fine.
19  That's fine.
20     MS. TERRY: Right. We'll -- we'll
21  agree to leave it to the discretion of
22  the Court as far as reconvening or
23  representing the witness.
24  ///
25  ///

Page 7

1              EXAMINATION
2  BY MR. RICHARDSON:
3     Q.   Okay. Officer Atzert, you're
4  represented by -- by -- by a great attorney, but I
5  just want to explain a few things, and I'm sure he's
6  already gone over it with you.
7           I'm going to be asking you questions,
8  and my questions are not intended to be confusing,
9  misleading, or anything. I want you to let me know
10  if the question is not clear or if it's vague, and I
11  will attempt to rephrase my question.
12     A.   Okay.
13     Q.   If you answer my question, then I can
14  only assume that you understood the question. Okay?
15     A.   Understood.
16     Q.   Have you ever had a deposition before?
17     A.   I have.
18     Q.   Okay. So you understand that your
19  responses need to be in English, they need to be
20  verbal because --
21     A.   Correct.
22     Q.   -- this gentleman right here to my right
23  and to your left is taking down everything that's
24  being -- that's being discussed at this -- at this
25  deposition. Okay?

Page 8

1     A.   I understand.
2     Q.   If you need a break, let us know. We've
3  got time. We've -- we've allocated time for your
4  deposition. If you need a time to talk with your
5  attorney, just -- just let me know. Okay?
6     A.   Okay.
7     Q.   You've already provided your name to the
8  court reporter, but could you give us your complete,
9  full name at this time?
10     A.   Sure. It's Thomas Atzert, Jr.
11     Q.   Do you go by any other name?
12     A.   Just Tommy.
13     Q.   And how old are you, Mr. Atzert?
14     A.   Thirty-two.
15     Q.   Okay. And without giving me any names,
16  do you have any relatives in the Northern District
17  of Georgia?
18     A.   Just my wife and my mother.
19     Q.   Okay.
20     A.   And my son.
21     Q.   Okay. And do you have -- I assume --
22  how old is your son?
23     A.   He's 2.
24     Q.   Okay. So you've got a -- you've got an
25  infant. Are the others able to vote?

Rosa Hampton v.
Thomas Atzert, Jr. and the City of Atlanta

Thomas Atzert, Jr.
November 8, 2013

---

**Page 9**

1   A.  Yes.
2   Q.  Okay.  Are they able to -- I assume,
3  then, they're able to sit as jurors, also?
4   A.  Yes.
5   Q.  Okay.  When did you -- when and where
6  did you graduate from high school?
7   A.  McIntosh High School in 1999.  That's in
8  Peachtree City, Georgia.
9   Q.  Now, have you ever been a party to a
10  lawsuit other than this case right here?
11   A.  Yes.
12   Q.  Can you explain, please?
13   A.  I can't give you much information as far
14  as -- it was a lawsuit involving an accident
15  involving a person that I had initially done a
16  traffic stop on.  I don't remember names or anything
17  like that.  The -- I'm sorry.  I do remember the
18  name.  The lawsuit was brought by a woman named
19  Yvette Bacon.
20   Q.  Bacon?
21   A.  Yes.
22   Q.  How do you spell that?
23   A.  B-a-c-o-n, I believe.
24   Q.  She brought a lawsuit against you?
25   A.  Against the City, against the City.

---

**Page 10**

1   Q.  Oh, against the City.  Okay.
2   A.  Yeah.
3   Q.  As a result of a stop that you made on
4  her?
5   A.  No, no, no.
6   Q.  Oh, I'm sorry.
7   A.  It was -- it was a result of a stop I
8  made on somebody else that fled the scene.  Then
9  after they fled the scene, they hit her.  They
10  caused an accident with her.
11   Q.  Okay.  I got you.
12   A.  So she sued.
13   Q.  Okay.
14   A.  Yeah.
15   Q.  So a third party had --
16   A.  Third party.
17   Q.  -- an accident with Yvette Brown?
18   A.  Correct.
19   Q.  Or Yvette -- yeah, Yvette Bacon?
20   A.  Bacon.
21   Q.  And then the third -- or Ms. Bacon then
22  claimed that the accident was caused --
23   A.  By me.
24   Q.  -- by you --
25   A.  Right.

---

**Page 11**

1   Q.  -- because the third person had took
2  off --
3   A.  Correct.
4   Q.  -- fleeing; is that correct?
5   A.  Correct.
6   Q.  Okay.  What ever happened with that
7  case?  Do you know?
8   A.  To be honest, I -- I really do not know.
9   Q.  Okay.
10   A.  I know it was scheduled for court one
11  week, and then all of a sudden, I got an e-mail
12  saying it was cancelled.  And I have no idea what
13  happened.
14   Q.  Okay.  How long ago was that?
15   A.  At least a year, I believe.
16   Q.  Okay.
17   A.  Well, no.  Hold on.  It happened over a
18  year ago, but I believe the -- the last thing I
19  heard as far as a court date was earlier this year,
20  perhaps, March or April.
21   Q.  Of 2013?
22   A.  Yes, I believe.
23   Q.  Okay.
24   A.  Yeah.
25   Q.  Okay.  And going back to 2011, how --

---

**Page 12**

1  how much did you weigh?
2   A.  Probably around two -- anywhere from 210
3  to 215.
4   Q.  Okay.  And what do you weigh today?
5   A.  This morning, 179.
6   Q.  Okay.  Because you remember taking some
7  pictures after this was all over with; correct?
8   A.  What's that?
9   Q.  You remember taking some pictures?
10   A.  Correct.
11   Q.  Okay.  Because you look a lot lighter
12  today than you did back then.
13   A.  Much lighter today.
14   Q.  Okay.  I imagine --
15   A.  I've made a concerted effort, yes, sir.
16   Q.  Okay.  Now, I assume your height hasn't
17  changed much?
18   A.  Not that I know of.
19   Q.  And how tall are you?
20   A.  Right around six one.
21   Q.  Okay.  Did you play any sports in high
22  school?
23   A.  No.
24   Q.  Okay.
25      Let's talk about what you're currently

---

Rosa Hampton v.
Thomas Atzert, Jr. and the City of Atlanta

Thomas Atzert, Jr.
November 8, 2013

---

**Page 13**

1 doing with the City of Atlanta.  Are you still
2 employed there?
3     A.  Yes, sir, I am.
4     Q.  Okay.  And what is your current
5 position?
6     A.  I'm an investigator.
7     Q.  And what are your hours?
8     A.  Right now my hours are kind of -- it's
9 just 8:00 in the morning.  I do -- I do anywhere
10 from 7:30 to 3:30 to 8:00 to 4:00, just --
11     Q.  Okay.
12     A.  -- early normal business hours.
13     Q.  And as an investigator, what are your
14 current duties?
15     A.  I'm currently assigned to or I'm under
16 the -- the vice unit in our special enforcement
17 section.
18     Q.  And where is -- where is that based out
19 of, or where is the precinct that you work out of?
20     A.  It's the headquarters building.
21     Q.  Where is that?
22     A.  226 Peachtree Street.
23     Q.  And how long have you been in the vice
24 unit?
25     A.  Since April of 2012?  Yeah, April 2012.

---

**Page 14**

1     Q.  Okay.  And prior to moving to the -- to
2 the vice unit, where were you at?
3     A.  I was assigned to Zone 4 CIDU unit, the
4 investigations unit, from January to April of 2012.
5     Q.  And who was your supervisor or -- strike
6 that.  Who is your current supervisor with the vice
7 unit?
8     A.  His name is Lieutenant Tellis.
9     Q.  Is that T-e-l-l-i-s?
10     A.  Uh-huh.
11     Q.  Okay.  And has he been your supervisor
12 since you moved there to the vice unit?
13     A.  No.  He just recently got up there.
14 The -- the commander before that was Lieutenant
15 Kreher or --
16     Q.  How do you spell that name?  Do you
17 know?
18     A.  K-r-e-h-e-r.  But he's actually a
19 captain now.  He's been promoted.
20     Q.  Okay.  And with that vice unit, what are
21 your -- what are your duties?
22     A.  It's mainly just investigations of
23 prostitution both on the street and using the
24 Internet, girls that, you know, post themselves up
25 for dates on the Internet, and we investigate those

---

**Page 15**

1 things.  We also sometimes, but it's very rare,
2 illegal gambling, liquor houses, and things
3 like that, but we haven't done any of that in a long
4 time.
5     Q.  Okay.  Where do you -- let me -- where
6 do you stand in the chain of -- of superiority with
7 the vice group?  Do you understand that question?
8     A.  Not really.
9     Q.  Let me rephrase the question.  You have
10 a supervisor of Sergeant or Lieutenant Tellis;
11 correct?
12     A.  Correct.
13     Q.  And where do you rank in relationship to
14 Lieutenant Tellis?
15     A.  Well, we have two sergeants below him,
16 and then we have five or six investigators, and so
17 I'm one of the investigators, so it's --
18     Q.  Okay.  So you --
19     A.  It's not a large unit.
20     Q.  Okay.  So you answer to two sergeants
21 and a lieutenant, then?
22     A.  Yes.
23     Q.  Okay.
24     A.  Yes.
25     Q.  And then I assume the other

---

**Page 16**

1 investigators are --
2     A.  The -- the same, answer to the two
3 sergeants.
4     Q.  They have the same ranks that you have?
5     A.  Correct, right.  There's no -- there's
6 no differentiation between the investigators.
7 Nothing's based on time, "Hey, this guy's been an
8 investigator longer, so he's got more say," nothing
9 like that.
10     Q.  Okay.  Are there different rankings with
11 the investigators?
12     A.  No.
13     Q.  Okay.  There's only one level?
14     A.  Correct.
15     Q.  Okay.  So you've had no promotions since
16 you moved into the vice group; is that correct?
17     A.  No.
18     Q.  Have you had any demotions since --
19     A.  No.
20     Q.  -- you've moved into the vice group?
21 Okay.
22         In 2012 you were at Zone 4.  That would
23 have been the same zone that you worked in 2011;
24 correct?
25     A.  Correct.

---

Rosa Hampton v.
Thomas Atzert, Jr. and the City of Atlanta

Thomas Atzert, Jr.
November 8, 2013

**Page 17**

1    Q.   Okay.  What were your -- what was your
2  rank at Zone 4?
3    A.   Well, in -- I made investigator in
4  January of 2012, so that's where I --
5    Q.   Okay.
6    A.   During 2011 I was an officer, just
7  patrol officer on -- on the watch, and then in
8  January I actually was promoted to investigator and
9  I moved to a different office, still within Zone 4,
10  but it was as an investigator doing follow-up
11  investigations on -- on cases.
12    Q.   Okay.  Now, when you became an
13  investigator --
14    A.   Uh-huh.
15    Q.   -- is that something that you requested
16  or something that you applied for, or was that
17  something that was handed over to you because of the
18  services that you had provided to the City?
19    A.   There was a -- it's a testing procedure.
20  You -- you take a test, and there's also an oral
21  interview.  If you're deemed -- it's pretty much a
22  pass/fail.  You -- if you -- if you pass the test,
23  then you're allowed to do the interview.  And once
24  you do the interview, they also give you a score and
25  they take a -- a pool of -- of the applicants that

**Page 18**

1  have -- that have tested, and if they deem that they
2  have successfully passed, they put them on an
3  eligibility list.  And so once you're on that list,
4  supervisors are able to request you to be promoted
5  to investigator, and so there was, I guess, a
6  sergeant in the CID unit that had requested that I
7  be promoted and transferred to his unit to serve as
8  an investigator.
9    Q.   Okay.  And -- and who would that
10  sergeant have -- have been in 2012 --
11    A.   I --
12    Q.   -- that made that request?
13    A.   I believe it was Sergeant Harris.
14    Q.   Okay.  Was -- was Sergeant Harris the --
15  the lead officer or head officer or superior officer
16  at Zone 4 at the time?
17    A.   He was the acting supervisor, yes, sir.
18    Q.   Okay.  And what was his name again?  I'm
19  sorry?
20    A.   Harris.
21    Q.   Harris?
22    A.   H-a-r-r-i-s.  First name is Todd, I
23  believe.
24    Q.   And so it's -- it's -- did you request
25  that Todd recommend or consider you for that

**Page 19**

1  investigator position?
2    A.   No, sir.
3    Q.   Okay.  So it's your -- it's your
4  testimony, your statement that he's the one that
5  recommended you for the investigator position?
6    A.   Correct.
7    Q.   Okay.  And the investigator position
8  would be a notch above the patrol officer
9  position --
10    A.   That is correct.
11    Q.   -- is that correct?
12    A.   Correct.
13    Q.   More pay involved; correct?
14    A.   Yes, sir.
15    Q.   Okay.  Would you still be working out of
16  Zone 4 as an investigator?
17    A.   I don't understand.
18    Q.   Okay.  Let me rephrase it, then.  When
19  you were recommended for an investigator position
20  back in 2012 by Sergeant Harris --
21    A.   Uh-huh.
22    Q.   -- was that with the understanding that
23  you would be an investigator at Zone 4?
24    A.   Yes.
25    Q.   Okay.

**Page 20**

1    A.   Yes.
2    Q.   And so at that point in time, if you
3  were to have -- or when you did get the investigator
4  position, you were working directly under Todd
5  Harris; is --
6    A.   Yes.
7    Q.   -- that correct?
8    A.   Correct.
9    Q.   Okay.  And how many investigators were
10  in Zone 4 at that time?
11    A.   Hm.  Well, there's two watches.  They
12  had a day watch and an evening watch.  I worked
13  evening watch, and there were -- oh, man.  I think
14  there were five on evening watch, and there were --
15  there were two sergeants.  It was Sergeant Harris
16  and Sergeant King, and so --
17    Q.   I'm not trying to lock --
18    A.   Yeah.
19    Q.   -- you down to a definite number.  If
20  you could just give me --
21    A.   It was five or six.
22    Q.   Okay.  Five or six.  Okay.
23    A.   On each watch.
24    Q.   So it would have been ten total at Zone
25  4, then?

Rosa Hampton v.
Thomas Atzert, Jr. and the City of Atlanta

Thomas Atzert, Jr.
November 8, 2013

---

Page 21

1  A.  Ten -- ten to twelve --
2  Q.  Okay.
3  A.  -- depending on -- I mean, some people
4  come in.  Some people move, you know.
5  Q.  What would an investigator do at -- at
6  Zone 4?
7  A.  They're assigned follow-up cases, things
8  like burglaries, aggravated assaults, robberies,
9  carjackings.  Anything that didn't actually lead or
10  result to a death they would handle in the zone, so
11  geographically cases that happened in Zone 4 would
12  stay in Zone 4 unless it was something like a
13  special victim, rape, or a murder.
14  Q.  Okay.  Okay.  If it wasn't a -- I guess,
15  a major homicide --
16  A.  Correct.
17  Q.  -- that would be your responsibility to
18  try and investigate and -- and research?
19  A.  Yes, sir.
20  Q.  Find out who the -- who the suspect was
21  in that -- in that particular case; is that correct?
22  A.  Correct.
23  Q.  Is it safe for me to assume, then, that
24  you would -- you would not have had any traffic
25  responsibilities?

---

Page 22

1  A.  As an investigator, no.
2  Q.  As an investigator?
3  A.  No.
4  Q.  Okay.  And you became an investigator, I
5  think you said, January?
6  A.  Yes, January 2012.
7  Q.  January 2012?  So you had applied for
8  that position, I assume, sometime in 2011, then;
9  correct?
10  A.  Right.  I had taken the test in 2011.
11  Q.  Okay.
12  A.  And then they -- they put out the
13  eligibility list, and at that time supervisors
14  are -- are able to, you know, recommend who they
15  would like to have in their unit.
16  Q.  Now, when you become an
17  investigator, are you -- I assume you're still a
18  police officer; correct?
19  A.  Correct.
20  Q.  Okay.  Is there a different ranking
21  among the police officers?
22  A.  No, not really.  They do have what they
23  call a senior patrol officer, an SPO.  Same thing as
24  investigator.  It's -- you take the test, you know.
25  You do the oral -- you take the -- the written

---

Page 23

1  examination and then an -- an oral interview, and
2  just like the investigator, they put you on an
3  eligibility list and then, you know --
4  Q.  Okay.
5  A.  -- able to be assigned to it.  So yes,
6  there is a -- a -- a higher patrol officer.  They're
7  still in uniform.  They still answer 911 calls.  But
8  I believe paywise it's the same as an investigator.
9  Q.  Okay.  Would you have been in uniform
10  when you became an investigator?
11  A.  You had the option.  You could wear the
12  uniform if you so chose, but other than that, no.
13  It was -- you could wear, you know, business attire,
14  shirt, tie.  I usually wore an Atlanta Police shirt,
15  you know, tucked in with a nice pair of pants and
16  boots.
17  Q.  Okay.
18  A.  Didn't get too fancy.
19  Q.  Okay.  So is it safe for me to assume,
20  then, that Todd Harris and Sergeant King were
21  basically both working in Zone 4 in 2011?
22  A.  Yes.  They were both assigned to CID.
23  Q.  Okay.
24  A.  Yes.
25  Q.  And you stated that sometime in 2011,

---

Page 24

1  Sergeant Harris, Sergeant Todd Harris, had
2  recommended or suggested that -- that you be
3  considered for the investigator position; correct?
4  A.  Correct.
5  Q.  And he would have approached you at some
6  point in time to encourage you to take the exam; is
7  that correct?
8  A.  No, he never encouraged me to take the
9  exam.  I -- I took the exam on my own and just based
10  on -- I assumed that based on his dealings with me
11  in the zone, seeing me work, then he had made the
12  recommendation, "Hey, I would like to have Officer
13  Atzert working under CID under me."
14  Q.  Okay.  So the initial idea of you
15  becoming an investigator was not Sergeant Harris's
16  idea?  It was your idea, then; is that correct?
17  A.  Correct.
18  Q.  Okay.
19  A.  Right.
20  Q.  And that --
21  A.  I took the test sometime in 2011, but I
22  can't remember the -- the dates.
23  Q.  No one suggested or encouraged that you
24  take the test, then; is --
25  A.  No.

---

Rosa Hampton v.
Thomas Atzert, Jr. and the City of Atlanta

Thomas Atzert, Jr.
November 8, 2013

**Page 25**

1    Q.    -- that correct?  Okay.  That's
2    something you wanted to do?
3    A.    Correct.
4    Q.    And then after you did well on the test,
5    then you basically got support from Sergeant Harris;
6    is that correct?
7    A.    That's correct.
8    Q.    Okay.  Got you.  Do you know when you
9    took that test in 2011?
10   A.    I really do not remember.
11   Q.    Okay.  Would it have been the latter
12   part or -- or early part, if you know that?
13   A.    I -- I -- honestly, I really don't --
14   Q.    Okay.
15   A.    -- remember.  I think it was probably
16   the earlier part of the year.
17   Q.    Okay.  Would it have been -- and -- and
18   I'm just going to make reference to this case.
19   Okay?
20   A.    Uh-huh.
21   Q.    The -- the Maurice Hampton case.
22   A.    Okay.
23   Q.    Was it prior to the Maurice Hampton case
24   or, let's say, the Maurice Hampton incident?
25   A.    I --

**Page 26**

1    Q.    If you know that.
2    A.    -- believe so, but I -- I -- I don't
3    remember.
4    Q.    Okay.  That's fine.  And in 2011 what
5    was your rank?
6    A.    Officer.
7    Q.    And what were your duties?
8    A.    Basically I was assigned to the Zone 4
9    patrol unit, and so I was on evening watch.  So
10   normally I would answer 911 calls, but I was
11   mainly a -- a traffic officer, so my duties were to
12   go out and look for traffic infractions and write
13   citations.
14   Q.    Okay.  So you were a -- you were a watch
15   call officer --
16   A.    Uh-huh.
17   Q.    -- correct?  And then --
18   A.    Correct.
19   Q.    -- you were also a patrol officer?
20   A.    Right.
21   Q.    Patrol officer is one that's in the
22   streets driving around patrolling the streets; is --
23   A.    Yes, sir.
24   Q.    -- that correct?
25   A.    Correct.

**Page 27**

1    Q.    A watch call officer is one that takes
2    calls and answers calls with regards to crimes; is
3    that correct?
4    A.    We all do the same thing, I mean.
5    They're all -- there's probably 30 officers assigned
6    to a watch, and then, you know, depending on off
7    days, you know, you may have around anywhere from 10
8    to 20 officers actually working.  And everybody's
9    got a certain geographic sort of beat that they are
10   centered around, and those are the calls that they
11   handle.  And I would do that some days based on
12   manpower, and then when we had enough people, I
13   would be a traffic car to where I -- I would help
14   answer 911 calls if need be, but my normal duties
15   would be just to look for traffic infractions within
16   the zone.
17   Q.    Okay.
18   A.    But if -- if a call came up, I was
19   close, I would handle it so . . .
20   Q.    Okay.  And -- and that's what a watch
21   call officer did?
22   A.    Right.  I mean, we don't call it that.
23   We're just patrol officers.  That's --
24   Q.    Patrol officers?  Okay.
25   A.    -- what we call ourselves.

**Page 28**

1    Q.    So do you -- do you -- how do you decide
2    whether or not you're going to get in the streets
3    and just wait to see if someone is running a traffic
4    light or whether you're going to sit in the office
5    and wait for a call?
6    A.    No, we don't sit in the office.  We
7    don't have that kind of time.
8    Q.    Okay.  You don't?  Okay.  I
9    misunderstood you, then.
10   A.    Right.  No, we -- nobody sits in the
11   office.  It's -- it's --
12   Q.    Okay.
13   A.    -- too busy.  You're actually in the
14   streets, and officers can do what they want to do.
15   They can -- they can do traffic infractions if
16   they're not actually handling a call.  They can
17   conduct their own stops with people they see in the
18   street, anything like that.  But their main duties
19   are to handle the 911 calls that come in, as was my
20   duties, as well.  But based on manpower, on certain
21   days the supervisor would say, "We've got enough
22   people.  Today you're your normal car.  You're a
23   traffic car.  Go look for traffic infractions."
24   Q.    Okay.  So -- so the more officers you
25   had, then, the more focus or attention that you

Rosa Hampton v.
Thomas Atzert, Jr. and the City of Atlanta

Thomas Atzert, Jr.
November 8, 2013

Page 29

1 would put on the drivers or on the roadway, the
2 violators on the roadway that are -- that are
3 violating traffic signals; is that correct?
4     A. Correct.
5     Q. And correct me if I'm wrong, but it
6 sounds like to me you're trying to put more emphasis
7 on the calls because crimes are being committed
8 versus the traffic violators; is that correct?
9     A. Correct.
10     Q. Okay.
11     A. That is -- that's the watch's main
12 focus, but yeah, like I said, based on manpower,
13 if -- if all the beat cars are filled, then yes, I
14 would be a traffic car. But if we didn't have
15 enough people one day, I wouldn't be a traffic car.
16 I would actually be a beat car, and I would go
17 handle 911 calls.
18     Q. Okay.
19     A. I would still write traffic infractions,
20 you know, citations when I had the time, but your
21 main goal at that point would be just to handle the
22 911 calls.
23     Q. Dealing with crimes?
24     A. Correct.
25     Q. Okay. And I -- and I guess the

Page 30

1 traffic -- traffic offense is a crime, but it's not
2 as serious as somebody breaking in somebody's home?
3     A. Correct.
4     Q. Okay. And you indicated that your rank
5 was a police officer during 2011?
6     A. Yes, sir.
7     Q. Are there different ranks among -- among
8 the police officers?
9     A. Only a senior patrol officer.
10     Q. Okay. And you were not a senior patrol
11 officer --
12     A. No.
13     Q. -- correct? And you worked out of Zone
14 4 the entire 2011?
15     A. Yes, I did.
16     Q. Okay. And let's talk about 2010. Did
17 you work out of Zone 4 in 2010?
18     A. I did.
19     Q. And before I get into 2010, who was your
20 supervisor in 2011 at Zone 4?
21     A. I mean, we had multiple, I mean. The
22 supervisors move a lot more often than the officers.
23 I had --
24     Q. Anyone stick off -- stick --
25     A. I had Sergeant Ries, R-i-e-s. I had

Page 31

1 Lieutenant Bogolin, B-o-g-o-l-i-n. Sergeant Carroll
2 was there, Sergeant Oliver. I had -- I mean, there
3 was multiple supervisors, I mean. Some of them get
4 promoted. Then they change watches, things like
5 that, so I can't give you the definitive list.
6     Q. That's fine. Sergeant Harris there?
7     A. He was there, but he was not on -- he
8 was not a watch sergeant. He was in CID.
9     Q. But he was in Zone 4?
10     A. Correct.
11     Q. Okay. And he was in C --
12     A. Two different buildings.
13     Q. Okay. He was in CID. What's CID?
14     A. Criminal investigations.
15     Q. Okay. And where is that building?
16     A. It's on Martin Luther King. It was -- I
17 think it was 3020 M.L.K., but I -- I can't be sure.
18 I -- it's been several years since I've worked
19 there.
20     Q. Where was your station, the Zone 4
21 station?
22     A. On Cascade Road.
23     Q. Okay. How far is that from the CID at
24 M.L.K.?
25     A. A five- to ten-minute drive. I mean,

Page 32

1 it's --
2     Q. Okay.
3     A. -- you know, several miles away.
4     Q. Okay.
5     So you obviously knew Sergeant Harris.
6 Where did you first meet Sergeant Harris?
7     A. Just probably on the street, you know.
8 When you're at a crime scene in -- in CID, the
9 investigators are called to come out. The
10 supervisors would come out occasionally, so I met
11 him there on one of the scenes.
12     Q. Okay.
13     A. I couldn't tell you exactly when or
14 where.
15     Q. But in 2011 you and Sergeant Harris
16 worked in two different buildings; correct?
17     A. Correct.
18     Q. In 2010 were you at Zone 4?
19     A. Yes.
20     Q. For the entire year?
21     A. Yes.
22     Q. Same responsibilities?
23     A. Yes, sir.
24     Q. That you had in 2011?
25     A. Yes, sir.

Rosa Hampton v.
Thomas Atzert, Jr. and the City of Atlanta

Thomas Atzert, Jr.
November 8, 2013

Page 33

1    Q.    Any supervisors stand out in 2010 that
2   you worked with at that time?
3        A.    No, because — I — I remember names,
4   but I can't remember time frames so . . .
5        Q.    And the further back we go, the more --
6        A.    Right.
7        Q.    -- difficult it's going to --
8        A.    I had -- we had -- at one point I
9   think -- we counted -- we had six or seven
10  lieutenants in one year, and that's -- that's a lot.
11  I mean, I -- honestly, I can't remember.
12      Q.    Okay.  That's fine.
13      A.    There's been quite a few.
14      Q.    Okay.  In 2009 -- were you still at Zone
15  4 in 2009?
16      A.    I was.
17      Q.    Same responsibilities?
18      A.    Yes, sir.
19      Q.    As 2010 and 2011?
20      A.    Yes, sir.
21      Q.    In 2008 were you at Zone 4?
22      A.    Only the last quarter, basically.  I —
23  I believe I started there in, I want to say, maybe
24  October of 2008.
25      Q.    And where were you at prior to being

Page 34

1   moved to Zone 4?
2        A.    Well, I finished the academy in two
3   thousand -- like May of 2008, and so at that point
4   you were field training, and we field-trained in
5   every zone.  We did, you know, like a two-week stint
6   in every zone with a different officer.
7        Q.    Are you talking about the -- when you
8   say you finished the academy, where did you finish
9   the academy at?
10      A.    The academy is located at 180 Southside
11  Industrial in Atlanta.
12      Q.    Okay.  And at some point in time -- I
13  believe you started in 2007; correct?
14      A.    Correct.  That was my actual hire date,
15  was in November of 2007.
16      Q.    And what did you do when you were hired?
17      A.    I worked as a recruit in the old City
18  Hall East building.
19      Q.    And were you --
20      A.    Only for a couple of weeks.
21      Q.    I'm sorry.  I didn't mean to cut you
22  off.
23      A.    That's fine.
24      Q.    Who were you recruiting?  What were you
25  recruiting?

Page 35

1        A.    That's — that was your title, recruit.
2        Q.    Recruit.  Okay.  Now --
3        A.    Right.
4        Q.    -- what does that mean?
5        A.    Well, that's just your -- that's your
6   title that you get before you actually go into
7   the -- the academy or actually while you're --
8   before you go to the academy and during the academy,
9   you're a recruit.  You're not --
10      Q.    Okay.
11      A.    -- a sworn officer at that time.
12      Q.    You're not recruiting anyone?  You were
13  the one that were recruited; is that correct?
14      A.    Correct.
15      Q.    So that's why they call you recruit?
16      A.    Yeah.
17      Q.    Okay.  And where were you stationed at
18  that time?  Where was -- where were you physically
19  stationed?
20      A.    Only for a couple of weeks, I was at
21  City Hall East in the narcotics unit.
22      Q.    Okay.  And then you began your P.O.S.T.
23  training at some point in time after that?
24      A.    It was in December of 2007, I believe.
25      Q.    Okay.  And who was your P.O.S.T.

Page 36

1   instructor?
2        A.    Carrie Jones.  It was Officer Carrie
3   Jones.  She was the class coordinator for the
4   academy.
5        Q.    Okay.  And who was your supervisor at
6   City Hall East as a recruit?
7        A.    Oh, I remember.  His name was Sergeant
8   D.D. Johnson.
9        Q.    Is that a female or male?
10      A.    No, it's a male.
11      Q.    Okay.  All right.
12           Do you recall any -- any -- or let me
13  just ask you this -- any demotions at any point in
14  time during your career as a -- as a police officer?
15      A.    No, sir.
16      Q.    Or -- or investigator?
17      A.    No, sir.
18      Q.    Okay.  And then obviously, you got the
19  one promotion in 2012; correct?
20      A.    Correct.
21      Q.    Is that the only promotion that you've
22  ever gotten?
23      A.    Yes.
24      Q.    Okay.
25           Okay.  I just want to ask you a few

Rosa Hampton v.
Thomas Atzert, Jr. and the City of Atlanta

Thomas Atzert, Jr.
November 8, 2013

---

**Page 37**

1  questions about your training.
2     A.  Okay.
3       MR. RICHARDSON: Could you mark
4  that as Plaintiffs' Exhibit --
5  Plaintiffs' Exhibit Number 1, please?
6       (Plaintiffs' Exhibit 1 was marked
7  for identification.)
8     Q.  (By Mr. Richardson) I've presented to
9  you what's been identified as Plaintiffs' Exhibit
10  Number 1. Do you recognize that Data Report System
11  document?
12     A.  I do.
13     Q.  Okay. And what do you recognize about
14  that document?
15     A.  It is a printout of training classes
16  that I've received and that are listed under the
17  Georgia Peace Officer Standards and Training --
18     Q.  Okay.
19     A.  -- Web site.
20     Q.  I -- I would like for you just to take a
21  couple of minutes --
22     A.  Okay.
23     Q.  -- and look over that document and
24  determine -- I don't want you to tell me anything or
25  say anything, but just look at it and determine

**Page 38**

1  whether or not that is accurate. Okay?
2     A.  Okay.
3       (Witness peruses document.)
4     A.  It's -- it's accurate. I'm not sure
5  what date you printed it. I have taken a few online
6  courses since the beginning of this year, which
7  aren't reflected on here, but it's probably only
8  like six or seven one-hour credit -- credit courses.
9     Q.  Well, let me ask you this question,
10  then. Is -- based on what you've had an opportunity
11  to review, is the information in that Data Report
12  System for the individual officer profile, is that,
13  in fact, your profile?
14     A.  Yes, it is.
15     Q.  And is most of the -- is -- is all of
16  that information in your profile accurate?
17     A.  Other than the weight. I mean, that's
18  an old weight, but yeah --
19     Q.  Okay.
20     A.  -- it is accurate.
21     Q.  Okay. It reflects that you've got a
22  bachelor's degree; is that correct?
23     A.  Yes. I do.
24     Q.  It reflects that you are in good
25  standing; is that correct?

**Page 39**

1     A.  Correct.
2     Q.  And what does that mean, that you are in
3  good standing?
4     A.  Honestly, I have no idea what their
5  classification of good standing is. I mean, I guess
6  that means I still hold my certification, which I
7  do.
8     Q.  Okay. Certainly not a bad thing to be
9  in good standing? That's not your -- I mean, you --
10     A.  No. I would say it was a good thing.
11     Q.  Okay. Got you. Okay. So -- so -- so
12  right now the -- the name on here, Thomas Atzert,
13  Jr., that's you? You're --
14     A.  Yes.
15     Q.  -- obviously white; correct?
16     A.  Correct.
17     Q.  And you say you're six one, 205?
18     A.  Right.
19     Q.  Is that close?
20     A.  Like I said earlier, I'm -- I'm one --
21  A little lighter now?
22     A.  180-ish, correct.
23     Q.  Got you.
24       It continues down and says officer
25  certifications. What does that mean?

**Page 40**

1     A.  There's -- well, the basic law
2  enforcement is -- is the -- like you see the
3  certification number there, that's the number they
4  give you once you are graduated and sworn in as an
5  officer. I guess that is your
6  ultimate certification. They send you a little
7  plaque that says you're now a certified police
8  officer.
9     Q.  Would that be a P.O.S.T. number, do you
10  think?
11     A.  It is a number given by P.O.S.T., yes.
12     Q.  Okay. All right.
13     A.  And then the lidar operator, they give
14  you that number once you are actually certified to
15  operate the lidar speed-detection unit.
16     Q.  The speed detection. And which one is
17  that? Aren't there several speed-detection devices?
18     A.  There's multiple brands and -- and
19  models. It -- it covers a -- a broad list of ones
20  that you're allowed to operate, but yeah, it's --
21  it's the lidar. It's the one that uses the laser,
22  not radar. It's different.
23     Q.  Okay. And then it goes on to talk
24  about -- the profile form goes on to talk about an
25  instructor certifications, and do you have any

---

Rosa Hampton v.
Thomas Atzert, Jr. and the City of Atlanta

Thomas Atzert, Jr.
November 8, 2013

**Page 41**

1  instructor certifications as of today's date?
2  **A.  No, I do not.**
3  Q.  Okay.  The next item of concern is the
4  employment, your employment history.
5  **A.  Uh-huh.**
6  Q.  Do you see that?
7  **A.  I do.**
8  Q.  Okay.  And is it accurate that you were
9  an Atlanta police officer or peace officer from
10  November 13th, 2007, to January 5th, 2012?
11  **A.  Correct.**
12  Q.  And that rank changed, and you got a
13  promotion; is that correct?
14  **A.  Correct.**
15  Q.  And that would have been to the
16  investigator position; is that correct?
17  **A.  Correct.**
18  Q.  And that promotion took place in January
19  of 2012; correct?
20  **A.  It did.**
21  Q.  Okay.  And it states that you're
22  actively employed in law enforcement today.  That's
23  correct information?
24  **A.  Correct.**
25  Q.  Okay.  And the next area of concern

**Page 42**

1  discusses sanctions.  Do you know what that's all
2  about?
3  **A.  No.  I would assume that that would be**
4  **if they had ever suspended your certification,**
5  **perhaps.**
6  Q.  Okay.  Have you ever been sanctioned by
7  the Atlanta Police Department for anything?
8  **A.  No.**
9  Q.  Okay.  And it says none found at this
10  point in time, so that would be accurate; is that
11  correct?
12  **A.  Correct.**
13  Q.  Now, we go down to the next item of
14  concern.  The area says investigations?
15  **A.  Correct.**
16  Q.  Now, that -- what does -- that says none
17  found?
18  **A.  Right.**
19  Q.  Okay.  Do you know what the status of
20  that is right now?
21  **A.  As far as I can tell, that I am not**
22  **under investigation, I would assume.  I don't know.**
23  Q.  Okay.  But are you aware that you are
24  under investigations with the -- with the -- with
25  the -- the district attorney's office in --

**Page 43**

1  **A.  Correct.**
2  Q.  -- Fulton County?  Okay.  But you're
3  not -- and -- and maybe this is a reflection of
4  investigations with the police department?
5  **A.  I -- I -- I -- I guess.  I really don't**
6  **know.  I'm not sure --**
7  Q.  Okay.
8  **A.  -- what that pertains --**
9  Q.  Okay.
10  **A.  -- to.**
11  Q.  That's fine.  But it indicates that
12  you're not -- there's nothing found as far as you
13  being under investigation at this time; correct?
14  **A.  Right.**
15  Q.  Okay.  And we've got the training
16  history.  What is your understanding of the training
17  history?
18  **A.  This is just -- it's basically your**
19  **transcript of all P.O.S.T.-certified classes that**
20  **you have taken and completed and things that you've**
21  **been given credit for.**
22  Q.  Okay.  Now, are -- are all of the
23  classes that are listed in your training history,
24  were all of those P.O.S.T. certified?
25  **A.  Yes.**

**Page 44**

1  Q.  Okay.
2  **A.  Yeah.**
3  Q.  Let's go to the next page and --
4  **A.  Okay.**
5  Q.  -- back up.  Okay?
6  **A.  All right.**
7  Q.  Let's start back in 2008.  Okay.  It has
8  a list of all the training that you received in
9  2008.  It looks like to me that would have been
10  the -- the bulk of your training; is that correct?
11  **A.  Yes.**
12  Q.  Okay.  And that would have been your
13  basic law enforcement training with P.O.S.T.;
14  correct?
15  **A.  Uh-huh, yes, sir.**
16  Q.  And you would have had to have obtained
17  that to become a certified police officer; correct?
18  **A.  Correct.**
19  Q.  Okay.  And do you recall whether or not
20  you received any other training in 2008?
21  **A.  Like I said, that was when I took the --**
22  **the lidar operator course, which is in turn what**
23  **gave me the certification.  I think I took a brief**
24  **class on the concealed carry weapons, which is the**
25  **firearm carry law, and then the rest of it is just,**

Page 45

1  like you said, the -- your basic law enforcement,
2  and then in Atlanta they give you extended classes,
3  so it's not -- I believe the -- the minimum is that
4  408, but we get a -- a bit more at the Atlanta
5  Police Academy, and so that's what the extent of the
6  basic course is.
7      Q.  Okay.  And this would have been all of
8  the training that you received in 2008; is that
9  correct?
10     A.  Yes.
11     Q.  Okay.  Let's talk about some of the
12  training that you received in 2009.  Would -- would
13  all of that training that's -- that's reflected on
14  your profile be accurate information?
15     A.  It would.
16     Q.  Okay.  Now, what's a firearms requal?
17  It's r-e-q-u-a-l.  What is that?
18     A.  That's your -- your yearly firearms test
19  at our range where you actually go and qualify and
20  get a passing score in order to continue to carry
21  your firearm.
22     Q.  Okay.  Do you think that means firearms
23  requalification?
24     A.  Yes.
25     Q.  Okay.  And it's just -- they just

Page 46

1  abbreviated it?
2      A.  Shortened it, yeah.
3      Q.  Okay.  And it looks like in January of
4  2009, you got your firearms requalification training
5  as well as use-of-deadly-force training; correct?
6      A.  Correct.
7      Q.  And when you look all the way over to
8  the right side, it says that you -- you received a
9  total of eight hours for training in both of those
10  areas; correct?
11     A.  Correct.
12     Q.  And next to the use of deadly force, it
13  specifies that you got two hours of training in the
14  use of deadly force; correct?
15     A.  Correct.
16     Q.  So the other six hours would have went
17  towards firearms requalification; is that correct?
18     A.  Correct.
19     Q.  Where would that training have been?
20     A.  At the -- the APD's range, Atlanta
21  Police Department's range.  It's down on Key Road.
22     Q.  Okay.  It's -- it's a range?
23     A.  It's a shooting range.
24     Q.  Shooting range?  Okay.  Could you
25  describe the shooting range?

Page 47

1      A.  As far as like physically?
2      Q.  Yes, sir.
3      A.  It's, I want to say -- it's an outdoor
4  grass range.  It's near where the SWAT unit is
5  located, and it's got, I want to say, 20-something
6  lanes that are -- I think the maximum distance on
7  the range is 25 yards, perhaps.  No, no, no.
8  It's -- it's longer.  It's 50 yards.
9      Q.  Okay.  And when you talk about a range,
10  I'm assuming, and help me if I'm wrong --
11     A.  Okay.
12     Q.  -- I'm assuming you're talking about
13  Point A where the -- where the gun is being fired to
14  Point B where the shot is being accepted; is that
15  correct?
16     A.  Correct.
17     Q.  And that would be the range, from Point
18  A to Point B; is that correct?
19     A.  Right.
20     Q.  And you're saying there's 25 different
21  ranges; correct?
22     A.  There's -- it's -- it's one -- it's a
23  big rectangle, and it's a long, you know, grassy,
24  flat area, and there's lanes, basically.  I mean,
25  they're not physically divided, but there's, you

Page 48

1  know, a target here, a target here.  There's 20
2  targets.  You call them lanes.
3      Q.  Okay.
4      A.  There's about -- I think there's 20 of
5  them.
6      Q.  Okay.  And I'm not trying to lock you
7  down --
8      A.  I understand.
9      Q.  -- on a number but just a -- just a
10  general idea.  So we've got 20, 25 different
11  targets; correct?
12     A.  Correct.  There's enough for a bunch of
13  officers to qualify at the same time in order to do
14  it in a timely fashion.
15     Q.  And then -- and then there's a point
16  where you -- where you actually fire or discharge
17  the weapon, so there's 25 or 20 different areas for
18  that, also?
19     A.  Right.
20     Q.  And those areas are lined up with the
21  target; correct?
22     A.  Correct.
23     Q.  Okay.  And this is in an open field?
24     A.  It is basically an open field, right,
25  but it's -- it's -- it's got a -- a large dirt

Rosa Hampton v.
Thomas Atzert, Jr. and the City of Atlanta

Thomas Atzert, Jr.
November 8, 2013

Page 49

1 backdrop so that no bullets are -- you know, no
2 errant bullets are going anywhere, and then there's
3 a -- a concrete wall on -- on either side, and
4 there's some woods on another side, so it's just --
5 it's basically an area contained so that all rounds
6 are going downrange and not flying off into the air.
7    Q.   We obviously want to be concerned that
8 no civilians in the area are going to get struck by
9 any of these --
10   A.   Correct.
11   Q.   -- stray bullets by some officers who --
12 who are just learning how to -- how to handle a gun,
13 maybe; correct?
14   A.   Yes.
15   Q.   Okay.  Are there any buildings over
16 there in this area?
17   A.   There is a building on -- behind the
18 range.  It's a -- it's a trailer that the
19 supervisors and the officers that are assigned to
20 the range, that's where they work out of.
21   Q.   Okay.  It's a trailer?
22   A.   I think so, yeah.
23   Q.   Are we talking about one trailer?  Two
24 trailers?
25   A.   No.  I mean, it's -- it's a -- I don't

Page 50

1 know.  It's a big double-wide, I think, that's been
2 basically placed there, I think.  And then they've
3 also got a -- a tower.  It's a big wooden tower that
4 looks down on the field so that an observer can
5 actually watch all the officers at once from above
6 so they can, you know, communicate to the other
7 officers that are working there, "Hey, you might
8 want to watch this guy," you know, "watch that guy,"
9 that kind of thing.  And then there's a building
10 that actually houses all of the ammunition that's
11 separate from the -- the main building.
12   Q.   When you say main building, are you
13 talking about the -- the double-wide --
14   A.   The --
15   Q.   -- trailer?
16   A.   The trailer, right.
17   Q.   And then there's another building that
18 houses the weapons?
19   A.   No.  It just houses -- I don't think
20 there's any weapons in there.
21   Q.   I'm sorry.
22   A.   It's --
23   Q.   Did you say weapons?
24   A.   It's ammunition.
25   Q.   I'm sorry.  Ammunition?

Page 51

1    A.   Right.
2    Q.   Okay.  So we have a building where
3 the -- where the supervisors --
4    A.   Uh-huh.
5    Q.   -- or the superiors operate out of?
6    A.   Correct.
7    Q.   And we've got a -- is it a smaller
8 building where they keep the ammunition?
9    A.   Yes.
10   Q.   Okay.  How big is the -- is the facility
11 where they house the ammunition?
12   A.   I couldn't give you dimensions.  I don't
13 know.
14   Q.   Okay.  There's nothing else that's done
15 inside that -- that building other than holding
16 ammunition --
17   A.   I have no idea.  I've --
18   Q.   -- is that correct?
19   A.   I've never been in it.  I don't know.
20   Q.   You've never been in that building.
21 Okay.  Have you ever been inside the trailer where
22 the superiors are?
23   A.   Yes.
24   Q.   Okay.  What -- what have you done inside
25 there?

Page 52

1    A.   That's where you would sign any
2 paperwork.  You would pick up -- you know, they
3 would -- there would be a temporary allotment of
4 ammo so that, you know, they don't have a bunch of
5 officers going in the ammo building.  There's ammo
6 there.  That's where you pick up your ammo.  And
7 once you qualify, they give you ammo to load up your
8 weapon.  There's cleaning supplies.  There's desks
9 for the officers, fax machine, that kind of stuff.
10   Q.   Okay.  So your paperwork is handled in
11 that -- in that --
12   A.   Correct.
13   Q.   -- in that building?  Anything else
14 that -- and what do you call that building?  Because
15 I just want to -- I don't want to just say building.
16 I would like to refer to it.
17   A.   The range office, I guess.
18   Q.   Okay.  Is there anything else that takes
19 place in that range office?
20   A.   I don't -- I don't know.  I don't work
21 there.
22   Q.   Did you --
23   A.   I'm not sure.
24   Q.   -- receive any training inside that
25 range office?

Rosa Hampton v.
Thomas Atzert, Jr. and the City of Atlanta

Thomas Atzert, Jr.
November 8, 2013

**Page 53**

1    A.   No.  There's a separate building for
2  that that's where the – the SWAT unit is assigned.
3  They've got other classrooms over there.
4    Q.   Okay.  So there's another building out
5  there, then; is that correct?
6    A.   I mean, there's a ton of buildings out
7  there.  There's probably – I don't know – eight or
8  nine buildings.
9    Q.   Okay.
10    A.   There's – there's a SWAT unit, and then
11  there's the range.  They're kind of separate, but
12  there's a couple of empty classrooms over where the
13  SWAT unit is, and that's where generally they will
14  hold classrooms if they've got a – if they need a
15  classroom for the range, that's where they'll hold
16  class because there's not an actual classroom in the
17  range office.  It's just a couple of desks for the
18  supervisors and the officers assigned.
19    Q.   Okay.  Okay.  So we have the range
20  office?
21    A.   Uh-huh.
22    Q.   We have the building where they store
23  ammunition?
24    A.   Correct.
25    Q.   And then you're saying there's how many

**Page 54**

1  other buildings?  There's six other buildings out
2  there?
3    A.   Maybe.  I – I – I can't tell you for
4  certain, but yeah, there's several buildings out
5  there that are assigned for the SWAT unit.
6    Q.   How many – how many of those buildings
7  are actually being used other than the – the – the
8  ammo building and the range office?
9    A.   I would assume they're – I mean, I –
10  they're all being used, I guess, because the SWAT
11  utilizes them.  There's a bathroom.  There's a – a
12  gym facility, and then there's several classrooms.
13    Q.   Have you ever been inside those
14  buildings?
15    A.   Yes.
16    Q.   Okay.  Let's talk about in two
17  thousand – 2009.  Would that have been the first
18  time that you've ever gone out to that area?
19    A.   No.  The first time I went out there was
20  2008.
21    Q.   Okay.  For your other training?
22    A.   Correct.
23    Q.   Okay.
24    A.   You – you do your initial firearms,
25  which is – it's – it's not listed under here

**Page 55**

1  because it – it technically falls under your basic
2  law enforcement training.  That was where the first
3  firearms was.
4    Q.   Okay.  Is that the only place where they
5  do the firearms training?
6    A.   Yes.
7    Q.   Okay.  Where – where is that at
8  generally?
9    A.   It's off Key Road, southwest Atlanta.  I
10  guess it's technically in DeKalb County.
11    Q.   Okay.  Now, I want to –
12    A.   I'm sorry.  Southeast Atlanta.
13    Q.   Okay.  And that's – in January of 2009
14  you had – you had firearms requalification
15  training, and it – and it looks like that that was
16  for six hours; correct?
17    A.   Correct.
18    Q.   And so you would have basically did what
19  for six hours to qualify or to – to be certified
20  for firearms and requalification?
21    A.   You do three rounds of – it's – it's
22  30 rounds each.  Each time you go out, you shoot 30
23  rounds, and there's different distances.  You shoot
24  different distances.  You – you start out further
25  away and you slowly move in, and you shoot 30 rounds

**Page 56**

1  at a time based on the instructions that the
2  officers that are assigned out there are giving to
3  you.  Like I said, there's multiple officers out
4  there, and then there's others that are waiting to
5  do the same thing.  You go through there.  You shoot
6  your course qualification.  You have to pass two out
7  of the three times in order to continue to carry
8  your weapon.
9    Q.   Okay.  Do you specifically remember what
10  you did in January 2009?  Are you basically –
11  strike that.  Strike that.
12         Did you do the same thing every time you
13  went out there to – to requalify every year?
14    A.   Essentially, I mean.  It's – it's –
15  the course may change a little bit.  I think it's
16  changed since – since 2008/2009.  It's a different
17  course of fire.  But, you know, you're still
18  shooting 30 rounds at certain distances, and – and
19  you have time limits and things like that.
20    Q.   Okay.  How about the use of deadly
21  force?  What – what – what happened, or what –
22  what was that all about?
23    A.   It's just a classroom –
24    Q.   In January 2009?
25    A.   It's – like you said, it's the two-hour

Rosa Hampton v.
Thomas Atzert, Jr. and the City of Atlanta

Thomas Atzert, Jr.
November 8, 2013

---

Page 57

1 classroom portion that you sit in there and the
2 instructors go over, you know, department policies
3 and then also the Georgia law.
4    Q.   Okay.  So is it a class session?
5    A.   Right.  It's in a classroom.  It's in
6 one of those buildings where the SWAT unit is.  It's
7 over there since that's where they actually have
8 tables and chairs for -- for an actual class
9 session.
10    Q.   Okay.  Do you know how long that was
11 for?
12    A.   It's anywhere from an hour to two hours.
13    Q.   Do you know who would have conducted
14 that or supervised that session in January 2009,
15 the --
16    A.   I don't --
17    Q.   -- use-of-deadly-force session?
18    A.   I don't remember.  It's, you know, the
19 same thing with them.  Supervisors move in and out
20 of different units, so, you know, whoever's there at
21 the time is generally.  They're -- they're certified
22 firearms instructors, and they're the ones that
23 are -- that are out there teaching the class.
24    Q.   Okay.  With regard to this training, is
25 this something that -- that was required of you as

---

Page 58

1 an officer, or was that something that you
2 requested?
3    A.   No.  It's -- it's required, I mean.  In
4 order to be a sworn officer and -- and be out there
5 on the street, you have to pass this -- you know,
6 this class in order to continue to carry your
7 firearm each year.
8    Q.   Okay.  Did you have to take a test?
9    A.   No.  It's just -- it's the -- the
10 qualification.  You actually passing and getting a
11 qualifying score out there on the range is -- is
12 your test.
13    Q.   Well, okay.  And I'm talking about --
14 and I'm sorry.  Maybe my question was a --
15    A.   Oh, for the deadly force?
16    Q.   Maybe my question was a little
17 misleading.  Yeah.  I -- I want to shift my
18 questions now towards the use of deadly force.
19    A.   Okay.
20    Q.   Okay.  Was that training ever outdoors?
21    A.   No.
22    Q.   Where was that training?
23    A.   In the classroom.
24    Q.   Was that -- was that the SWAT -- did
25 you --

---

Page 59

1    A.   Right, the SWAT team.
2    Q.   -- state something was a SWAT classroom
3 or something?
4    A.   Uh-huh.
5    Q.   Okay.  And who would have been the
6 trainer or instructor over that SWAT -- over that --
7    A.   I don't remember.
8    Q.   -- use-of-deadly-force training session?
9 Okay.  Did you have to take tests?
10    A.   No.
11    Q.   Were there any demonstrations?
12    A.   No.
13    Q.   Any hands-on practice or any hands-on
14 work?  Do you know what I'm saying?  Do I need to --
15 maybe I'll rephrase that.  Was there any -- any
16 hands-on, hand-to-hand practicing between another
17 officer in terms of -- of using deadly force?
18    A.   No, no, not like that, not -- not during
19 the classroom session, no.
20    Q.   Okay.  If you could just describe that
21 use-of-deadly-force session as best as you possibly
22 can.  What happened in that -- that training
23 session?
24    A.   Like I said, they go over the
25 department's policy.  They read it and make sure

---

Page 60

1 everybody knows it, and then they also go over, you
2 know, Georgia law, like I said.  It's not a long
3 class.  It's just -- it's basically a discussion,
4 you know, and -- and a refresher to make sure
5 everybody's -- you know, remembers what the policy
6 says.
7    Q.   Okay.  And you're not taking any test?
8    A.   No.
9    Q.   You're not asked any questions?
10    A.   They ask questions, you know, if anybody
11 can state the policy, that sort of thing, I mean.
12 If you have questions, you can ask questions.
13    Q.   Okay.  So basically it sounds like to
14 me -- and if I'm wrong, let me know.  Basically
15 you're in a classroom.  You have a -- an instructor
16 who is basically reading materials and information
17 to you about what the law is; correct?
18    A.   Correct.
19    Q.   And if there's any changes in the law;
20 correct?
21    A.   Correct.
22    Q.   Are you going or reviewing any of your
23 cases?
24    A.   Like individual cases?
25    Q.   Yes, sir.

---

Rosa Hampton v.
Thomas Atzert, Jr. and the City of Atlanta

Thomas Atzert, Jr.
November 8, 2013

---

Page 61

1    A.  No.
2    Q.  Okay.  And so it's my understanding
3  you're basically going over -- you've got an
4  instructor that's just reading you materials and
5  basically highlighting you on what the law is at
6  that point in time?
7    A.  Correct.
8    Q.  And reinforcing the information that
9  you've learned before; correct?
10    A.  Yes.
11    Q.  Okay.  And that -- that can be anywhere
12  from one hour to two hours; is that correct?
13    A.  Correct.
14    Q.  And that would have been all the
15  training that you would have received in 2009 with
16  regards to the use of deadly force; is that correct?
17    A.  Yes.
18    Q.  Okay.  Now, in 2010 it looks like you
19  took another deadly-force class; is that correct?
20    A.  Correct.
21    Q.  And another firearms requalification
22  test; is that correct?
23    A.  Correct.
24    Q.  Was anything different in 2010 than it
25  was in 2009?

---

Page 62

1    A.  Not that I remember.
2    Q.  Basically the same kind of training; is
3  that correct?
4    A.  Yes, sir.
5    Q.  Okay.  And would you remember the -- the
6  instructor or supervisor in that class in 2010?
7    A.  Not really.  No, I don't.
8    Q.  Okay.  Do any of the instructors stand
9  out to you, you know, as far as "Man, that guy did a
10  great job or he was really -- he was better than the
11  rest"?  Does anybody stand out to you at any point
12  in time during your training sessions with regards
13  to use of deadly force?
14    A.  No.
15    Q.  Okay.  And in 2010 you would have
16  received six -- six hours of training for
17  requalification of the firearm and then another two
18  hours of training for the use of deadly force;
19  correct?
20    A.  Yes.
21    Q.  Okay.  In 2011 it looks like you also
22  had the use-of-deadly-force training; is that
23  correct?
24    A.  Yes.
25    Q.  And you also had firearms

---

Page 63

1  requalification training; is that correct?
2    A.  Yes.
3    Q.  And it looks like that training took
4  place in September of 2011; is that correct?
5    A.  It did.
6    Q.  Okay.  Would you have any reason to
7  dispute the date there and the number of hours that
8  you received for that training?
9    A.  No.
10    Q.  And that training would have been
11  comparable or equivalent to the use-of-deadly-force
12  training that you had received in the previous
13  years; is that correct?
14    A.  Correct.
15    Q.  Okay.  And in 2012 it looks like you
16  received firearms requalification and deadly-force
17  training again.  That would have been August 28th,
18  2012; is that correct?
19    A.  Correct.
20    Q.  Okay.  And would that training in 2012
21  have been any different than the previous
22  use-of-deadly-force training that you had received
23  in 2011, 2010, and 2009?
24    A.  No.
25    Q.  Okay.  Now, was all this training at the

---

Page 64

1  same facility?
2    A.  Are you talking about --
3    Q.  If you can --
4    A.  -- all of this stuff?
5    Q.  Yes, sir, yes, sir.  We're talking about
6  now from 2009 or -- yeah, 2009 through 2012.
7    A.  No.  Most of it is at the training
8  academy, but there are some classes that I took at
9  the actual Georgia P.O.S.T. standards training
10  center.
11    Q.  Okay.
12    A.  Which is down in Forsyth, I believe.
13    Q.  Okay.
14    A.  So I've taken some classes down there,
15  as well.
16    Q.  And let me be a little more specific
17  because I may not have been.  The -- as far as the
18  use-of-deadly-force training, where was --
19    A.  All of that stuff is -- was done at
20  the -- the SWAT unit where the firearms
21  requalification course is.
22    Q.  And all of that training would have been
23  done at the same --
24    A.  Same --
25    Q.  -- facility?

---

Rosa Hampton v.
Thomas Atzert, Jr. and the City of Atlanta

Thomas Atzert, Jr.
November 8, 2013

---

**Page 65**

1    A.   Same facility, correct.
2    Q.   Okay.  Is there any -- you told -- I
3  think you told -- you stated earlier that there was
4  a patrol room and you had to sign in at that patrol
5  room; is that correct?
6    A.   I don't remember.
7    Q.   Didn't you call it -- I thought you
8  called it patrol room, the room where you've got to
9  get your ammunition and the room where you've got to
10  sign in and stuff.
11    A.   Talking about the range office?
12    Q.   I'm sorry.  You called -- you did call
13  it the range office.  Did you have to sign in there?
14    A.   You do sign in initially.  Generally
15  when you get out there, the first order of business
16  is in the classroom at the SWAT unit, and that is
17  where the paperwork is, is where you sign up, you --
18  you know, you sign your name and put your ID number,
19  and then that paperwork ends up in the -- the range
20  office, where I guess it gets filed.
21    Q.   Okay.  So every time you went out there
22  for training, you would have had to sign in; is that
23  correct?
24    A.   Correct.
25    Q.   Okay.  So there is a document somewhere

---

**Page 66**

1  that verifies that you attended these --
2    A.   Yes.
3    Q.   -- classes on the dates that are -- that
4  are reflected on this individual profile; correct?
5    A.   Correct.
6    Q.   Okay.  Do you know where those documents
7  are?
8    A.   I -- I do not.  The -- the range office,
9  I guess, I would assume, but I'm not a hundred
10  percent sure.
11    Q.   Okay.  Once you sign it, that's -- you
12  don't -- you don't get a copy of that, or do you get
13  a copy of that?
14    A.   No, uh-uh.
15    Q.   You don't.  Okay.
16    A.   Because it's -- it's -- it's one sheet
17  with everybody's names, and you sign next to your
18  name and put an ID number just verifying that you
19  were there.
20    Q.   So what happens to that document you
21  don't know after you sign?
22    A.   No.
23    Q.   Okay.  It's out of your control;
24  correct?
25    A.   Correct.

---

**Page 67**

1    Q.   All right.  Okay.
2         Were you ever informed by the Atlanta
3  Police Department or the City of Atlanta verbally as
4  to what the policy and procedure was as a -- within
5  their departments with regards to the use of deadly
6  force?
7    A.   Yes.
8    Q.   Okay.  When was that?
9    A.   The -- the first incident would have
10  been, you know, back in 2008 where you go to your --
11    Q.   Okay.
12    A.   -- firearms, the -- the very first
13  qualification that you would get, and then they go
14  over deadly force out there.  I believe at one point
15  they -- you know, they may have gone over use of
16  force when we were actually at the academy, but
17  again, I guess the -- the technical class would have
18  been at the range where they do your initial --
19    Q.   Okay.
20    A.   -- qualification.
21    Q.   Okay.  And did you ever receive anything
22  in writing, any documents?
23    A.   Yes.
24    Q.   Any paperwork with regards to -- to the
25  use -- the policy and procedure with regards to the

---

**Page 68**

1  use of deadly force?
2    A.   Yes.  Everybody's -- you know, all the
3  recruits are given an actual paper copy of -- of
4  the -- the standard operating procedures that you're
5  allowed to --
6    Q.   Okay.
7    A.   -- physically take home and read.
8    Q.   Okay.  And is that yours?  Are you
9  allowed to keep that?
10    A.   Yes, yes, you are.
11    Q.   Okay.  And did you, in fact, do that?
12    A.   I do have it somewhere, yes.
13    Q.   Okay.  You have it somewhere stored at
14  home?
15    A.   Right.  And then -- you get multiple --
16  I mean, you can get copies pretty much at any point,
17  I mean, yeah, so I have several copies, actually.
18    Q.   Okay.  Is it safe, then, for me to -- to
19  conclude, then, that all -- the only training you
20  ever received with regards to deadly force, then,
21  was at these -- at these training sessions?
22    A.   Correct.
23    Q.   Okay.  And what weapons -- and let's
24  just talk about 2008.  What weapons were you -- were
25  you provided as a law-enforcement officer?

---

Rosa Hampton v.
Thomas Atzert, Jr. and the City of Atlanta

Thomas Atzert, Jr.
November 8, 2013

---

Page 69

1   A.   It was a Smith & Wesson .40 caliber
2   handgun.
3   Q.   Okay.  And is that the same type of
4   handgun that you carry today?
5   A.   Yes.
6   Q.   Okay.  Is it the same handgun that
7   you're carrying today?
8   A.   No.
9   Q.   Okay.  How many have you had since 2008?
10  A.   Just two.
11  Q.   Okay.  What other weapons other than
12  the -- the .40 caliber, what other weapons do you --
13  do you carry?
14  A.   You're allowed to qualify with a second
15  weapon or an off-duty weapon.  The term is used
16  interchangeably.  It's -- but it's the same thing.
17  I've got a smaller version.  It's a compact version
18  of the weapon that we would carry on duty.  It's
19  still a Smith & Wesson.  It is a .40 caliber.  It
20  just holds less ammunition.  It's a smaller frame.
21  Q.   Okay.  When you're on duty, how many
22  weapons are you allowed to carry?
23  A.   You can carry up to two or -- well, you
24  can really carry three.  It's depending on -- you
25  could carry the one that you're assigned, and then

---

Page 70

1   you could also have a multiple of one or two
2   backups.
3   Q.   Okay.  And -- and we're -- I hope we're
4   on the same page.  You're talking about firearms?
5   A.   Correct.
6   Q.   Okay.  What other weapons other than
7   firearms are you carrying?
8   A.   Well, I don't wear -- as an
9   investigator, I don't wear the uniform anymore so --
10  Q.   Okay.
11  A.   But if you were in full uniform, you
12  would have your OC spray, the pepper spray, if you
13  will, and you would --
14  Q.   Okay.
15  A.   -- have the ASP baton.  There are
16  officers out there that have Tasers.  I do not have
17  one.
18  Q.   Okay.  In 2011 you were in full uniform;
19  correct?
20  A.   I was.
21  Q.   Okay.  And what weapons were you
22  carrying then?
23  A.   Just the -- the firearm, the Smith &
24  Wesson firearm; the ASP baton, the extendable baton;
25  and then the OC spray.

---

Page 71

1   Q.   Okay.  Were you ever trained with the
2   ASP baton?
3   A.   Yes.
4   Q.   Okay.  And that would have been through
5   the same training courses and sessions that you
6   took --
7   A.   Right.  There's --
8   Q.   -- under the -- with the --
9   A.   You get it initially in --
10  Q.   Hold on.  Let me just finish.
11  A.   Okay.
12  Q.   I didn't mean to cut you off.
13  A.   That's fine.
14  Q.   But would you have gotten the same ASP
15  baton training in the sessions that are noted --
16  that are noted on your individual profile?
17  A.   Yes.
18  Q.   Okay.  And which weapons -- which
19  weapons were you carrying in 2011 that you would
20  deem as deadly weapons?
21  A.   The ASP baton and the firearm.
22  Q.   Okay.  And just describe.  Why would
23  they be deemed or why would you deem them as deadly
24  weapons?
25  A.   The firearm, obviously, because it can

---

Page 72

1   inflict some serious bodily injury or death and
2   the -- the ASP baton because it's the same thing.
3   Depending on where -- where on somebody's body you
4   hit them, it could cause some serious damage because
5   it is a metal baton.  It's basically just a metal
6   stick.
7   Q.   Okay.  And you -- you stated that you
8   had the -- you had the pepper spray; right?
9   A.   Correct.
10  Q.   Okay.  What else is that -- what is that
11  called?  That's called something else.
12  A.   Oleoresin capsicum, I believe.
13  Q.   Okay.  All right.  That's pretty good.
14       When you were trained, what deadly
15  weapons -- what weapons were you trained or
16  instructed as weapons to be deadly?
17  A.   The --
18  Q.   Do you understand that question?
19  A.   I understand what you're saying.
20  Q.   Okay.  Okay.
21  A.   The firearm.
22  Q.   Okay.  Were you ever trained and
23  instructed that the baton was a deadly weapon?
24  A.   It is a deadly weapon, but as far as for
25  a police officer using it as a defensive weapon,

---

Rosa Hampton v.
Thomas Atzert, Jr. and the City of Atlanta

Thomas Atzert, Jr.
November 8, 2013

Page 73

1   it's not meant to be.  For the police officer it's
2   not meant to be used as an offensive weapon in order
3   to inflict serious bodily harm, you know, as far as,
4   you know, when you're instructed to use it, you're
5   instructed not to hit anybody in the head, you know,
6   causing, you know, brain injury or contusions like
7   that to somebody's head that could, in fact, lead to
8   a serious injury or death.  You're instructed to,
9   you know -- to hit somebody in -- in, you know, the
10  trunk, basically, as far as to inflict pain but not
11  serious bodily injury.
12      Q.   Okay.  So are you trained to do that, or
13  are you told to do that?
14      A.   You are trained.  They -- they do go
15  through a -- a physical training class to where, you
16  know, you and another officer would basically be
17  sparring and you would have the baton, but the --
18  your partner would have a large, heavy foam bag and
19  so that you could make strikes, not necessarily at a
20  hundred percent, but you could practice strikes and
21  understand where about the body they're supposed to
22  go.
23      Q.   Okay.  So you were trained as to how to
24  physically use that baton and where to use it on
25  the -- on the -- on the suspect's body; is that

Page 74

1   correct?
2       A.   Correct.
3       Q.   Okay.
4       A.   Correct.
5       Q.   And how about with the firearm?  Are you
6   trained in terms of where you are to try and use or
7   penetrate or -- or -- or strike the victim with the
8   firearm?  Do you -- do you understand my question?
9       A.   I do.  I mean, essentially, yes, I mean,
10  when -- when you are qualifying at the range, you're
11  shooting at a target that is a silhouette of a human
12  body, and the -- the area that you're trained to hit
13  is, you know, the center torso, and then also --
14      Q.   Okay.
15      A.   -- it goes up in -- into the head.
16      Q.   Okay.  And -- and you are trained to hit
17  the center torso?
18      A.   Correct.
19      Q.   Okay.  Obviously, that's -- that's
20  the -- the larger mass of the body, too?
21      A.   Correct.
22      Q.   It would probably be a better shot; is
23  that correct?
24      A.   Correct.
25      Q.   Okay.

Page 75

1       Based on the training that you had
2   received, what is your understanding from what
3   you've learned as to when you are authorized to use
4   deadly force?
5       A.   Well, I guess when your life or somebody
6   else's life is in jeopardy or there's the threat of
7   serious bodily harm or, you know, threatening you or
8   another officer or another citizen.
9       Q.   Okay.  And has that policy ever changed?
10      A.   Not to my knowledge, no.
11      Q.   Okay.  So ever since you started in
12  2008, the -- the policy and procedure with regards
13  to the use of deadly force has always been that you
14  are authorized to use it if -- if you believe that
15  you are -- your life is threatened or your life is
16  danger or in danger and if someone else is in
17  possession of a deadly weapon or something that
18  could cause deadly force upon your person or another
19  person, then; is that correct?
20      A.   Correct.
21      Q.   Okay.
22          Prior to this incident --
23      A.   Uh-huh.
24      Q.   -- prior to this incident have you ever
25  had to use deadly force on -- on the job?

Page 76

1       A.   No.
2       Q.   Okay.  Prior to this incident have you
3   ever had to use your firearm for whatever reason to
4   make a point known or to get control of a situation?
5       A.   The only time I've really used my
6   firearm is to clear a vacant house.  I mean, you --
7   when you clear the vacant house, you have your
8   firearm out.  I've been involved in, you know,
9   felony traffic stops where the firearm has been
10  pulled but it's never actually been fired.
11      Q.   Okay.  And discarding this incident --
12  we're not talking about this --
13      A.   Okay.
14      Q.   -- this incident at hand -- you have
15  never discharged your weapon on the line -- in the
16  line of duty?
17      A.   No.
18      Q.   Okay.  Discarding this case at hand,
19  have you ever seriously injured anyone with a baton?
20      A.   I have been involved in an incident.
21  There were several officers.  It was a -- a male
22  that was resisting arrest by two officers, and I
23  went to assist, and several officers used the ASP
24  baton on this gentleman in order to gain compliance.
25      Q.   Several officers used ASP batons?

Rosa Hampton v.
Thomas Atzert, Jr. and the City of Atlanta

Thomas Atzert, Jr.
November 8, 2013

**Page 77**

1    A.    Yeah.  He was six five, six four, six
2  five, probably 280, 290, trying to get to an AK-47
3  with a 75 round drum in his trunk.
4    Q.    Okay.
5          You may have answered this and I -- did
6  you say how many times you've had to actually use
7  your baton to get control of a situation, dis -- not
8  considering this incident here?
9    A.    The one that we just spoke of is -- is
10 the only one that comes to mind.  I --
11   Q.    Okay.
12   A.    Other than that, I can't really think of
13 any.
14   Q.    Okay.
15        Okay.  Let's go back to June 30th of
16 2011.
17   A.    Okay.
18   Q.    What was your work schedule on that day?
19   A.    2:30 to 10:30, 2:30 p.m., 10:30 in
20 the -- in the evening.
21   Q.    And were you carrying -- were you
22 carrying the same weapons on that day that you
23 testified earlier or stated earlier that you were
24 carrying, the .40 caliber, the baton, the pepper
25 spray?

**Page 78**

1    A.    Yes.
2    Q.    What were your duties that day?
3    A.    Like we discussed earlier, there was
4  plenty of people on the watch.  I was a -- I was
5  assigned as a traffic unit, so my main duties were
6  to -- to go out and write traffic citations.
7    Q.    Okay.  And is that, in fact, what you
8  did?
9    A.    It was.  It was -- there was a little --
10 it was a little busy at first, and so I assisted
11 another officer on an accident, I believe.
12   Q.    Okay.
13   A.    I don't remember if -- I don't think I
14 wrote the report.  I think he did.  But I went to
15 the -- I went to the scene initially, helped him do
16 that, and then probably around -- I don't know --
17 6:00 or so was when I actually started to look for
18 traffic infractions.
19   Q.    Okay.  And at some point in time, you
20 came into contact with Maurice Hampton; correct?
21   A.    Correct.
22   Q.    Okay.  And what happened when you came
23 into contact with Maurice Hampton?
24   A.    As far as what was the initial --
25   Q.    When you -- when you --

**Page 79**

1    A.    When I first saw him?
2    Q.    When you first saw him, what happened?
3          MR. MILLICAN: I'm going to object
4    to the extent we're about to go into --
5    just to sort of let you know, there's
6    maybe a couple more questions he's going
7    to be able to answer before I'm going to
8    instruct him to -- not to answer.
9          MR. RICHARDSON: And that's fine.
10   I understand that.  I just wanted to get
11   there.
12         MR. MILLICAN: I understand.
13         MR. RICHARDSON: And then -- and
14   then put on the record the other
15   questions that --
16         MR. MILLICAN: Sure.
17         MR. RICHARDSON: -- I was going to
18   ask, and then -- and then we'll note on
19   the record that you're not going to allow
20   him to answer those questions, and
21   then -- and then we'll move on.
22   Q.    (By Mr. Richardson)  At some point in
23 time, you pulled over Mr. Hampton; is that correct?
24   A.    Correct.
25   Q.    Okay.  And why did you pull him over?

**Page 80**

1    A.    I witnessed him run a stop sign.  Do you
2  want the intersection?
3    Q.    Please.
4    A.    It was -- it's Panther Trail, Southwest,
5  and Childress Drive, Southwest.  And he was actually
6  headed southbound on Childress.
7    Q.    Okay.  And what happened after that?
8          MR. MILLICAN: I'm going to object
9    at this point.
10         MR. RICHARDSON: Okay.
11         MR. MILLICAN: Go ahead and
12   instruct you not to answer any questions
13   and assert your Fifth Amendment right.
14         THE WITNESS: Okay.
15         MR. RICHARDSON: Okay.  And just
16   for the record, my follow-up questions
17   were going to be, and I'm assuming
18   counsel is advising him to -- to assert
19   his privilege as to the follow-up
20   questions.
21         I was going to ask Officer Atzert
22   what -- what happened after he stopped my
23   client, what happened at any point in
24   time when my client exited his vehicle,
25   whether or not he gave pursuit or chase

Rosa Hampton v.
Thomas Atzert, Jr. and the City of Atlanta

Thomas Atzert, Jr.
November 8, 2013

---

Page 81

1  of my client. I was going to ask him
2  what happened after he gave pursuit of my
3  client. I also want to know what
4  happened down in that field when Officer
5  Atzert followed my client down in the
6  field.
7      I want to ask a number of questions
8  about how my client ended up shot in the
9  back. I want to ask a number of
10 questions as to how the shooting took
11 place, why it took place.
12     And it's my understanding that --
13 that his attorney is not going to allow
14 him to answer any of those questions; is
15 that correct?
16     MR. MILLICAN: Yeah. But just for
17 purposes of the record, all those
18 questions that you just asked, I've
19 got -- Mr. Atzert has a response to it,
20 and if he could read that for purposes of
21 the record for --
22     THE WITNESS: Understood.
23     MR. MILLICAN: -- all of those
24 questions.
25     THE WITNESS: On the advice of my

---

Page 82

1  counsel, I assert my rights under the
2  Fifth Amendment and respectfully decline
3  to answer the questions.
4      MR. RICHARDSON: Okay.
5      MR. MILLICAN: And -- I'm sorry.
6  Just to clarify, that's for all of those
7  questions that you just asked.
8      MR. RICHARDSON: Okay. And I --
9  and -- and just for the record, I just
10 want to be clear that -- that if I were
11 to ask any other questions above the ones
12 that I haven't -- that I've already
13 mentioned that pertains to that shooting,
14 that pertains to the events that led up
15 to the shooting, you're advising your --
16 your client not to answer those questions
17 under the Fifth Amendment privilege --
18     MR. MILLICAN: (Nods head
19 affirmatively.)
20     MR. RICHARDSON: -- that he has to
21 remain silent? Okay. That's fine.
22     MR. MILLICAN: That's correct. And
23 if -- and if you want to -- I mean, if
24 you wanted to ask each individual
25 question, he could respond, or we could

---

Page 83

1  do it just sort of the blanket way we did
2  it. It's up to you.
3      MR. RICHARDSON: Okay.
4      MR. MILLICAN: But his response
5  would be that he's not going to answer
6  based on his Fifth Amendment rights.
7      MR. RICHARDSON: Okay.
8      Q.  (By Mr. Richardson) What happened --
9  and I'll -- and I'll just ask you a few. I don't
10 want to go through all of them but just a few. That
11 way the record is perfectly clear as to what
12 position you're taking in this case. All right?
13     A.  Okay.
14     Q.  Okay. What happened after you chased my
15 client from the -- from the point where you stopped
16 him after he committed the traffic violation? What
17 happened after that point in time?
18     A.  On the advice of my counsel, I assert my
19 rights under the Fifth Amendment and respectfully
20 decline to answer the question.
21     Q.  Okay. And did you, in fact, follow my
22 client into an area that was -- that was a field
23 that was behind the 291 Club?
24     A.  On the advice of my counsel, I assert my
25 rights under the Fifth Amendment and respectfully

---

Page 84

1  decline to answer the question.
2      Q.  Okay. I want to know -- I want to know
3  everything that happened down in that field between
4  you and Maurice Hampton that led to the shooting of
5  Maurice Hampton.
6      A.  On the advice of my counsel, I assert my
7  rights under the Fifth Amendment and respectfully
8  decline to answer the question.
9      Q.  Okay.
10     Let's discuss what happened after the
11 shooting, if we -- if we can. What did you do --
12 what did you do after the incident with Maurice
13 Hampton?
14     A.  On the advice of my counsel, I assert my
15 rights under the Fifth Amendment and respectfully
16 decline to answer the question.
17     Q.  Okay. Did you -- did you at any point
18 in time ever witness any other officers come to the
19 scene after the incident with Maurice Hampton?
20     A.  On the advice of my counsel, I assert my
21 rights under the Fifth Amendment and respectfully
22 decline to answer the question.
23     Q.  Okay. So you're not going to answer any
24 questions about what officers came to the scene?
25     MR. MILLICAN: That's correct.

---

Rosa Hampton v.
Thomas Atzert, Jr. and the City of Atlanta

Thomas Atzert, Jr.
November 8, 2013

Page 85

1    MR. RICHARDSON: Okay.
2    THE WITNESS: Correct.
3    Q.  (By Mr. Richardson)  Are you going to
4  answer any questions with regards to what any of the
5  other officers may have done when they arrived at
6  the scene after the shooting?
7    A.  Correct.
8    Q.  Correct?  Correct, you're not going to
9  answer any of those questions?
10    A.  On the advice of my counsel, I assert my
11  rights under the Fifth Amendment --
12    Q.  Okay.
13    A.  -- and respectfully decline to answer
14  the question.
15    Q.  Okay.  After you left -- at some point
16  in time, I assume that you left the area behind the
17  290 Club, the area where the shooting took place.
18  Did you go back to Zone 4?
19    A.  No.
20    Q.  Okay.  Where did --
21    A.  Not -- not initially.
22    Q.  Okay.  Can you tell me where you went
23  after the initial -- or after the incident with
24  Maurice Hampton?
25    A.  I was transported to Grady Hospital.

Page 86

1    Q.  Okay.  All right.  So you went from the
2  scene to Grady Hospital?
3    A.  That is correct.
4    Q.  Okay.  And how long were you at Grady
5  Hospital?
6    A.  Probably three to four hours, I believe.
7    Q.  Okay.  Can you tell me what time that
8  was?
9    A.  It was after 7:30 or so and probably up
10  until around midnight, but I'm not certain of the
11  exact time frame.
12    Q.  And I'm not trying to lock you down.
13    A.  I understand.
14    Q.  I'm more concerned with what you did
15  after that.  Did anyone come to the hospital or go
16  to the hospital with you?
17    A.  Yes.  An officer was assigned to --
18  to -- to follow me up there.
19    Q.  And who was that?
20    A.  His name is Officer Ryan Heald,
21  H-e-a-l-d.
22    Q.  How did you get to the hospital?
23    A.  Through the -- the Grady ambulance
24  actually transported me.
25    Q.  Okay.  Did the officer follow the

Page 87

1  ambulance to Grady?
2    A.  Yes, yeah.  He followed in his -- his
3  own patrol car.
4    Q.  Got you.  Okay.  And then you were at
5  Grady for three or four hours?
6    A.  Something like that.
7    Q.  We're not certain, but something like
8  that?
9    A.  Right.
10    Q.  Where did you go after you left Grady?
11    A.  The officer actually -- once I was
12  cleared at Grady, the officer transported me back to
13  Zone 4, where my personal vehicle was parked.
14    Q.  Okay.  And that would have been around
15  what time, best --
16    A.  It was -- it was --
17    Q.  -- that you can recall?
18    A.  -- around midnight.  It was around
19  midnight.  I think I remember getting home around
20  1:00, so it was -- like I said, I think it was
21  around midnight.
22    Q.  Okay.  And how did you get home?
23    A.  I actually drove my personal vehicle.
24    Q.  Okay.  Did you need any assistance doing
25  that?

Page 88

1    A.  No.
2    Q.  You were -- you were able to do that on
3  your own?
4    A.  I was.
5    Q.  Did anyone go home with you?
6    A.  No.
7    Q.  Okay.
8    Who did you provide statements to after
9  the -- after the incident with Maurice Hampton?
10    A.  Talking about that night?  No one.
11    Q.  Okay.  No one that night?
12    A.  No.
13    Q.  Okay.  Did you ever provide any
14  recording statements later on that you know of?
15    MR. MILLICAN: I'm going to object
16  and instruct him not to answer.
17    THE WITNESS: On the advice of my
18  counsel, I assert my rights under the
19  Fifth Amendment and respectfully decline
20  to answer the question.
21    MR. RICHARDSON: Okay.
22    Q.  (By Mr. Richardson)  Okay.  When did you
23  report back to work?
24    Let's strike that.
25    What day was that on, if you can

Rosa Hampton v.
Thomas Atzert, Jr. and the City of Atlanta

Thomas Atzert, Jr.
November 8, 2013

Page 89

1 remember?
2     A.   I believe it was a Thursday.
3     Q.   Okay.  Did you go to work on that
4 Friday?
5     A.   No, sir, I did not.
6     Q.   Okay.  Do you know the next time that
7 you returned to work?  Do you know that?
8     A.   I think the following -- the following
9 Wednesday.
10    Q.   And if you're not certain, that's okay.
11 That's no big deal.
12    A.   I think it was the following Wednesday,
13 but I'm not sure because technically I had off days
14 in between there, and so I was off.  And I had --
15 like I said, my elbow was injured, and so I actually
16 had to get the doctor's advice to say, "Yeah, you
17 can -- you can go back to work."
18    Q.   Okay.
19    A.   But I believe that was Wednesday.
20    Q.   And you believe you took a few days off?
21    A.   I did.
22    Q.   And you're not for sure how many, but
23 you probably took a couple of days?
24    A.   (Witness nods head affirmatively.)
25    Q.   Two to three days off of work?  Okay.

Page 90

1     A.   Correct.
2     Q.   Do you have -- do you have any -- any
3 personal insurance that covers a situation like
4 this, the incident that --
5     A.   I have --
6     Q.   The lawsuit that we're -- we're dealing
7 with now?
8     A.   I have no idea --
9     Q.   Okay.
10    A.   -- I mean.  I'm not really sure what
11 you're talking about.
12    Q.   Would you have liability coverage for
13 incidents as a police officer, if you know that or
14 not?
15    A.   I don't -- I don't think so.  I don't
16 know.
17    Q.   You don't remember taking out a special
18 policy for something like -- something like this?
19    A.   No.
20    Q.   Okay.  Do you know how much you are
21 covered as an officer with the City of Atlanta?  Do
22 you know that information?
23    A.   No, I do not.
24    Q.   Okay.  You've never talked about that
25 with anyone?

Page 91

1     A.   I haven't, no.
2     Q.   Okay.
3          MR. RICHARDSON:  Let me just check.
4     I don't think I have anything else.
5     Could you mark that as P-2, please?
6     (Plaintiffs' Exhibit 2 was marked
7     for identification.)
8     Q.   (By Mr. Richardson)  I've just shown you
9 what has been marked as Plaintiffs' Exhibit Number
10 2.  Do you recognize that document?
11    A.   I do.  It looks like sort of a brief
12 summary of my OPS file, the Office of Professional
13 Standards files.
14    Q.   Okay.  And more specifically, what is
15 it?
16    A.   It's -- it's my disciplinary history.
17    Q.   Okay.  So this document deals with
18 disciplinary matters?
19    A.   Yeah.  It's -- it's like, I guess,
20 the -- what the disposition of whatever complaint
21 was made.
22    Q.   Okay.  What does -- and that's -- that's
23 your name on there; correct?
24    A.   Thomas Atzert.  Yes, it is.
25    Q.   And I don't see -- is that -- is that

Page 92

1 a -- is that your badge number, 4917?
2     A.   No.  It's -- we have a bunch of
3 different numbers.  That's just what they call your
4 unique ID number.
5     Q.   Okay.  Okay.  And then -- so your badge
6 number is not on here; is that correct?
7     A.   Correct.
8     Q.   And then hire -- that appears to be hire
9 date; is that correct?
10    A.   It is correct.
11    Q.   That is -- that is your hire date,
12 November 13, 2007 --
13    A.   Uh-huh.
14    Q.   -- correct?
15    A.   Correct.
16    Q.   Okay.  And then it has -- that's all
17 under Part 1, correct, Personal Information?
18    A.   Correct.
19    Q.   Then we've got a Part 2 that says
20 Disciplinary History?
21    A.   Uh-huh.
22    Q.   And I see something with a case number
23 there.  Do you know what that case number means or
24 some kind of number and some letters?
25    A.   As far as I know, that's the case number

Rosa Hampton v.
Thomas Atzert, Jr. and the City of Atlanta

Thomas Atzert, Jr.
November 8, 2013

Page 93

1   that OPS assigns a particular investigation.
2       Q.   Okay.  Why would they assign that number
3   to an investigation?
4       A.   That would mean they're doing -- like
5   this one says citizen complaint.  It means they had
6   a complaint and so they're doing their investigation
7   on that particular complaint.
8       Q.   Got you.  Do you know what that's all
9   about?
10      A.   Are you talking about one specifically
11  or --
12      Q.   That one right there, the -- I'm sorry,
13  and let me -- I'm sorry.  Let me be more specific.
14  Citizen Complaint Number 09C0185UAF, do you know
15  what that's all about?
16      A.   I don't remember the actual incident,
17  no, sir.
18      Q.   Okay.  All right.  And what was the
19  disposition of that?
20      A.   It says not sustained.
21      Q.   Okay.  And it looks like it was not
22  sustained on -- on two different matters; is that
23  correct?
24      A.   Correct.
25      Q.   That would have been maltreatment or

Page 94

1   unnecessary force.  It was not sustained; correct?
2       A.   Correct.
3       Q.   And then it was not sustained for
4   courtesy.  What does that mean?  You weren't --
5   well, what are they alleging here?  Do you know?
6       A.   I guess that --
7       Q.   If you know?
8       A.   -- they're alleging that -- that I
9   wasn't courteous or respectful to them.
10      Q.   Okay.  All right.  And the next
11  complaint is Case Number 09C0361MISC.  Do you -- do
12  you know anything about that?  That was in August of
13  2010.
14      A.   Again, I -- I do not remember the
15  specifics regarding the complaint, no.
16      Q.   Okay.  But it looks like -- it looks
17  like there's another courtesy complaint; correct?
18      A.   Correct.
19      Q.   And nothing -- both complaints were not
20  sustained; correct?
21      A.   Correct.
22      Q.   Okay.  And then we've got a third.  Now,
23  that says internal.  What's that all about, the
24  11I0020VA?  Do you know what that's all about?
25      A.   I had an accident with my city vehicle.

Page 95

1       Q.   Okay.  And it looks like to me that
2   it -- oral admonishment.  What is that?  Just like
3   an oral reprimand or something?
4       A.   Correct.
5       Q.   Okay.  And it looks like that was, in
6   fact, sustained; correct?
7       A.   Yes, sir.
8       Q.   All right.
9            What is the next complaint?  It's 11,
10  looks like I0350PS?
11           MR. MILLICAN:  I'm going to object
12  to him answering questions about that
13  complaint and the next one, the
14  13I0121CRSX, as they appear to be ongoing
15  investigations.
16           MR. RICHARDSON:  Okay.  Okay.
17      Q.   (By Mr. Richardson)  Is that your
18  understanding, Officer?  These are ongoing
19  investigations?
20      A.   Yes, sir.
21      Q.   Okay.  All right.
22      A.   On the advice of my counsel, I assert my
23  rights under the Fifth Amendment and respectfully
24  decline to answer the question.
25      Q.   Okay.  And that's -- you're -- you're

Page 96

1   also asserting that right as to Case Number
2   13I0121CRSX?
3       A.   That is correct.
4       Q.   Okay.  You're not going to explain to me
5   what this internal investigation is about, either?
6       A.   No, sir.  On the advice of my counsel, I
7   assert my rights under the Fifth Amendment and
8   respectfully decline to answer the question.
9       Q.   Okay.  All right.
10           MR. RICHARDSON:  I think that's it.
11  Thank you.
12           (Deposition concluded at 12:27 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Rosa Hampton v.
Thomas Atzert, Jr. and the City of Atlanta

Thomas Atzert, Jr.
November 8, 2013

Page 97

1          CERTIFICATE OF COURT REPORTER

2

3    STATE OF GEORGIA:

4    COUNTY OF COBB:

5

6          I hereby certify that the foregoing

7    transcript was reported as stated in the

8    caption and the questions and answers

9    thereto were reduced to typewriting by

10   me; that the foregoing 96 pages represent

11   a true, correct, and complete transcript

12   of the evidence given on November 8,

13   2013, by the witness, Thomas Atzert, Jr.,

14   who was first duly sworn by me.

15          This, the 17th day of November

16   2013.

17

18

19

20

21

22

23          JOHN P. PAYNE
            Certified Court Reporter
24          Georgia Certificate A-1006

25

---

Page 98

1          DISCLOSURE OF NO CONTRACT

2

3          I, John P. Payne, Certified Court Reporter,
     do hereby disclose pursuant to Article 10.B. of the
4    Rules and Regulations of the Board of Court
     Reporting of the Judicial Council of Georgia that I
5    am a Georgia Certified Court Reporter; I was
     contacted by the party taking the deposition to
6    provide court reporting services for this
     deposition; I will not be taking this deposition
7    under any contract that is prohibited by O.C.G.A. §§
     15-14-37(a) and (b) or Article 7.C. of the Rules and
8    Regulations of the Board; and I am not disqualified
     for a relationship of interest under O.C.G.A. §
9    9-11-28(c).

10         There is no contract to provide reporting
     services between myself or any person with whom I
11   have a principal and agency relationship nor any
     attorney at law in this action, party to this
12   action, party having a financial interest in this
     action, or agent for an attorney at law in this
13   action, party to this action, or party having a
     financial interest in this action.  Any and all
14   financial arrangements beyond my usual and customary
     rates have been disclosed and offered to all
15   parties.

16         This, the 17th day of November 2013.

17

18

19

20

21

22

23          JOHN P. PAYNE
            Certified Court Reporter
24          Georgia Certificate A-1006

25

---

Page 99

1          DEPOSITION OF THOMAS ATZERT, JR.

2          I do hereby certify that I have read all
     questions propounded to me and all answers given by
3    me on November 8, 2013, taken before John P. Payne,
     and that:

4

5          1)  There are no changes noted.
           2)  The following changes are noted:

6          Pursuant to Rule 30(e) of the Federal Rules of
     Civil Procedure and/or the Official Code of Georgia
7    Annotated 9-11-30(e), both of which read in part:
     Any changes in form or substance which you desire to
8    make shall be entered upon the deposition...with a
     statement of the reasons given...for making them.
9    Accordingly, to assist you in effecting corrections,
     please use the form below:

10

11   Page No.        Line No.        should read:

12

13   Page No.        Line No.        should read:

14   Page No.        Line No.        should read:

15

16   Page No.        Line No.        should read:

17   Page No.        Line No.        should read:

18

19   Page No.        Line No.        should read:

20   Page No.        Line No.        should read:

21

22   Page No.        Line No.        should read:

23   Page No.        Line No.        should read:

24

25   Page No.        Line No.        should read:

---

Page 100

1          DEPOSITION OF THOMAS ATZERT, JR.

2

3    Page No.        Line No.        should read:

4    Page No.        Line No.        should read:

5

6    Page No.        Line No.        should read:

7    Page No.        Line No.        should read:

8

9    Page No.        Line No.        should read:

10   Page No.        Line No.        should read:

11

12   Page No.        Line No.        should read:

13   Page No.        Line No.        should read:

14

15   If supplemental or additional pages are necessary,
     please furnish same in typewriting annexed to this
16   deposition.

17

18          THOMAS ATZERT, JR.

19   Sworn to and subscribed before me,
     This the      day of          , 20    .
20

21   Notary Public
     My commission expires:
22

23   Please forward corrections to:

24          Payne Court Reporting, LLC
            4811 Galloways Farm Court
25          Acworth, Georgia 30101

---

Rosa Hampton v.
Thomas Atzert, Jr. and the City of Atlanta

Thomas Atzert, Jr.
November 8, 2013

**/**

**///** (2) 6:24,25

**A**

**abbreviated** (1) 46:1
**able** (8) 8:25;9:2,3;18:4;
22:14;23:5;79:7;88:2
**above** (3) 19:8;50:5;82:11
**academy** (11) 34:2,8,9,10;
35:7,8,8;36:4;45:5;64:8;67:16
**accepted** (1) 47:14
**accident** (9) 9:14;10:10,17,22;
78:11;94:25
**accurate** (4) 38:1,4,16,20;
41:8;42:10;45:14
**acting** (1) 18:17
**actively** (1) 41:22
**actual** (6) 34:14;53:16;57:8;
64:9;68:3;93:16
**actually** (27) 14:18;17:8;21:9;
27:8;28:13,16;29:16;35:6,7;
40:14;45:19;48:16;50:5,10;
54:7;57:7;58:10;67:16;68:17;
76:10;77:6;78:17;80:5;86:24;
87:11,23;89:15
**administrator** (1) 4:11
**admonishment** (1) 95:2
**advice** (11) 81:25;83:18,24;
84:6,14,20;85:10;88:17;
89:16;95:22;96:6
**advising** (2) 80:18;82:15
**affirmatively** (2) 82:19;89:24
**again** (4) 18:18;63:17;67:17;
94:14
**against** (4) 9:24,25,25;10:1
**aggravated** (1) 21:8
**ago** (2) 11:14,18
**agree** (3) 6:6,14,21
**ahead** (1) 80:11
**air** (1) 49:6
**AK-47** (1) 77:2
**alleging** (2) 94:5,8
**allocated** (1) 8:3
**allotment** (1) 52:3
**allow** (3) 6:4;79:19;81:13
**allowed** (7) 6:13;17:23;40:20;
68:5,9;69:14,22
**always** (1) 75:13
**ambulance** (2) 86:23;87:1
**Amendment** (15) 5:4,15;
80:13;82:2,17;83:6,19,25;
84:7,15,21;85:11;88:19;
95:23;96:7
**ammo** (6) 52:4,5,5,6,7;54:8
**ammunition** (9) 50:10,24,25;
51:8,11,16;53:23;65:9;69:20
**among** (3) 22:21;30:7,7
**answered** (1) 77:5
**anticipates** (1) 5:12
**anymore** (1) 70:9

**APD's** (1) 46:20
**apparent** (1) 5:23
**appear** (1) 95:14
**appears** (1) 92:8
**applicants** (1) 17:25
**applied** (2) 17:16;22:7
**approached** (1) 24:5
**appropriate** (1) 5:17
**April** (4) 11:20;13:25,25;14:4
**area** (11) 41:25;42:14;47:24;
49:5,8,16;54:18;74:12;83:22;
85:16,17
**areas** (3) 46:10;48:17,20
**around** (12) 12:2,20;26:22;
27:7,10;78:16;86:10;87:14,
18,18,19,21
**arrest** (1) 76:22
**arrived** (1) 85:5
**Article** (1) 4:2
**ASP** (8) 70:15,24;71:2,14,21;
72:2;76:23,25
**assaults** (1) 21:8
**assert** (13) 4:20;80:13,18;
82:1;83:18,24;84:6,14,20;
85:10;88:18;95:22;96:7
**asserting** (2) 5:14;96:1
**assign** (1) 93:2
**assigned** (15) 13:15;14:3;
21:7;23:5,22;26:8;27:5;
49:19;53:2,18;54:5;56:2;
69:25;78:5;86:17
**assigns** (1) 93:1
**assist** (1) 76:23
**assistance** (1) 87:24
**assisted** (1) 78:10
**assume** (14) 7:14;8:21;9:2;
12:16;15:25;21:23;22:8,17;
23:19;42:3,22;54:9;66:9;
85:16
**assumed** (1) 24:10
**assuming** (3) 47:10,12;80:17
**Atlanta** (13) 13:1;23:14;34:11;
41:9;42:7;45:2,4;46:20;55:9,
12;67:2,3;90:21
**attempt** (1) 7:11
**attended** (1) 66:1
**attention** (1) 28:25
**attire** (1) 23:13
**attorney** (5) 4:10;5:10;7:4;8:5;
81:13
**attorney's** (1) 42:25
**ATZERT** (12) 4:5,14;5:10;7:3;
8:10,13;24:13;39:12;80:21;
81:5,19;91:24
**August** (2) 63:17;94:12
**authorized** (2) 75:3,14
**available** (1) 6:10
**aware** (1) 42:23
**away** (2) 32:3;55:25

**B**

**bachelor's** (1) 38:22

**back** (13) 11:25;12:12;19:20;
33:5;44:5,7;67:10;77:15;
81:9;85:18;87:12;88:23;
89:17
**backdrop** (1) 49:1
**backups** (1) 70:2
**Bacon** (5) 9:19,20;10:19,20,21
**B-a-c-o-n** (1) 9:23
**bad** (1) 39:8
**badge** (2) 92:1,5
**bag** (1) 73:18
**based** (12) 5:3;13:18;16:7;
24:9,10;27:11;28:20;29:12;
38:10;56:1;75:1;83:6
**basic** (5) 40:1;44:13;45:1,6;
55:1
**basically** (21) 23:21;25:5;
26:8;33:22;43:18;47:24;
48:24;49:5;50:2;55:18;56:10;
60:3,13,14,16;61:3,5;62:2;
72:5;73:10,16
**bathroom** (1) 54:11
**baton** (15) 70:15,24,24;71:2,
15,21;72:2,5,23;73:17,24;
76:19,24;77:7,24
**batons** (1) 76:25
**beat** (3) 27:9;29:13,16
**became** (3) 17:12;22:4;23:10
**become** (2) 22:16;44:17
**becoming** (1) 24:15
**began** (1) 35:22
**beginning** (1) 38:6
**behind** (3) 49:17;83:23;85:16
**below** (1) 15:15
**best** (2) 59:21;87:15
**better** (2) 62:10;74:22
**big** (5) 47:23;50:1,3;51:10;
89:11
**bit** (2) 45:4;56:15
**blanket** (1) 83:1
**Board** (1) 4:3
**bodily** (4) 72:1;73:3,11;75:7
**body** (5) 72:3;73:21,25;74:12,
20
**Bogolin** (1) 31:1
**B-o-g-o-l-i-n** (1) 31:1
**boots** (1) 23:16
**both** (5) 14:23;23:21,22;46:9;
94:19
**brain** (1) 73:6
**brands** (1) 40:18
**break** (1) 8:2
**breaking** (1) 30:2
**brief** (2) 44:23;91:11
**broad** (1) 40:19
**brought** (2) 9:18,24
**Brown** (1) 10:17
**building** (20) 13:20;31:15;
34:18;49:17;50:9,11,12,17;
51:2,8,15,20;52:5,13,14,15;
53:1,4,22;54:8
**buildings** (11) 31:12;32:16;
49:15;53:6,8;54:1,1,4,6,14;

57:6
**bulk** (1) 44:10
**bullets** (3) 49:1,2,11
**bunch** (3) 48:12;52:4;92:2
**burglaries** (1) 21:8
**business** (3) 13:12;23:13;
65:15
**busy** (2) 28:13;78:10

**C**

**caliber** (4) 69:1,12,19;77:24
**call** (15) 22:23;26:15;27:1,18,
21,22,25;28:5,16;35:15;48:2;
52:14;65:7,12;92:3
**called** (5) 32:9;65:8,12;72:11,
11
**calls** (10) 23:7;26:10;27:2,2,
10,14;28:19;29:7,17,22
**came** (4) 27:18;78:20,22;
84:24
**can** (25) 7:13;9:12;28:14,15,
15,16;42:21;50:4,6;59:22;
60:11,12;61:11;64:3;68:16;
69:23,24;71:25;84:11;85:22;
86:7;87:17;88:25;89:17,17
**cancelled** (1) 11:12
**capsicum** (1) 72:12
**captain** (1) 14:19
**car** (7) 27:13;28:22,23;29:14,
15,16;87:3
**career** (1) 36:14
**carjackings** (1) 21:9
**Carrie** (2) 36:2,2
**Carroll** (1) 31:1
**carry** (12) 44:24,25;45:20;
56:7;58:6;69:4,13,18,22,23,
24,25
**carrying** (7) 69:7;70:7,22;
71:19;77:21,22,24
**cars** (1) 29:13
**Cascade** (1) 31:22
**case** (13) 9:10;11:7;21:21;
25:18,21,23;76:18;83:12;
92:22,23,25;94:11;96:1
**cases** (5) 17:11;21:7,11;
60:23,24
**cause** (2) 72:4;75:18
**caused** (2) 10:10,22
**causing** (1) 73:6
**center** (3) 64:10;74:13,17
**centered** (1) 27:10
**certain** (9) 5:12,15;27:9;
28:20;54:4;56:18;86:10;87:7;
89:10
**Certainly** (1) 39:8
**certification** (5) 39:6;40:3,6;
42:4;44:23
**certifications** (3) 39:25;40:25;
41:1
**certified** (6) 40:7,14;43:24;
44:17;55:19;57:21
**chain** (1) 15:6

**chairs (1)** 57:8
**change (2)** 31:4;56:15
**changed (4)** 12:17;41:12;
56:16;75:9
**changes (1)** 60:19
**chase (1)** 80:25
**chased (1)** 83:14
**check (1)** 91:3
**Childress (2)** 80:5,6
**chose (1)** 23:12
**CID (8)** 18:6;23:22;24:13;
31:8,13,13,23;32:8
**CIDU (1)** 14:3
**citations (3)** 26:13;29:20;78:6
**citizen (3)** 75:8;93:5,14
**City (12)** 9:8,25,25;10:1;13:1;
17:18;34:17;35:21;36:6;67:3;
90:21;94:25
**Civil (1)** 4:16
**civilians (1)** 49:8
**claimed (1)** 10:22
**clarify (1)** 82:6
**class (12)** 36:3;44:24;53:16;
57:4,8,23;58:6;60:3;61:19;
62:6;67:17;73:15
**classes (7)** 37:15;43:19,23;
45:2;64:8,14;66:3
**classification (1)** 39:5
**classroom (10)** 53:15,16;
56:23;57:1,5;58:23;59:2,19;
60:15;65:16
**classrooms (4)** 53:3,12,14;
54:12
**cleaning (1)** 52:8
**clear (5)** 7:10;76:6,7;82:10;
83:11
**cleared (1)** 87:12
**client (10)** 5:13;80:23,24;81:1,
3,5,8;82:16;83:15,22
**close (2)** 27:19;39:19
**Club (2)** 83:23;85:17
**commander (1)** 14:14
**committed (2)** 29:7;83:16
**communicate (1)** 50:6
**compact (1)** 69:17
**comparable (1)** 63:11
**complaint (10)** 91:20;93:5,6,7,
14;94:11,15,17;95:9,13
**complaints (1)** 94:19
**complete (1)** 8:8
**completed (1)** 43:20
**compliance (1)** 76:24
**concealed (1)** 44:24
**concern (3)** 41:3,25;42:14
**concerned (2)** 49:7;86:14
**concerted (1)** 12:15
**conclude (1)** 68:19
**concluded (1)** 96:12
**concrete (1)** 49:3
**conduct (1)** 28:17
**conducted (1)** 57:13
**confusing (1)** 7:8
**consider (1)** 18:25

**considered (1)** 24:3
**considering (1)** 77:8
**contact (2)** 78:20,23
**contained (1)** 49:5
**continue (3)** 45:20;56:7;58:6
**continues (1)** 39:24
**control (1)** 66:23;76:4;77:7
**contusions (1)** 73:6
**conversations (1)** 5:11
**coordinator (1)** 36:3
**copies (2)** 68:16,17
**copy (3)** 66:12,13;68:3
**Council (1)** 4:4
**counsel (13)** 4:20;6:1;80:18;
82:1;83:18,24;84:6,14,20;
85:10;88:18;95:22;96:6
**counted (1)** 33:9
**County (2)** 43:2;55:10
**couple (7)** 34:20;35:20;37:21;
53:12,17;79:6;89:23
**course (4)** 44:22;45:6;56:6,15,
17;64:21
**courses (3)** 38:6,8;71:5
**Court (5)** 4:3;6:22;8:8;11:10,
19
**courteous (1)** 94:9
**courtesy (2)** 94:4,17
**coverage (1)** 90:12
**covered (1)** 90:21
**covers (2)** 40:19;90:3
**credit (3)** 38:8,8;43:21
**crime (3)** 30:1;32:8
**crimes (3)** 27:2;29:7,23
**Criminal (1)** 31:14
**cross (1)** 4:17
**cross-examination (1)** 4:18
**cross-examine (1)** 5:21
**current (3)** 13:4,14;14:6
**currently (2)** 12:25;13:15
**cut (2)** 34:21;71:12

## D

**damage (1)** 72:4
**danger (2)** 75:16,16
**Data (2)** 37:10;38:11
**date (7)** 11:19;34:14;38:5;
41:1;63:7;92:9,11
**dates (3)** 14:25;24:22;66:3
**day (6)** 20:12;29:15;77:18,22;
78:2;88:25
**days (7)** 27:7,11;28:21;89:13,
20,23,25
**DD (1)** 36:8
**deadly (24)** 46:12,14;56:20;
58:15,18;59:17;61:16;62:13,
18;67:5,14;68:1,20;71:20,23;
72:14,16,23,24;75:4,13,17,18,
25
**deadly-force (2)** 61:19;63:16
**deal (1)** 89:11
**Dealing (2)** 29:23;90:6
**dealings (1)** —

**deals (1)** 91:17
**death (3)** 21:10;72:1;73:8
**December (1)** 35:24
**decide (1)** 28:1
**decline (10)** 82:2;83:20;84:1,
8,16,22;85:13;88:19;95:24;
96:8
**deem (3)** 18:1;71:20,23
**deemed (2)** 17:21;71:23
**defensive (1)** 72:25
**definite (1)** 20:19
**definitive (1)** 31:5
**degree (1)** 38:22
**DeKalb (1)** 55:10
**demonstrations (1)** 59:11
**demotions (2)** 16:18;36:13
**Department (4)** 42:7;43:4;
57:2;67:3
**departments (1)** 67:5
**Department's (2)** 46:21;59:25
**depending (4)** 21:3;27:6;
69:24;72:3
**deposition (7)** 4:13,14;6:5;
7:16,25;8:4;96:12
**describe (3)** 46:25;59:20;
71:22
**desks (2)** 52:8;53:17
**detailed (1)** 5:11
**detection (1)** 40:16
**determine (2)** 37:24,25
**devices (1)** 40:17
**different (19)** 16:10;17:9;
22:20;30:7;31:12;32:16;34:6;
40:22;47:20;48:10,17;55:23,
24;56:16;57:20;61:24;63:21;
92:3;93:22
**differentiation (1)** 16:6
**difficult (1)** 33:7
**dimensions (1)** 51:12
**directly (1)** 20:4
**dirt (1)** 48:25
**dis (1)** 77:7
**discarding (2)** 76:11,18
**discharge (1)** 48:16
**discharged (1)** 76:15
**disciplinary (3)** 91:16,18;92:20
**disclosure (1)** 4:1
**discovery (1)** 4:18
**discretion (1)** 6:21
**discuss (1)** 84:10
**discussed (3)** 5:14;7:24;78:3
**discusses (1)** 42:1
**discussion (1)** 60:3
**disposition (2)** 91:20;93:19
**dispute (1)** 63:7
**distance (1)** 47:6
**distances (3)** 55:23,24;56:18
**District (2)** 8:16;42:25
**divided (1)** 47:25
**doctor's (1)** 89:16
**document (8)** 37:11,14,23;
38:3;65:25;66:20;91:10,17
**documents (2)** 66:6;67:22

**done (7)** 9:15;15:3;51:14,24;
64:19,23;85:5
**double-wide (2)** 50:1,13
**down (13)** 7:23;20:19;39:24;
42:13;46:21;48:7;50:4;64:12,
14;81:4,5;84:3;86:12
**downrange (1)** 49:6
**drive (2)** 31:25;80:5
**drivers (1)** 29:1
**driving (1)** 26:22
**drove (1)** 87:23
**drum (1)** 77:3
**duly (1)** 4:6
**During (6)** 17:6;30:5;35:8;
36:14;59:18;62:12
**duties (9)** 13:14;14:21;26:7,
11;27:14;28:18,20;78:2,5
**duty (5)** 69:18,21;76:16

## E

**earlier (7)** 11:19;25:16;39:20;
65:3;77:23,23;78:3
**early (2)** 13:12;25:12
**East (3)** 34:18;35:21;36:6
**effort (1)** 12:15
**eight (2)** 46:9;53:7
**either (3)** 6:1;49:3;96:5
**elbow (1)** 89:15
**eligibility (3)** 18:3;22:13;23:3
**else (8)** 10:8;51:14;52:13,18;
72:10,11;75:16;91:4
**else's (1)** 75:6
**e-mail (1)** 11:11
**emphasis (1)** 29:6
**employed (2)** 13:2;41:22
**employment (2)** 41:4,4
**empty (1)** 53:12
**encourage (1)** 24:6
**encouraged (2)** 24:8,23
**ended (1)** 81:8
**ends (1)** 65:19
**enforcement (6)** 13:16;40:2;
41:22;44:13;45:1;55:2
**English (1)** 7:19
**enough (4)** 27:12;28:21;
29:15;48:12
**entire (2)** 30:14;32:20
**equivalent (1)** 63:11
**errant (1)** 49:2
**Essentially (2)** 56:14;74:9
**estate (1)** 4:11
**evening (5)** 20:12,13,14;26:9;
77:20
**events (1)** 82:14
**everybody (1)** 60:1
**everybody's (4)** 27:8;60:5;
66:17;68:2
**evidentiary (1)** 4:24
**exact (1)** 86:11
**exactly (1)** 32:13
**exam (3)** 24:6,9,9
**EXAMINATION (2)** 7:1;23:1

Rosa Hampton v.
Thomas Atzert, Jr. and the City of Atlanta

Thomas Atzert, Jr.
November 8, 2013

examined (1) 4:6
except (2) 4:21;5:1
Exhibit (6) 37:4,5,6,9;91:6,9
exist (1) 5:24
exited (1) 80:24
explain (3) 7:5;9:12;96:4
extendable (1) 70:24
extended (1) 45:2
extent (3) 5:2;45:5;79:4

**F**

facility (5) 51:10;54:12;64:1,
25;65:1
fact (6) 38:13;68:11;73:7;
78:7;83:21;95:6
falls (1) 55:1
fancy (1) 23:18
far (14) 6:22;9:13;11:19;
31:23;42:21;43:12;47:1;62:9;
64:17;72:24;73:3,10;78:24;
92:25
fashion (1) 48:14
fax (1) 52:9
Federal (2) 4:15;6:3
felony (1) 76:9
female (1) 36:9
few (7) 7:5;33:13;36:25;38:5;
83:9,10;89:20
field (8) 34:4;48:23,24;50:4;
81:4,6;83:22;84:3
field-trained (1) 34:4
Fifth (15) 5:3,15;80:13;82:2,
17;83:6,19,25;84:7,15,21;
85:11;88:19;95:23;96:7
file (1) 91:12
filed (1) 65:20
files (1) 91:13
filled (1) 29:13
Find (1) 21:20
fine (13) 4:25;6:8,11,18,19;
26:4;31:6;33:12;34:23;43:11;
71:13;79:9;82:21
finish (2) 34:8;71:10
finished (2) 34:2,8
fire (2) 48:16;56:17
firearm (15) 44:25;45:21;58:7;
62:17;70:23,24;71:21,25;
72:21;74:5,8;76:3,6,8,9
firearms (18) 45:16,18,22;
46:4,17;54:24;55:3,5,14,20;
57:22;61:21;62:25;63:16;
64:20;67:12;70:4,7
fired (2) 47:13;76:10
first (12) 4:6;18:22;32:6;
54:17,19;55:2;65:15;67:9,12;
78:10;79:1,2
five (6) 15:16;20:14,21,22;
77:1,2
five- (1) 31:25
flat (1) 47:24
fled (2) 10:8,9
fleeing (1) 11:4

flying (1) 49:6
foam (1) 73:18
focus (3) 28:25;29:12
follow (3) 83:21;86:18,25
followed (2) 81:5;87:2
following (3) 89:8,8,12
follows (1) 4:7
follow-up (1) 17:10;21:7;
80:16,19
force (19) 46:12,14;56:21;
58:15,18;59:17;61:16;62:13,
18;67:6,14,16;68:1,20;75:4,
13,18,25;94:1
form (2) 4:21;40:24
Forsyth (1) 64:12
found (3) 42:9,17;43:12
four (3) 71:1;86:6;87:5
frame (2) 69:20;86:11
frames (1) 33:4
Friday (1) 89:4
full (3) 8:9;70:11,18
Fulton (1) 43:2
further (2) 33:5;55:24
future (1) 5:23

**G**

gain (1) 76:24
gambling (1) 15:2
gave (3) 44:23;80:25;81:2
general (1) 48:10
generally (4) 53:13;55:8;
57:21;65:14
gentleman (1) 7:22;76:24
geographic (1) 27:9
geographically (1) 21:11
Georgia (7) 4:4;8:17;9:8;
37:17;57:3;60:2;64:9
gets (1) 65:20
girls (1) 14:24
given (3) 40:11;43:21;68:3
giving (2) 8:15;56:2
goal (1) 29:21
goes (3) 40:23,24;74:15
good (6) 38:24;39:3,5,9,10;
72:13
graduate (1) 9:6
graduated (1) 40:4
Grady (8) 85:25;86:2,4,23;
87:1,5,10,12
grass (1) 47:4
grassy (1) 47:23
great (2) 7:4;62:10
group (3) 15:7;16:16,20
guess (18) 5:21;14:29:25;
39:5;40:5;43:5;52:17;54:10;
55:10;65:20;66:9;67:17;75:5;
91:19;94:6
gun (2) 47:13;49:12
guy (3) 50:8,8;62:9
guy's (1) 16:7
gym (1) 54:12

**H**

Hall (3) 34:18;35:21;36:6
Hampton (14) 4:10,12;25:21,
23,24;78:20,23;79:23;84:4,5,
13,19;85:24;88:9
hand (2) 76:14,18
handed (1) 17:17
handgun (3) 69:2,4,6
handle (7) 21:10;27:11,19;
28:19;29:17,21;49:12
handled (1) 52:10
handling (1) 28:16
hands-on (3) 59:13,13,16
hand-to-hand (1) 59:16
happened (18) 11:6,13,17;
21:11;56:21;59:22;78:22;
79:2;80:7,22,23;81:2,4;83:8,
14,17;84:3,10
happens (1) 66:20
harm (2) 73:3;75:7
Harris (15) 18:13,14,20,21;
19:20;20:5,15,23;20:24:1,1;
25:5;31:6;32:5,6,15
H-a-r-r-i-s (1) 18:22
Harris's (1) 24:15
head (6) 18:15;73:5,7;74:15;
82:18;89:24
headed (1) 80:6
headquarters (1) 13:20
Heald (1) 86:20
H-e-a-l-d (1) 86:21
heard (1) 11:19
hearing (1) 4:24
heavy (1) 73:18
height (1) 12:16
help (2) 27:13;47:10
helped (1) 78:15
Hey (3) 16:7;24:12;50:7
high (3) 9:6,7;12:21
higher (1) 23:6
highlighting (1) 61:5
hire (4) 34:14;92:8,8,11
hired (1) 34:16
history (6) 41:4;43:16,17,23;
91:16;92:20
hit (6) 10:9;72:4;73:5,9;74:12,
16
Hm (1) 20:11
Hold (5) 11:17;39:6;53:14,15;
71:10
holding (1) 51:15
holds (1) 69:20
home (3) 30:2;68:7,14;87:19,
22;88:5
homicide (1) 21:15
honest (1) 11:8
honestly (3) 25:13;33:11;39:4
hope (1) 70:3
Hospital (6) 85:25;86:2,5,15,
16,22
hour (2) 57:12;61:12

hours (15) 13:7,8,12;46:9,13,
16;55:16,19;57:12;61:12;
62:16,18;63:7;86:6;87:5
house (3) 51:11;76:6,7
houses (4) 15:2;50:10,18,19
human (1) 74:11
hundred (2) 66:9;73:20

**I**

I0350PS (1) 95:10
ID (3) 65:18;66:18;92:4
idea (8) 11:12;24:14,16,16;
39:4;48:10;51:17;90:8
identification (2) 37:7;91:7
identified (1) 37:9
illegal (1) 15:2
imagine (1) 12:14
incident (5) 25:24;67:9;
75:22,24;76:2,11,14,20;77:8;
84:12,19;85:23;88:9;90:4;
93:16
incidents (1) 90:13
indicated (1) 30:4
indicates (1) 43:11
individual (5) 38:12;60:24;
66:4;71:16;82:24
Industrial (1) 34:11
Infant (1) 8:25
inflict (3) 72:1;73:3,10
information (9) 9:13;38:11,16;
41:23;45:14;60:16;61:8;
90:22;92:17
informed (1) 67:2
infractions (6) 26:12;27:15;
28:15,23;29:19;78:18
initial (5) 24:14;54:24;67:18;
78:24;85:23
initially (5) 9:15;65:14;71:9;
78:15;85:21
injured (2) 76:19;89:15
injury (4) 72:1;73:6,8,11
inside (5) 51:15,21,24;52:24;
54:13
instruct (3) 79:8;80:12;88:16
instructed (5) 72:16,23;73:4,5,
8
instructions (1) 56:1
instructor (7) 36:1;40:25;41:1;
59:6;60:15;61:4;62:6
instructors (3) 57:2,22;62:8
insurance (1) 90:3
intended (1) 7:8
interchangeably (1) 69:16
internal (2) 94:23;96:5
Internet (1) 14:24,25
intersection (1) 8:22
interview (4) 17:21,23,24;23:1
into (11) 5:3;16:16,20;30:19;
35:6;49:6;74:15;78:20,23;
79:4;83:22
investigate (2) 14:25;21:18
investigation (6) 42:22;43:13;

Rosa Hampton v.
Thomas Atzert, Jr. and the City of Atlanta

Thomas Atzert, Jr.
November 8, 2013

93:1,3,6;96:5
**investigations (9)** 14:4,22;
17:11;31:14;42:14,24;43:4;
95:15,19
**investigator (30)** 13:6,13;16:8;
17:3,8,10,13;18:5,8;19:1,5,7,
16,19,23;20:3;21:5;22:1,2,4,
17,24;23:2,8,10;24:3,15;
36:16;41:16;70:9
**investigators (7)** 15:16,17;
16:1,6,11;20:9;32:9
**involved (3)** 19:13;76:8,20
**involving (2)** 9:14,15
**item (2)** 41:3;42:13

**J**

**January (13)** 14:4;17:4,8;22:5,
6,7;41:10,18;46:3;55:13;
56:10,24;57:14
**jeopardy (1)** 75:6
**job (2)** 62:10;75:25
**Johnson (1)** 36:8
**Jones (2)** 36:2,3
**Joshua (1)** 5:9
**JR (4)** 4:5,10;8:10;39:13
**Judicial (1)** 4:4
**June (1)** 77:15
**jurors (1)** 9:3

**K**

**keep (2)** 51:8;68:9
**Key (2)** 46:21;55:9
**kind (7)** 13:8;28:7;50:9;52:9;
53:11;62:2;92:24
**King (3)** 20:16;23:20;31:16
**knew (1)** 32:5
**knowledge (1)** 75:10
**known (1)** 76:4
**knows (1)** 60:1
**Kreher (1)** 14:15
**K-r-e-h-e-r (1)** 14:18

**L**

**lanes (3)** 47:6,24;48:2
**large (3)** 15:19;48:25;73:18
**larger (1)** 74:20
**laser (1)** 40:21
**last (2)** 11:18;33:22
**later (1)** 88:14
**latter (1)** 25:11
**law (11)** 40:1;41:22;44:13,25;
45:1;55:2;57:3;60:2,17,19;
61:5
**law-enforcement (1)** 68:25
**lawsuit (5)** 9:10,14,18,24;90:6
**lead (3)** 18:15;21:9;73:7
**learned (2)** 61:9;75:3
**learning (1)** 49:12
**least (1)** 11:15
**leave (1)** 6:21

**led (2)** 82:14;84:4
**left (4)** 7:23;85:15,16;87:10
**less (1)** 69:20
**letters (1)** 92:24
**level (1)** 16:13
**liability (1)** 90:12
**lidar (4)** 40:13,15,21;44:22
**Lieutenant (6)** 14:8,14;15:10,
14,21;31:1
**lieutenants (1)** 33:10
**life (4)** 75:5,6,15,15
**light (1)** 28:4
**lighter (3)** 12:11,13;39:21
**limits (1)** 56:19
**line (2)** 76:15,16
**lined (1)** 48:20
**liquor (1)** 15:2
**list (7)** 18:3,3;22:13;23:3;
31:5;40:19;44:8
**listed (3)** 37:16;43:23;54:25
**little (7)** 39:21;40:6;56:15;
58:16;64:16;78:9,10
**load (1)** 52:7
**located (3)** 34:10;47:5
**lock (3)** 20:17;48:6;86:12
**long (7)** 11:14;13:23;15:3;
47:23;57:10;60:2;86:4
**longer (1)** 5:24;16:8;47:8
**look (8)** 12:11;26:12;27:15;
28:23;37:23,25;46:7;78:17
**looks (15)** 44:9;46:3;50:4;
55:15;61:18;62:21;63:3,15;
91:11;93:21;94:16,16;95:1,5,
10
**lot (3)** 12:11;30:22;33:10
**Luther (1)** 31:16

**M**

**machine (1)** 52:9
**main (6)** 28:18;29:11,21;
50:11,12;78:5
**mainly (2)** 14:22;26:11
**major (1)** 21:15
**makes (1)** 6:16
**male (3)** 36:9,10;76:21
**maltreatment (1)** 93:25
**man (2)** 20:13;62:9
**manpower (3)** 27:12;28:20;
29:12
**many (8)** 20:9;53:25;54:6,6;
69:9,21;77:6;89:22
**March (1)** 11:20
**mark (2)** 37:3;91:5
**marked (3)** 37:6;91:6,9
**Martin (1)** 31:16
**mass (1)** 74:20
**materials (2)** 60:16;61:4
**matters (2)** 91:18;93:22
**Maurice (12)** 4:12;25:21,23,
24;78:20,23;84:4,5,12,19;
85:24;88:9
**Max (1)** 4:9

**maximum (1)** 47:6
**may (8)** 5:24;27:7;34:3;56:15;
64:17;67:15;77:5;85:5
**maybe (8)** 33:23;43:3;49:13;
54:3;58:14,16;59:15;79:6
**McIntosh (1)** 9:7
**mean (33)** 21:3;27:4,22;
30:21;21:31:2,3,25;33:11;
34:21;35:4;38:17;39:2,5,9,25;
47:24;49:25;53:6;54:9;56:14;
58:3;60:11;68:16,17;71:12;
74:9,9;76:6;82:23;90:10;
93:4;94:4
**means (4)** 39:6;45:22;92:23;
93:5
**meant (2)** 73:1,2
**meet (1)** 32:6
**mentioned (1)** 82:13
**met (1)** 32:10
**metal (2)** 72:5,5
**midnight (4)** 86:10;87:18,19,
21
**might (1)** 50:7
**miles (1)** 32:3
**MILLICAN (21)** 5:1,6,9;6:3,9,
12,16;79:3,12,16;80:8,11;
81:16,23;82:5,18,22;83:4;
84:25;88:15;95:11
**mind (1)** 77:10
**minimum (1)** 45:3
**minutes (1)** 37:21
**misleading (2)** 7:9;58:17
**misunderstood (1)** 28:9
**MLK (2)** 31:17,24
**models (1)** 40:19
**more (13)** 16:8;19:13;28:24,
25;29:6;30:22;33:5;45:4;
64:16;79:6;86:14;91:14;
93:13
**morning (2)** 12:5;13:9
**most (2)** 38:15;64:7
**mother (1)** 8:18
**move (5)** 21:4;30:22;55:25;
57:19;79:21
**moved (5)** 14:12;16:16,20;
17:9;34:1
**moving (1)** 14:1
**much (7)** 9:13;12:1,13,17;
17:21;68:16;90:20
**multiple (6)** 30:21;31:3;40:18;
56:3;68:15;70:1
**murder (1)** 21:13

**N**

**name (15)** 4:9;8:7,9,11;9:18;
14:8,16;18:18;22:36;7:39:12;
65:18;66:18;86:20;91:23
**named (1)** 9:18
**names (4)** 8:15;9:16;33:3;
66:17
**narcotics (1)** 35:21
**near (1)** 47:4

**necessarily (1)** 73:19
**need (8)** 7:19,19;8:2,4;27:14;
53:14;59:14;87:24
**next (10)** 41:3,25;42:13;44:3;
46:12;66:17;89:6;94:10;95:9,
13
**nice (1)** 23:15
**night (2)** 88:10,11
**nine (1)** 53:8
**nobody (1)** 28:10
**Nods (2)** 82:18;89:24
**none (2)** 42:9,16
**normal (3)** 13:12;27:14;28:22
**normally (1)** 26:10
**Northern (1)** 8:16
**notch (1)** 19:8
**note (1)** 79:18
**noted (3)** 5:19;71:15,16
**Nothing's (1)** 16:7
**November (3)** 34:15;41:10;
92:12
**number (26)** 20:19;37:5,10;
40:3,3,9,11,14;48:9;63:7;
65:18;66:18;81:7;9:9;92:1,
4,6,22,23,24,25;93:2,14;
94:11;96:1
**numbers (1)** 92:3

**O**

**object (5)** 5:6;79:3;80:8;
88:15;95:11
**objection (1)** 5:2
**objections (1)** 4:20
**observer (1)** 50:4
**obtained (1)** 44:16
**obviously (6)** 32:5;36:18;
39:15;49:7;71:25;74:19
**OC (2)** 70:12,25
**occasionally (1)** 32:10
**October (1)** 33:24
**off (11)** 11:2;27:6;30:24;
34:22;49:6;55:9;71:12;89:13,
14,20,25
**off-duty (1)** 69:15
**offense (1)** 30:1
**offensive (1)** 73:2
**office (16)** 17:9;28:4,6,11;
42:25;52:17,19,25;53:17,20;
54:8;65:11,13,20;66:8;91:12
**Officer (54)** 4:14;5:22;7:3;
17:6,7;18:15,15,15;19:8;
22:18,23;23:6;24:12;26:6,11,
15,19,21;27:1,21;30:5,9,11;
34:6;35:11;36:2,14;37:17;
38:12;39:24;40:5,8;41:9,9;
44:17;58:1,4;59:17;68:25;
72:25;73:1,16;75:8;78:11;
80:21;81:4;86:17,20,25;
87:11,12;90:13,21;95:18
**officers (27)** 22:21;27:5,8,23,
24;28:14,24;30:8,22;48:13;
49:11,19;50:5,7;52:5,9;53:18;

Rosa Hampton v.
Thomas Atzert, Jr. and the City of Atlanta

Thomas Atzert, Jr.
November 8, 2013

56:2,3;70:16;76:21,22,23,25;
84:18,24;85:5
**often** (1) 30:22
**old** (4) 8:13,22;34:17;38:18
Oleoresin (1) 72:12
Oliver (1) 31:2
**once** (9) 5:3;17:23;18:3;40:4,
14;50:5;52:7;66:11;87:11
**one** (36) 5:6;11:10;12:20;
15:17;16:13;19:4;24:23;
26:21;27:1;29:15;32:11;33:8,
10;35:13;36:19;39:17,20;
40:16,21;47:22;49:23;57:6;
61:12;66:16;67:14;69:25;
70:1,17;77:9,10;88:10,11;
93:5,10,12;95:13
**one-hour** (1) 38:8
**ones** (3) 40:19;57:22;82:11
**ongoing** (2) 95:14,18
**online** (1) 38:5
**only** (12) 7:14;16:13;30:9;
33:22;34:20;35:20;36:21;
38:7;55:4;68:19;76:5;77:10
**open** (2) 48:23,24
**operate** (3) 40:15,20;51:5
**operating** (1) 68:4
**operator** (2) 40:13;44:22
**opportunity** (1) 38:10
**OPS** (2) 91:12;93:1
**option** (1) 23:11
**oral** (5) 17:20;22:25;23:1;
95:2,3
**order** (8) 45:20;48:13;56:7;
58:4,6;65:15;73:2;76:24
**others** (2) 8:25;56:4
**ourselves** (1) 27:25
**out** (39) 13:18,19;19:15;
21:20;22:12;26:12;30:13,17;
32:9,10;33:1;49:20;51:5;53:4,
6;54:1,4,18,19;59:2;64:7;
3,6,13;57:19,23;58:4,11;62:9,
11;65:15,21;66:23;67:14;
70:16;76:8;78:6;90:17
**outdoor** (1) 47:3
**outdoors** (1) 58:20
**over** (20) 7:6;11:17;12:7;
17:17;37:23;46:7;49:15;53:3,
12;57:2,7;59:6,6,24;60:1;
61:3;67:14,15;79:23,25
**own** (4) 24:9;28:17;87:3;88:3

**P**

**P-2** (1) 91:5
**page** (2) 44:3;70:4
**pain** (1) 73:10
**pair** (1) 23:15
**Panther** (1) 80:4
**pants** (1) 23:15
**paper** (1) 68:3
**paperwork** (5) 52:2,10;65:17,
19;67:24
**parked** (1) 87:13

**part** (5) 25:12,12,16;92:17,19
**particular** (3) 21:21;93:1,7
**partner** (1) 73:18
**party** (3) 9:9;10:15,16
**pass** (3) 17:22;56:6;58:5
**pass/fail** (1) 17:22
**passed** (1) 18:2
**passing** (2) 45:20;58:10
**patrol** (15) 17:7;19:8;22:23;
23:6;26:9,19,21;27:23,24;
30:9,10;65:4,4,8;87:3
**patrolling** (1) 26:22
**pay** (1) 19:13
**paywise** (1) 23:8
**Peace** (2) 37:17;41:9
**Peachtree** (2) 9:8;13:22
**penetrate** (1) 74:7
**people** (7) 21:3,4;27:12;
28:17,22;29:15;78:4
**pepper** (3) 70:12;72:8;77:24
**percent** (2) 66:10;73:20
**perfectly** (1) 83:11
**perhaps** (3) 11:20;42:5;47:7
**person** (4) 9:15;11:1;75:18,19
**personal** (4) 87:13,23;90:3;
92:17
**pertains** (3) 43:8;82:13,14
**peruses** (1) 38:3
**physical** (1) 73:15
**physically** (5) 35:18;47:1,25;
68:7;73:24
**pick** (2) 52:2,6
**pictures** (2) 12:7,9
**place** (7) 41:18;52:19;55:4;
63:4;81:11,11;85:17
**placed** (1) 50:2
**Plaintiffs'** (6) 37:4,5,6,9;91:6,9
**plaque** (1) 40:7
**play** (1) 12:21
**please** (4) 9:12;37:5;80:3;
91:5
**plenty** (1) 78:4
**pm** (2) 77:19;96:12
**point** (29) 4:19;5:22;20:2;
24:6;29:21;33:8;34:3,12;
35:23;36:13;42:10;47:13,14,
17,18;48:15;61:6;62:11;
67:14;68:16;76:4;78:19;
79:22;80:9,23;83:15,17;
84:17;85:15
**police** (17) 22:18,21;23:14;
30:5,8;36:14;40:7;41:9;42:7;
43:4;44:17;45:5;46:21;67:3;
72:25;73:1;90:13
**policies** (1) 57:2
**policy** (8) 59:25;60:5,11;67:4,
25;75:9,12;90:18
**pool** (1) 17:25
**portion** (1) 57:1
**position** (11) 13:5;19:1,5,7,9,
19;20:4;22:8;24:3;41:16;
83:12
**possession** (1) 75:17

**possibly** (1) 59:21
**post** (9) 14:24;35:22,25;40:9,
11;43:24;44:13;64:9
**POST-certified** (1) 43:19
**practice** (2) 59:13;73:20
**practicing** (1) 59:16
**precinct** (1) 13:19
**presented** (1) 37:8
**pretty** (3) 17:21;68:16;72:13
**previous** (2) 63:12,21
**printed** (1) 38:5
**printout** (1) 37:15
**prior** (6) 14:1;25:23;33:25;
75:22,24;76:2
**privilege** (4) 5:15,24;80:19;
82:17
**probably** (13) 5:4;12:2;25:15;
27:5;32:7;38:7;53:7;74:22;
77:2;78:16;86:6,9;89:23
**problem** (2) 5:25;6:1
**Procedure** (5) 4:16;17:19;
67:4,25;75:12
**procedures** (1) 68:4
**Professional** (1) 91:12
**profile** (7) 38:12,13,16;40:24;
45:14;66:4;71:16
**promoted** (5) 14:19;17:8;18:4,
7;31:4
**promotion** (4) 36:19,21;41:13,
18
**promotions** (1) 16:15
**prostitution** (1) 14:23
**provide** (2) 88:8,13
**provided** (8) 8:7;17:18;68:25
**pull** (1) 79:25
**pulled** (2) 76:10;79:23
**purposes** (4) 4:17;81:17,20
**pursuant** (2) 4:1,15
**pursuit** (2) 80:25;81:2
**put** (8) 18:2;22:12;23:2;29:1,
6;65:18;66:18;79:14

**Q**

**qualification** (4) 56:6;58:10;
67:13,20
**qualify** (5) 45:19;48:13;52:7;
55:19;69:14
**qualifying** (2) 58:11;74:10
**quarter** (1) 33:22
**quite** (1) 33:13

**R**

**radar** (1) 40:22
**range** (28) 45:19;46:20,21,22,
23,24,25;47:4,7,9,17;49:18,
20;52:17,19,25;53:11,15,17,
19;54:8;58:11;65:11,13,19;
66:8;67:18;74:10
**ranges** (1) 47:21
**rank** (5) 15:13;17:2;26:5;30:4;
41:12

**ranking** (1) 22:20
**rankings** (1) 16:10
**ranks** (2) 16:4;30:7
**rape** (1) 21:13
**rare** (1) 15:1
**read** (3) 59:25;68:7;81:20
**reading** (2) 60:16;61:4
**really** (12) 11:8;15:8;22:22;
25:10,13;43:5;62:7,10;69:24;
76:5;77:12;90:10
**reason** (2) 63:6;76:3
**recall** (3) 36:12;44:19;87:17
**receive** (2) 52:24;67:21
**received** (14) 31:16;44:8,20;
45:8,12;46:8;61:15;62:16;
63:8,12,16,22;68:20;75:2
**recently** (1) 14:13
**recognize** (3) 37:10,13;91:10
**recommend** (2) 18:25;22:14
**recommendation** (1) 24:12
**recommended** (3) 19:5,19;
24:2
**reconvening** (1) 6:22
**record** (11) 4:8;5:8,19,20;
79:14,19;80:16;81:17,21;
82:9;83:11
**recording** (1) 88:14
**recruit** (6) 34:17;35:1,2,9,15;
36:6
**recruited** (1) 35:13
**recruiting** (3) 34:24,25;35:12
**recruits** (1) 68:3
**rectangle** (1) 47:23
**refer** (1) 52:16
**reference** (1) 25:18
**reflect** (3) 4:9;5:9,20
**reflected** (3) 38:7;45:13;66:4
**reflection** (1) 43:3
**reflects** (2) 38:21,24
**refresher** (1) 60:4
**regard** (1) 57:24
**regarding** (1) 94:15
**regards** (10) 5:11;27:2;61:16;
62:12;67:5,24,25;68:20;
75:12;85:4
**Regulations** (1) 4:3
**reinforcing** (1) 61:8
**relationship** (1) 15:13
**relatives** (1) 8:16
**remain** (1) 82:21
**remember** (24) 9:16,17;12:6,
9;24:22;25:10,15;26:3;33:3,4,
11;36:7;56:9;57:18;59:7;
62:1,5;65:6;78:13;87:19;
89:1;90:17;93:16;94:14
**remembers** (1) 60:5
**rephrase** (4) 7:11;15:9;19:18;
59:15
**Report** (4) 37:10;38:11;78:14;
88:23
**Reporter** (2) 4:1;8:8
**Reporting** (1) 4:4
**represented** (1) 7:4

representing (1) 6:23
reprimand (1) 95:3
requal (1) 45:16
r-e-q-u-a-l (1) 45:17
requalification (10) 45:23;
46:4,17;55:14,20;61:21;
62:17;63:1,16;64:21
requalify (1) 56:13
request (3) 18:4,12,24
requested (3) 17:15;18:6;58:2
required (2) 57:25;58:3
research (1) 21:18
reserved (1) 4:23
reserving (1) 5:21
resisting (1) 76:22
respectful (1) 94:9
respectfully (10) 82:2;83:19,
25;84:7,15,21;85:13;88:19;
95:23;96:8
respond (1) 82:25
response (2) 81:19;83:4
responses (1) 7:19
responsibilities (3) 21:25;
32:22;33:17
responsibility (1) 21:17
responsiveness (1) 4:22
rest (2) 44:25;62:11
result (1) 10:3,7;21:10
returned (1) 89:7
review (1) 38:11
reviewing (1) 60:22
RICHARDSON (32) 4:8,9;5:5,
8;6:7,11,15,18;7:2;37:3,8;
79:9,13,17,22;80:10,15;82:4,
8,20;83:3,7,8;85:1,3;88:21,
22;91:3,8;95:16,17;96:10
Ries (1) 30:25
R-i-e-s (1) 30:25
right (48) 5:21;6:20;7:22,22;
9:10;10:25;12:20,23;18:8;16:5;
22:10;24:19;26:20;27:22;
28:10;33:6;35:3;36:11;39:12,
18;40:12;42:18,20;43:14;
44:6;46:8;47:19;48:19,24;
50:16;51:1;57:5;59:1;67:1;
68:15;71:7;72:8,13;80:13;
83:12;86:1;87:9;93:12,18;
94:10;95:8,21;96:1,9
rights (11) 82:1;83:6,19,25;
84:7,15,21;85:11;88:18;
95:23;96:7
Road (1) 31:22;46:21;55:9
roadway (1) 29:1,2
robberies (1) 21:8
room (2) 65:4,5,8,8,9
Rosa (1) 4:10
round (1) 77:3
rounds (6) 49:5;55:21,22,23,
25;56:18
Rules (3) 4:2,16;6:4
run (1) 80:1
running (1) 28:3
Ryan (1) 86:20

## S

safe (3) 21:23;23:19;68:18
same (25) 16:2,4,23;22:23;
23:8;27:4;32:22;33:17;48:13;
56:5,12;57:19;62:2;64:1,23,
24;65:1;69:3,6,16;70:4;71:5,
14;72:2;77:22
sanctioned (1) 42:6
sanctions (1) 42:1
saw (2) 79:1,2
saying (5) 11:12;47:20;53:25;
59:14;72:19
scene (8) 10:8,9;32:8;78:15;
84:19,24;85:6;86:2
scenes (1) 32:11
schedule (1) 77:18
scheduled (1) 11:10
school (3) 9:6,7;12:22
score (3) 17:24;45:20;58:11
second (1) 69:14
section (1) 13:17
seeing (1) 24:11
send (1) 40:6
senior (3) 22:23;30:9,10
sense (1) 6:17
separate (3) 50:11;53:1,11
September (1) 63:4
Sergeant (22) 15:10;18:6,10,
13,14;19:20;20:15,16,23;20:
24:1,1,15;25:5;30:25;31:1,2,
6,8;32:5,6,15;36:7
sergeants (4) 15:15,20;16:3;
20:15
serious (3) 30:2;72:1,4;73:3,8,
11;75:7
seriously (1) 76:19
serve (1) 18:7
services (1) 17:18
session (8) 57:4,9,14,17;59:8,
19,21,23
sessions (4) 62:12;68:21;
71:5,15
seven (2) 33:9;38:8
several (4) 31:18;32:3;40:17;
54:4,12;68:17;76:21,23,25
sheet (1) 66:16
shift (1) 58:17
shirt (2) 23:14,14
shoot (4) 55:22,23,25;56:5
shooting (12) 46:23,24,25;
56:18;74:11;81:10;82:13,15;
84:4,11;85:6,17
Shortened (1) 46:2
shot (3) 47:14;74:22;81:8
shown (1) 91:8
side (3) 46:8;49:3,4
sign (12) 52:1;65:4,10,13,14,
17,18,22;66:11,17,21;80:1
signals (1) 29:3
silent (1) 82:21
silhouette (1) 74:11

sit (4) 9:3;28:4,6;57:1
site (1) 37:19
sits (1) 28:10
situation (3) 76:4;77:7;90:3
six (16) 12:20;15:16;20:21,22;
33:9;38:8;39:17;46:16;54:1;
55:16,19;62:16,16;77:1,1,1
slowly (1) 55:25
smaller (3) 51:7;69:17,20
Smith (3) 69:1,19;70:23
somebody (4) 10:8;30:2;73:9;
75:5
somebody's (3) 30:2;72:3;
73:7
someone (2) 28:3;75:16
sometime (3) 22:8;23:25;
24:21
sometimes (1) 15:1
somewhere (3) 65:25;68:12,
13
son (2) 8:20,22
sorry (9) 9:17;10:6;18:19;
34:21;50:21,25;55:12;58:14;
65:12;82:5;93:12,13
sort (5) 27:9;60:11;79:5;83:1;
91:11
sounds (2) 29:6;60:13
southbound (1) 80:6
Southeast (1) 55:12
Southside (1) 34:10
southwest (3) 55:9;80:4,5
sparring (1) 73:17
special (3) 13:16;21:13;90:17
specific (2) 64:16;93:13
specifically (3) 56:9;91:14;
93:10
specifics (1) 94:15
specifies (1) 46:13
speed (1) 40:16
speed-detection (2) 40:15,17
spell (1) 9:22;14:16
SPO (1) 22:23
spoke (1) 77:9
sports (1) 12:21
spray (5) 70:12,12,25;72:8;
77:25
stand (4) 15:6;33:1;62:8,11
standard (1) 68:4
Standards (3) 37:17;64:9;
91:13
standing (4) 38:25;39:3,5,9
start (2) 44:7;55:24
started (4) 33:23;34:13;75:11;
78:17
state (2) 59:2;60:11
stated (4) 23:25;65:3;72:7;
77:23
statement (1) 19:4
statements (2) 88:8,14
states (1) 41:21
station (2) 31:20,21
stationed (2) 35:17,19
status (2) 42:19

stay (1) 21:12
stick (3) 30:24,24;72:6
still (11) 13:1;17:9;19:15;
22:17;23:7,7;29:19;33:14;
39:6;56:17;69:19
stint (1) 34:5
stop (4) 9:16;10:3,7;80:1
stopped (2) 80:22;83:15
stops (2) 28:17;76:9
store (1) 53:22
stored (1) 68:13
stray (1) 49:11
Street (5) 13:22;14:23;28:18;
32:7;58:5
streets (4) 26:22,22;28:2,14
strike (5) 14:5;56:11,11;74:7;
88:24
strikes (2) 73:19,20
struck (1) 49:8
stuff (5) 5:4;52:9;64:4,19;
65:10
successfully (1) 18:2
sudden (1) 11:11
sued (1) 10:12
suggested (2) 24:2,23
summary (1) 91:12
superior (1) 18:15
superiority (1) 15:6
superiors (2) 51:5,22
supervised (1) 57:14
supervisor (9) 14:5,6,11;
15:10;18:17;21:20;30:20;
36:5;62:6
supervisors (10) 18:4;22:13;
30:22;31:3;32:10;33:1;49:19;
51:3;53:18;57:19
supplies (1) 52:8
support (1) 25:5
supposed (1) 73:21
sure (11) 7:5;8:10;31:17;38:4;
43:6;52:23;59:25;60:4;66:10;
79:16;89:13,22;90:10
suspect (1) 21:20
suspect's (1) 73:25
suspend (1) 6:4
suspended (1) 42:4
sustained (6) 93:20,22;94:1,3,
20;95:6
SWAT (13) 47:4;53:2,10,13;
54:5,10;57:6;58:24;59:1,2,6;
64:20;65:16
sworn (4) 4:6;35:11;40:4;58:4
System (2) 37:10;38:12

## T

tables (1) 57:8
talk (9) 8:4;12:25;30:16;
40:23,24;45:11;47:9;54:16;
68:24
talked (1) 90:24
talking (13) 34:7;47:12;49:23;
50:13;58:13;64:2,5;65:11;

70:4;76:12;88:10;90:11;
93:10
**tall (1)** 12:19
**target (4)** 48:1,1,21;74:11
**targets (2)** 48:2,11
**Tasers (1)** 70:16
**teaching (1)** 57:23
**team (1)** 59:1
**technical (1)** 67:17
**technically (3)** 55:1,10;89:13
**Tellis (3)** 14:8;15:10,14
**T-e-l-l-i-s (1)** 14:9
**temporary (1)** 52:3
**ten (3)** 20:24;21:1,1
**ten-minute (1)** 31:25
**term (1)** 69:15
**terms (2)** 59:17;74:6
**TERRY (1)** 6:20
**test (13)** 17:20,22;22:10,24;
24:21,24;25:4,9;45:18;58:8,
12;60:7;61:22
**tested (1)** 18:1
**testified (2)** 4:7;77:23
**testimony (1)** 19:4
**testing (1)** 17:19
**tests (1)** 59:9
**third (5)** 10:15,16,21;11:1;
94:22
**Thirty-two (1)** 8:14
**THOMAS (6)** 4:5,14;5:10;
8:10;39:12;91:24
**thought (1)** 65:7
**thousand (2)** 34:3;54:17
**threat (1)** 75:6
**threatened (1)** 75:15
**threatening (1)** 75:7
**three (6)** 55:21;56:7;69:24;
86:6;87:5;89:25
**Thursday (1)** 89:2
**tie (1)** 23:14
**timely (1)** 48:14
**times (2)** 56:7;77:6
**title (2)** 35:1,6
**today (7)** 12:4,12,13;28:22;
41:22;69:4,7
**today's (1)** 41:1
**Todd (5)** 18:22,25;20:4;23:20;
24:1
**told (3)** 65:2,3;73:13
**Tommy (1)** 8:12
**ton (1)** 53:6
**took (6)** 11:1;24:9,21;25:9;
41:18;44:21,23;61:19;63:3;
64:8;71:6;81:10,11;85:17;
89:20,23
**torso (2)** 74:13,17
**total (2)** 20:24;46:9
**towards (2)** 46:17;58:18
**tower (2)** 50:3,3
**traffic (22)** 9:16;21:24;26:11,
12;27:13,15;28:3,15,23,23;
29:3,8,14,15,19;30:1,1;76:9;
78:5,6,18;83:16

**Trail (1)** 80:4
**trailer (6)** 49:18,21,23;50:15,
16;51:21
**trailers (1)** 49:24
**trained (10)** 71:1;72:14,15,22;
73:12,14,23;74:6,12,16
**trainer (1)** 59:6
**training (56)** 34:4;35:23;37:1,
15,17;43:15,16,23;44:8,10,13,
20;45:8,12,13;46:4,5,9,13,19;
52:24;54:21;55:2,5,15;57:24;
58:20,22;59:8,22;61:15;62:2,
12,16,18,22;63:1,3,8,10,12,17,
20,22,25;64:7,9,18,22;65:22;
68:19,21;71:5,15;73:15;75:1
**transcript (1)** 43:19
**transferred (1)** 18:7
**transported (3)** 85:25;86:24;
87:12
**trial (1)** 4:23
**trunk (2)** 73:10;77:3
**try (2)** 21:18;74:6
**trying (6)** 6:13;20:17;29:6;
48:6;77:2;86:12
**tucked (1)** 23:15
**turn (1)** 44:22
**twelve (1)** 21:1
**two (22)** 12:2;15:15,20;16:2;
20:11,15;31:12;32:16;34:2;
46:13;49:23;54:16;56:6;
57:12;61:12;62:17;69:10,23;
70:1;76:22;89:25;93:22
**two-hour (1)** 56:25
**two-week (1)** 34:5
**type (1)** 69:3

## U

**uh-uh (1)** 66:14
**ultimate (1)** 40:6
**under (23)** 13:15;20:4;24:13,
13;37:16;42:22,24;43:13;
54:25;55:1;71:8;82:1,17;
83:19,25;84:7,15,21;85:11;
88:18;92:17;95:23;96:7
**understood (3)** 7:14,15;81:22
**uniform (6)** 23:7,9,12;70:9,11,
18
**unique (1)** 92:4
**unit (24)** 13:16,24;14:2,3,4,7,
12,20;15:19;18:6,7;22:15;
26:9;35:21;40:15;47:4;53:2,
10,13;54:5;57:6;64:20;65:16;
78:5
**units (1)** 57:20
**unless (1)** 21:12
**unnecessary (1)** 94:1
**up (17)** 14:13,24;27:18;44:5;
48:20;52:2,6,7;65:17,19;
69:23;74:15;81:8;82:14;83:2;
86:9,18
**upon (1)** 75:18
**use (21)** 46:12,14;56:20;

58:18;61:16;62:13,18;67:5,
15,25;68:1;73:4,24,24;74:6;
75:3,13,14,25;76:3;77:6
**used (7)** 54:7,10;69:15;73:2;
76:5,23,25
**use-of-deadly-force (8)** 46:5;
57:17;59:8,21;62:22;63:11,
22;64:18
**uses (1)** 40:21
**using (3)** 14:23;59:17;72:25
**usually (1)** 23:14
**utilizes (1)** 54:11

## V

**vacant (2)** 76:6,7
**vague (1)** 7:10
**vehicle (4)** 80:24;87:13,23;
94:25
**verbal (1)** 7:20
**verbally (1)** 67:3
**verifies (1)** 66:1
**verifying (1)** 66:18
**version (2)** 69:17,17
**versus (1)** 29:8
**vice (9)** 13:16,23;14:2,6,12,
20;15:7;16:16,20
**victim (2)** 21:13;74:7
**violating (1)** 29:3
**violation (1)** 83:16
**violators (2)** 29:2,8
**vote (1)** 8:25

## W

**wait (2)** 28:3,5
**waiting (1)** 56:4
**wall (1)** 49:3
**watch (16)** 17:7;20:12,12,13,
14,23;26:9,14;27:1,6,20;31:8;
50:5,8,8;78:4
**watches (2)** 20:11;31:4
**watch's (1)** 29:11
**way (3)** 46:7;83:1,11
**weapon (12)** 48:17;52:8;56:8;
69:15,15,18;72:23,24,25;
73:2;75:17;76:15
**weapons (19)** 44:24;50:18,20,
23;68:23,24;69:11,12,22;
70:6,21;71:18,19,20,24;72:15,
15,16;77:22
**wear (4)** 23:11,13;70:8,9
**Web (1)** 37:19
**Wednesday (3)** 89:9,12,19
**week (1)** 11:11
**weeks (2)** 34:20;35:20
**weigh (2)** 12:1,4
**weight (2)** 38:17,18
**weren't (1)** 94:4
**Wesson (3)** 69:1,19;70:24
**What's (5)** 12:8;31:13;37:9;
45:16;94:23
**white (1)** 39:15

**whoever's (1)** 57:20
**wife (1)** 8:18
**within (3)** 17:9;27:15;67:4
**without (1)** 8:15
**witness (6)** 6:23;38:3;80:14;
81:22,25;84:18;85:2;88:17;
89:24
**witnessed (1)** 80:1
**woman (1)** 9:18
**wooden (1)** 50:3
**woods (1)** 49:4
**wore (1)** 23:14
**work (12)** 13:19;24:11;30:17;
49:20;52:20;59:14;77:18;
88:23;89:3,7,17,25
**worked (7)** 16:23;20:12;
30:13;31:18;32:16;33:2;
34:17
**working (6)** 19:15;20:4;23:21;
24:13;27:8;50:7
**write (3)** 26:12;29:19;78:6
**writing (1)** 67:22
**written (1)** 22:25
**wrong (3)** 29:5;47:10;60:14
**wrote (1)** 78:14

## Y

**yards (2)** 47:7,8
**year (9)** 11:15,18,19;25:16;
32:20;33:10;38:6;56:13;58:7
**yearly (1)** 45:18
**years (2)** 31:18;63:13
**Yvette (4)** 9:19;10:17,19,19

## Z

**Zone (31)** 14:3;16:22,23;17:2,
9;18:16;19:16,23;20:10,24;
21:6,10,11,12;23:21;24:11;
26:8;27:16;30:13,17,20;31:9,
20;32:18;33:14,21;34:1,5,6;
85:18;87:13

## 0

**09C0185UAF (1)** 93:14
**09C0361MISC (1)** 94:11

## 1

**1 (4)** 37:5,6,10;92:17
**1:00 (1)** 87:20
**10 (1)** 27:7
**10:30 (2)** 77:19,19
**10B (1)** 4:2
**11 (1)** 95:9
**11I0020VA (1)** 94:24
**12:27 (1)** 96:12
**13 (1)** 92:12
**13I0121CRSX (1)** 96:2
**13IO121CRSX (1)** 95:14
**13th (1)** 41:10

Rosa Hampton v.
Thomas Atzert, Jr. and the City of Atlanta

Thomas Atzert, Jr.
November 8, 2013

**179 (1)** 12:5
**180 (1)** 34:10
**180-ish (1)** 39:22
**1999 (1)** 9:7

## 2

**2 (4)** 8:23;91:6,10;92:19
**2:30 (2)** 77:19,19
**20 (5)** 27:8;48:1,4,10,17
**2007 (5)** 34:13,15;35:24;
  41:10;92:12
**2008 (12)** 33:21,24;34:3;44:7,
  9,20;45:8;54:20;67:10;68:24;
  69:9;75:12
**2008/2009 (1)** 56:16
**2009 (14)** 33:14,15;45:12;
  46:4;54:17;55:13;56:10,24;
  57:14;61:15,25;63:23;64:6,6
**2010 (12)** 30:16,17,19;32:18;
  33:1,19;61:18,24;62:6,15;
  63:23;94:13
**2011 (22)** 11:25;16:23;17:6;
  22:8,10;23:21,25;24:21;25:9;
  26:4;30:5,14,20;32:15,24;
  33:19;62:21;63:4,23;70:18;
  71:19;77:16
**2012 (16)** 13:25,25;14:4;
  16:22;17:4;18:10;19:20;22:6,
  7;36:19;41:10,19;63:15,18,
  20;64:6
**2013 (1)** 11:21
**205 (1)** 39:17
**20-something (1)** 47:5
**210 (1)** 12:2
**215 (1)** 12:3
**226 (1)** 13:22
**25 (4)** 47:7,20;48:10,17
**280 (1)** 77:2
**28th (1)** 63:17
**290 (2)** 77:2;85:17
**291 (1)** 83:23

## 3

**3:30 (1)** 13:10
**30 (5)** 27:5;55:22,22,25;56:18
**3020 (1)** 31:17
**30th (1)** 77:15

## 4

**4 (25)** 14:3;16:22;17:2,9;
  18:16;19:16,23;20:10,25;
  21:6,11,12;23:21;26:8;30:14,
  17,20;31:9,20;32:18;33:15,
  21;34:1;85:18;87:13
**4:00 (1)** 13:10
**40 (4)** 69:1,12,19;77:24
**408 (1)** 45:4
**4917 (1)** 92:1

## 5

**50 (1)** 47:8
**5th (1)** 41:10

## 6

**6:00 (1)** 78:17

## 7

**7:30 (2)** 13:10;86:9
**75 (1)** 77:3

## 8

**8:00 (2)** 13:9,10

## 9

**911 (6)** 23:7;26:10;27:14;
  28:19;29:17,22