IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ROSA HAMPTON, Individually
and as Administrator of the
Estate of MAURICE HAMPTON,
and on behalf of the minor
children of the ESTATE OF
MAURICE HAMPTON,

        Plaintiffs,

    vs.

THOMAS ATZERT, JR.,
Individually and in his
capacity as a City of
Atlanta Police Officer, and
the City of Atlanta,
GEORGIA,

        Defendants.

CIVIL ACTION NO.

1:13-CV-00584-TWT

DEPOSITION OF

CAROLD D. WILLIAMS

November 8, 2013

12:40 p.m.

2024 Beaver Ruin Road
Norcross, Georgia

John P. Payne, RDR, CRR, CCR A-1006



PAYNE
COURT REPORTING, LLC
4811 Galloways Farm Court
Acworth, Georgia 30101
T (770) 596-0804  F (770) 529-7837
info@paynereporting.com
www.paynereporting.com

APPEARANCES OF COUNSEL


On behalf of the Plaintiffs:

    MAX C. RICHARDSON, JR., Esq.
    Max Richardson, Jr., P.C.
    2024 Beaver Ruin Road
    Norcross, Georgia 30071
    (770) 209-7999


On behalf of Defendant Thomas Atzert, Jr.:

    JOSHUA A. MILLICAN, Esq.
    Law Office of Joshua A. Millican, P.C.
    The Grant Building, Suite 607
    44 Broad Street, N.W.
    Atlanta, Georgia 30303
    (404) 522-1152


On behalf of Defendant City of Atlanta, Georgia:

    LASHAWN W. TERRY, Esq.
    City of Atlanta Law Department
    68 Mitchell Street, Suite 4100
    Atlanta, Georgia 30303
    (404) 330-6838


- - -



# TABLE OF CONTENTS

Examination                                    Page

Examination by Mr. Richardson                     4
Examination by Mr. Millican                      41
Examination by Ms. Terry                         79

- - -

Plaintiffs'
  Exhibit            Description              Page

    3                  Sketch                  14

(Original exhibit has been attached to the original transcript.)

- - -

```
 1                (Reporter disclosure made pursuant
 2          to Article 10.B. of the Rules and
 3          Regulations of the Board of Court
 4          Reporting, Judicial Council of Georgia.)
 5                MR. RICHARDSON:  Do you want to
 6          agree to the same stipulations, the
 7          same --
 8                MR. MILLICAN:  Sure.
 9                MR. RICHARDSON:  Okay.
10                   CAROLD D. WILLIAMS,
11  having been first duly sworn, was examined and
12  testified as follows:
13                       EXAMINATION
14  BY MR. RICHARDSON:
15      Q.    Could you please state your full,
16  complete name for the record?
17      A.    Carold D. Williams, C-a-r-o-l-d, middle
18  initial D., W-i-l-l-i-a-m-s.
19      Q.    What does the D. stand for?
20      A.    Donald.
21      Q.    Okay.  All right.  And where do you
22  reside, Mr. Williams?
23      A.    I live in Atlanta, southwest Atlanta.
24  My mailing address is Post Office Box 43971,
25  Atlanta, Georgia 30336.
```

1      Q.    Okay.  And what kind of education
2 background do you have?
3      A.    Well, I would say it was a lot.  You
4 might not think it was a lot, but I have four
5 degrees.  I have a bachelor of science degree in
6 chemistry.  I have a master of education degree in
7 math and science.  I have a Juris Doctor and a
8 master of litigation, LL.M. and a J.D.
9      Q.    Wow.
10           MS. TERRY:  That's too much.
11      Q.    (By Mr. Richardson)  Okay.  And -- I
12 would agree.  Where -- where are you currently
13 employed?
14      A.    I am self-employed, part-time lawyer,
15 pick and choose what I want to fool around with, and
16 that's after 20 years of practicing law.  I went to
17 law school after 24 years in the military.
18      Q.    Wow.  What branch of the military were
19 you involved?
20      A.    I served 5 years in the Air Force and
21 19 years and 4 months in the Army.
22      Q.    And where were you stationed?
23      A.    I've been stationed a lot of -- a lot of
24 places.
25      Q.    Oh, okay.  I got you.

```
 1       A.      Alabama, Georgia, Korea, Germany, Utah,
 2  Texas, Maryland.
 3       Q.      Okay.  Most of it -- most of it here in
 4  the U.S.?
 5       A.      Most of it is in the Army, and I've been
 6  overseas to Germany, Korea.
 7       Q.      Wow.
 8       A.      Japan, Australia.
 9       Q.      Okay.
10       A.      A lot of places for a country boy.
11       Q.      Okay.  When you say a country boy, where
12  are you from?
13       A.      Greenville, South -- well, Piedmont,
14  South Carolina, 12 miles from Greenville, which you
15  might be able to identify with.
16       Q.      Okay.  All right.  And what type of
17  practice -- what kind of practice have you had over
18  the years?  What kind of law practice?
19       A.      The majority of my practice has been
20  personal injury, domestic relations, employment,
21  anti-discrimination law.
22       Q.      Okay.
23       A.      Very -- very, very little criminal
24  stuff.  We had some nephews got in a little
25  shoplifting one time or some -- a friend, close
```

```
 1  friend's children got into possession of marijuana,
 2  just light stuff.  All the heavy stuff I handed off
 3  to people like you who knew what you were doing.
 4      Q.    Okay.
 5            I want to take you back to June 30th,
 6  2011.
 7      A.    Okay.
 8      Q.    All right.  Do you remember that day?
 9      A.    I do.
10      Q.    Okay.  And why does that day stand out
11  in your mind right now?
12      A.    Because I witnessed a guy getting shot
13  by the Atlanta Police Department, an officer from
14  the Atlanta Police Department, and I hadn't heard
15  much about it up until recently.
16      Q.    Okay.  And what -- where did this
17  happen?
18      A.    It happened adjacent to a building
19  that's called Club 291 on Campbellton Road, 3011
20  Campbellton Road in Atlanta.
21      Q.    And -- and what's that building's --
22  does that building have a -- you say it's 291 Club?
23      A.    It's Club 291, but it's also the post
24  headquarters for American Legion Post 911.
25      Q.    And what were you doing there?
```

```
 1        A.     Well, I'm a member of the post, and

 2   we -- some of us old guys get up and go meet up

 3   there two or three times a week and tell war stories

 4   and have a beer or a drink like whiskey or whatever

 5   we like.

 6        Q.     Okay.

 7        A.     And just kind of fraternize and

 8   socialize a little bit.

 9        Q.     Okay.  And tell me what -- what the

10   conditions were or -- or -- strike that.

11               What time was it when you were up there

12   and you made these observations?

13        A.     I think 6:30, 7:00 o'clock.

14        Q.     Okay.

15        A.     Around that time.

16        Q.     And this was on June 30th?

17        A.     Right.

18        Q.     And what was the lighting conditions?

19        A.     Well, this was in the middle of June.

20   You know, it doesn't get dark till around 9:30 or

21   10:00 o'clock.  This was around 7:00.  There was

22   plenty of light.

23        Q.     Okay.

24        A.     You could see.

25        Q.     Okay.  And why don't you just tell us
```

1  when you first observed anything unusual.

2       A.    Okay.  I had been there at the club for

3  an hour or so.  I got up there around 6:00 o'clock.

4  I was going to meet my brother and a couple of other

5  guys there around 7:00, and they hadn't gotten there

6  at 7:00 o'clock, so I said, "Well, you know, I'm

7  going to leave, and I'll come back later."  And so I

8  came out, went to my car, which was parked across

9  the driveway.

10      Q.    Okay.  Where -- your car was in the

11 driveway?

12      A.    My car was -- well, you know, the

13 parking lot just -- you just park up against the

14 bank, go all the way down to the -- to the street,

15 so my car was parked across in where all the cars

16 normally parked.

17           And I come out and was about to open --

18 open my car door.  I had put the key in the lock and

19 turned it and was about to open it.  I hear some

20 noise, and I looked to my right.  Well, this is the

21 way I was facing, because I looked to my left, and

22 coming up the driveway from toward Campbellton Road

23 was this black guy being chased by an Atlanta police

24 officer, so I --

25      Q.    And let me -- let me just stop you



1  there.

2       A.    Okay.

3       Q.    When you saw this black guy, did you

4  recognize him?

5       A.    I did not.

6       Q.    Had you ever seen him before?

7       A.    I had not.

8       Q.    Okay.  Had -- had you seen the officer

9  before?

10      A.    I had not.

11      Q.    Okay.  And so how far were you away or

12 how far were they from you when you first made these

13 observations?

14      A.    When I first saw them, they were

15 probably 50 or 60 feet away coming toward me.

16      Q.    Coming towards you?

17      A.    Yes.

18      Q.    Okay.  Then what happened?

19      A.    When they got up even with me, the

20 officer didn't have any weapons.  Well, he -- he

21 had -- he was talking to somebody on a little

22 handheld phone that they have and running, I'd say,

23 four to five steps behind the black guy he was

24 chasing, and having watched them for 20 or 30 feet

25 that he was gaining on this guy, so I knew he was



1  going to catch him sooner or later because this was
2  a big guy that was running.
3       Q.   Okay.  Let's -- let's stop right there
4  and describe the -- the -- the big guy that the
5  officer was chasing.
6       A.   Okay.
7       Q.   Describe him.
8       A.   He was a black male.  I would say he was
9  six two, six one or six two, probably 240 pounds.
10      Q.   He was a big guy?
11      A.   A big guy.
12      Q.   Okay.
13      A.   The guy that was chasing --
14      Q.   Wait.  What was he wearing, if you --
15      A.   What was he wearing?
16      Q.   Yeah.
17      A.   The best I can remember, just a shirt
18  and a pair of trousers and a belt and shoes, nothing
19  special, no kind of uniform or anything like that.
20      Q.   Describe the officer that was chasing
21  this guy.
22      A.   The officer that was chasing him was a
23  Caucasian male, I assume five ten or five eleven, a
24  hundred and seventy-five, a hundred and eighty
25  pounds.

1      Q.    Okay.

2      A.    I would say, if I had to venture a guess

3   in age, he was 22 or 23.

4      Q.    So he --

5      A.    Something like that.

6      Q.    He was a young guy?

7      A.    Yes.

8      Q.    How about the black male?  I don't

9   think you --

10      A.    I would think he was 40-ish.

11      Q.    -- gave us an age.

12      A.    I think he -- I would say he was 40-ish.

13   I did notice one thing about his face.  He was like,

14   you know, people who's had Down's syndrome, how

15   they -- little round-faced guy.  That's the kind of

16   face he had, and at least that's what -- that was my

17   initial impression:  This guy had or has had Down's

18   syndrome or something.

19      Q.    Okay.

20      A.    Because he just didn't -- he just looked

21   like they did, a little round face to these folk.

22      Q.    Okay.  So -- so what happens now after

23   you get a chance to see them both running?

24      A.    Okay.  They came up the hill past me.  I

25   was standing by my car.  They passed me in the

1    driveway, I guess, no more than 10 feet away, and
2    the officer looked at me and then kept going.  He
3    kept talking, and they kept going, and they went
4    over the -- over the ridge to where I could no
5    longer see them.
6              So I took my time, put -- I locked my
7    car back because I'm going to walk up to see if this
8    officer caught this guy because I assumed he was
9    going to catch him because he was a fat guy being
10   chased by a smaller guy, he was going to catch him.
11   So when I got up -- I had to walk 15, 10 to 15 feet,
12   lock my car, walk 10 to 15 feet to where I could
13   see.
14             And when I got to the edge of the slope
15   where you look down below on this field, I could see
16   the officer had this guy down, facedown on the
17   ground with one arm, his left arm behind his back.
18   And he was beating him on his right shoulder and
19   side and hitting him with a billy club trying to get
20   his right arm up.
21        Q.    Okay.
22        A.    And eventually he was able to do that
23   and he had both hands behind his back.
24        Q.    Okay.  Let's just back up a little
25   bit because I want to --

1        A.      Okay.

2        Q.      -- get some clarity here on what --

3    where you were at when you made your observations.

4        A.      Okay.

5        Q.      I'm showing you what's been marked as

6    a -- as a sketch of the scene.  It's not to scale.

7        A.      Okay.

8        Q.      It's a sketch that's made by one of the

9    officers, and I want to try and use this to get an

10   idea as to where you may have been -- your car was

11   positioned and -- and where -- where the individuals

12   were coming from.  Okay?

13       A.      Okay.

14              MR. RICHARDSON:  One second.

15              (Off the record.)

16              (Plaintiffs' Exhibit 3 was marked

17       for identification.)

18       Q.      (By Mr. Richardson)  I'm showing you

19   what's marked as Plaintiffs' Exhibit 3.  It's a

20   rough-scale diagram sketch that was prepared by one

21   of the officers with regards to the -- to the scene.

22   Okay?

23       A.      Okay.

24       Q.      Now, on Plaintiffs' Exhibit Number 3,

25   you have Campbellton Road down at the bottom?

1        A.    Right.

2        Q.    Okay.  And does Campbellton Road cross

3   Childress?

4        A.    No.  Childress intersects into

5   Campbellton.  Campbellton keeps going.

6        Q.    Okay.  So -- so they -- they do -- they

7   do come to an intersection --

8        A.    Yes.

9        Q.    -- is that correct?

10       A.    Childress intersects Campbellton.

11       Q.    Okay.  So this looks like the

12   intersection down here; is that correct?

13       A.    Right.

14       Q.    Okay.  Now, where -- where would the

15   club be in relationship to -- to this diagram?

16       A.    The club was -- is on the right-hand

17   side as you come from Campbellton Road.

18       Q.    Okay.  Okay.  Now, let's -- let's --

19   let's assume for purposes of this diagram that these

20   are four cars.  They look like milk cartons to me or

21   milk --

22       A.    Right.

23       Q.    But let's assume these are four cars

24   parked down there.  Were -- were there four cars in

25   the field that --

1      A.    It was -- there were three cars and a

2  truck.

3      Q.    Okay.  All right.  So let's assume these

4  are the trucks.  That appears to be a body right

5  there.  It looks like Number 3 on here.  Okay?

6      A.    Okay.

7      Q.    Now, where would you have been in --

8  where would your car have been positioned according

9  to this diagram if 3011 Campbellton Road is the

10 club --

11     A.    Right.

12     Q.    -- and this is the field --

13     A.    Right.

14     Q.    -- where everything transpired?  Where

15 would your car have been?

16     A.    Here (indicating).

17     Q.    Okay.  Could you -- could you just draw

18 a little car there and then put CW, and we know the

19 CW is for Carold Williams?

20     A.    (Witness complies.)

21     Q.    Okay.  And then put "car" underneath

22 that because that's a terrible looking car.

23     A.    (Witness complies.)

24     Q.    Okay.  All right.

25           Now -- now, you stated that you were

```
1  getting inside your car?

2       A.    Right.

3       Q.    And where were the individuals -- where

4  was the officer and Mr. Atzert coming from at --

5       A.    Appeared from down this way

6  (indicating).

7       Q.    Okay.  And if you could just put two Xs,

8  maybe one X in front and one X behind.

9       A.    (Witness complies.)  When I saw them,

10 they came way up the --

11      Q.    Okay.

12      A.    -- up the driveway.  I do know they were

13 in my line of vision.

14      Q.    When you first saw them, where were they

15 at?

16      A.    (Indicating.)

17      Q.    Okay.  Okay.  And could you put PO near

18 the police officer?

19      A.    (Witness complies.)

20      Q.    And then could you put --

21      A.    Put the X for subject?

22      Q.    That would -- that would be fine.  Okay.

23      A.    Okay.

24      Q.    All right.  Why don't you write subject

25 all the way out so we'll know exactly -- write
```

```
 1   subject out.
 2         A.     I got s-u-b-j-e-c-t.
 3         Q.     Okay.  And you were --
 4         A.     Proceeding that way (indicating).
 5         Q.     Okay.  And you drew an arrow on the
 6   diagram as to the direction that the subject and the
 7   police officer were -- were on foot; is that
 8   correct?
 9         A.     Right.
10         Q.     And they were running; correct?
11         A.     Yes.
12         Q.     Okay.  Now, what is -- it appears to be
13   a road or something right here on this diagram.
14   Could you describe what that looks like?
15         A.     This --
16         Q.     I don't want you writing on it.
17         A.     Okay.
18         Q.     Just describe to us what that -- that
19   looks like out at the scene.
20         A.     From here you wouldn't know that -- it's
21   not a -- a hard-surface road.  It's more of a little
22   trail that goes down through there, a rock and
23   gravelly stone trail that goes from the parking lot
24   just down in here.
25         Q.     Okay.  Now, from -- from this -- the
```



1  parking lot area -- this is all the parking lot area

2  up here where it says parking lot; correct?

3      A.    Yes.

4      Q.    Now, is this area down here, is this a

5  field down here?

6      A.    This -- all this is a field.

7      Q.    Okay.

8      A.    These are -- this road, it doesn't run

9  all the way down here.  It's -- well, it's not

10 really a road.  It's a -- a trail that people will

11 use and drive cars down there.

12     Q.    Okay.

13     A.    So you can drive down there.

14     Q.    And my question is, is this area up

15 here, the parking area, does that sit higher or does

16 that sit lower than the field?

17     A.    It's higher than the field.

18     Q.    It's higher?  So --

19     A.    Yes.

20     Q.    So at this point in time where the

21 gravel road, it goes downward; is that correct?

22     A.    Yes, where you walk through there and

23 see that it's a slope, and it goes down.

24     Q.    Okay.

25     A.    And you can't see it --- if you're back

1  here far enough, you can't see anything --

2      Q.    Okay.

3      A.    -- going on down here.

4      Q.    So is that why you couldn't see -- or at

5  some point in time, you said you couldn't see them;

6  is that correct?

7      A.    Right.  After they came running past me,

8  they went over the -- over the little hill down this

9  trail, and I could no longer see them.

10     Q.    Could you put another arrow as to what

11 direction they traveled after they passed you?

12     A.    (Witness complies.)

13     Q.    Okay.

14     A.    He was going that way.

15     Q.    Okay.  All right.

16           And when they got to this trail area, at

17 what point in time did you -- were you not able to

18 see them?

19     A.    The -- from the time they passed me

20 until the time they went over the hill couldn't have

21 been any more than 20 or 25 seconds because I locked

22 my car back and walked over there.

23     Q.    Okay.

24     A.    And it was closer.

25     Q.    You walked over.  Where did you walk to?

```
1        A.    From -- from my car I walked to the edge

2   of the -- well, I call it a little bank where it

3   turns and goes down into the field.

4        Q.    Okay.  Okay.  Now, when you walked,

5   where did you walk to?

6        A.    I walked to here (indicating).  There's

7   a --

8        Q.    Okay.

9        A.    There was a Dump -- a Dumpster here.

10       Q.    Okay.

11       A.    I walked there to beside the Dumpster,

12  and I could see everything that was going on down

13  here in the field.

14       Q.    Okay.  Now, now, when you first looked

15  down into the field area, where did you see the

16  individuals?

17       A.    The subject and the police officer --

18       Q.    Before you answer that -- strike that

19  question.

20             This is the gravel road area.  What

21  is --

22       A.    Uh-huh.

23       Q.    What is over here?

24       A.    Woods and weeds, trees.

25       Q.    Okay.
```

 1      A.      Along there.  The road runs between the
 2   trees; and this down here, this dumps off into a
 3   field.
 4      Q.      Okay.  Could you just put some trees and
 5   stuff over here, then?
 6      A.      (Witness complies.)
 7      Q.      You can do better than that, can't you?
 8      A.      And then it -- it stays like that all
 9   the way around.
10      Q.      Okay.  Now, now, let's assume for
11   purposes that this is where -- at some -- well, let
12   me ask this question:  At some point in time, did
13   you ever see Mr. Atzert -- and I'm sorry.  Did you
14   ever see Mr. Hampton shot?
15      A.      Did I see him shot?
16      Q.      Yes.
17      A.      Yes.
18      Q.      Did you see where he fell?
19      A.      Yes.
20      Q.      Did his body fall near the cars?
21      A.      It would be in the bushes, be -- like
22   these are cars.  All these are bushes over in here.
23      Q.      Okay.  All right.  Okay.
24      A.      He fell in the bushes.
25      Q.      Now, before that did you ever see Mr. --

```
 1  did you ever see the officer and Mr. Hampton in
 2  another area in -- in that -- in that field?
 3       A.    Yes.  They were down here in the field.
 4       Q.    Okay.
 5       A.    That's where they had either -- I didn't
 6  see how he went down.  When I got where I could see,
 7  he was already laying down, facedown, and the
 8  officer was --
 9       Q.    Okay.
10       A.    -- over him, straddling him on the back,
11  beating him with the billy club.
12       Q.    Okay.  Now, when you saw that, that was
13  the --
14       A.    Uh-huh.
15       Q.    Was that the first thing that you saw
16  after you exited your car and then came over to the
17  area where you could see what was going on down in
18  the field?
19       A.    Yes.
20       Q.    Okay.  And where were they?  Could you
21  just put the police officer and the suspect at a
22  rough-draft area as to where they were at when you
23  first observed them?
24       A.    (Witness complies.)
25       Q.    Okay.
```



 1     A.    They were laying down.  He had him down.

 2     Q.    Okay.  Who had who down?

 3     A.    The police officer had the black subject

 4  down, facedown right in here in these weeds, and he

 5  was straddling him with his billy club, beating him

 6  on the shoulder and right side.

 7     Q.    Okay.

 8     A.    And he already had one hand behind his

 9  back, and he kept pulling the other one till he

10  finally got the other one loose and had both hands

11  behind his back.

12     Q.    Okay.

13     A.    And I assume at that point he was

14  handcuffing him.  That's what --

15     Q.    Okay.

16     A.    -- it looked like to me.

17     Q.    Now, you -- you didn't -- did you --

18  you're saying you assumed he handcuffed him.  You

19  didn't see any handcuffs, then; is that correct?

20     A.    That's right.

21     Q.    Okay.

22     A.    But he was doing something to indicate

23  to me he was restraining both hands back here.  Now,

24  whether that was with handcuffs or with rope or a

25  cord or anything, I can't tell you that.

1       Q.      Okay.

2       A.      But I can tell you both hands were

3   behind his back constrained or restrained by

4   something.

5       Q.      Okay.  And what happened after that?

6       A.      He was able to get the -- the subject

7   up, and they started to walk from the weeds back out

8   here toward this little road.

9       Q.      Okay.  Can you draw an arrow as to where

10  they started walking?

11      A.      They started walking this way

12  (indicating).

13      Q.      Okay.  And then what happened?

14      A.      After they came out into here, the

15  subject jerked -- looked like he tried to jerk his

16  one hand a loose.  The officer -- when they were

17  coming out of the weeds, the officer had one hand in

18  the back of -- the back of his hand.  He had the

19  other hand on the guy's right shoulder, and they

20  started to walk from here over to here.

21              On the way out, I could see his left arm

22  flinch like he may have been trying to jerk that

23  loose.  The officer then took his hand off of his

24  shoulder and put it on his side, his -- the side

25  with his weapon, put it on top of his weapon

1  holster.  They made another couple of steps, and I
2  saw this arm jerk.  And the officer then pulled this
3  guy up a little closer, and they made another step.
4  And it looked like to me he tried to launch -- take
5  his -- his right arm again loose behind his back,
6  and all of a sudden, he was loose.  I don't know if
7  he was turned loose or broke loose.  And he started
8  running this way (indicating).

9        Q.    Who started running?

10       A.    The subject.

11       Q.    Okay.  Okay.  Put an arrow as to where
12 he ran.

13       A.    (Witness complies.)  He started running
14 this way.

15       Q.    Okay.  Okay.  And then what happened?

16       A.    And when he started to run, the officer
17 pulled his weapon and with both hands aimed and
18 fired.  As soon as he fired, this guy went facedown
19 in the bushes or weeds, whatever you want to call
20 them.  I call them bushes or weeds.  All I'm saying,
21 they were little shrubs as opposed to trees or
22 anything like that.  He went facedown.

23            The officer walked over with him with
24 his gun still drawn down to his side, reached down
25 and touched him.  I didn't see any movement out of

1  the subject.  The officer turned around, started to

2  talk to somebody on his little handheld phone, put

3  his weapon back into his holster.

4            And at that point I yelled at him,

5  "Officer, do you need some help?"  And he looked up

6  and saw me and started to wave with his right hand

7  like that (indicating).  I interpreted that to mean

8  "go back" or "don't come any further," whatever.  So

9  I moved back here, back to my car.

10           I could no longer see over this hill,

11 but until I moved -- there was a Dumpster here, so I

12 was stationed right here beside this Dumpster

13 because, you know, I didn't want to get up there and

14 have him shooting at me, so I stayed behind this

15 Dumpster all the time that I was talking to him

16 because I could hardly -- I yelled at him.  He

17 looked up and saw me.  I was standing right here

18 beside the Dumpster.

19      Q.    Okay.  What did you have on?

20      A.    I had on a -- a cap, a shirt, a pair of

21 Dockers trousers.

22      Q.    What color was your cap?

23      A.    Burgundy, with Tuskegee written across

24 the front.

25      Q.    Okay.

1            You -- you just stated that you saw the

2    officer approach the body and touch the body

3        A.    Yes.

4        Q.    Okay.  But you couldn't see anything

5    else?

6        A.    That's all he did.  He touched -- he

7    touched him, and when the guy didn't move, he put

8    his weapon back in his -- in the holster and turned

9    around and walked out talking to somebody on the

10   little phone that they carry on their -- in their

11   pocket.

12       Q.    Okay.

13       A.    And that's when I yelled at him, "Do you

14   need some help?"

15       Q.    Okay.

16       A.    And as he motioned for me to leave, from

17   over here, there was two individuals.  I thought one

18   was a -- a -- a state trooper by the kind of way he

19   was dressed, and the other person was a -- I'll call

20   some kind of tactical guy like those Red Dog squad

21   guys.  They wore -- they have black like fatigues

22   stuff on.  That's what the other one of the guys --

23   they were both Caucasian guys.  They came down

24   this -- as I was going back to my car to leave, they

25   came off of this hill on the Childress Street side.

 1  There's another building here that joins here, but
 2  this is where they came from (indicating).  They
 3  were coming down that hill as I was leaving.
 4       Q.   Okay.  And put -- put two Xs and -- over
 5  here.
 6       A.   What do you want me to put?
 7       Q.   Two Xs to represent two individuals
 8  and -- two Xs, please.
 9       A.   Okay.  (Witness complies.)
10       Q.   Okay.  And you saw -- and then just mark
11  down there -- you say one was a police -- did you
12  say a --
13       A.   I thought one was a state trooper, and
14  the other was a -- some kind of special forces kind
15  of guy.
16       Q.   Okay.
17       A.   That's as opposed to a regular uniformed
18  officer which -- which I would have been able to
19  identify.  At least I wouldn't have --
20       Q.   Okay.
21       A.   -- confused him if it was a special
22  forces type.
23       Q.   Okay.  And you stated that the officer,
24  you thought he was waving you off?
25       A.   Yes.

```
 1      Q.     Is that correct?

 2      A.     Yes.

 3      Q.     And what did you do after that?

 4      A.     I turned around, came back to my car.

 5 Well, after I yelled at him, "Do you -- do you need

 6 some help?" and he started to wave me back, I came

 7 back to my car, unlocked my car, got in, and drove

 8 out of the parking lot.

 9              As I was driving out of the parking lot,

10 I met an unmarked car coming up and another City of

11 Atlanta police car coming up.  They passed me coming

12 up --

13      Q.     Okay.

14      A.     -- to -- to here, to -- to --

15      Q.     Okay.

16      A.     -- the parking lot.  Off from

17 Campbellton Road --

18      Q.     Okay.

19      A.     -- is where they was coming from.

20      Q.     Okay.  They couldn't have been coming

21 from over here, could they?

22      A.     No.  There's no way for no car to get

23 over there.  They were coming from Campbellton Road.

24      Q.     All right.

25              At any point in time when you -- when
```

```
 1  you first approached the ledge up here that was near
 2  your car and you looked down into the field and you
 3  saw the subject and the police officer over here in
 4  the wooded area or --
 5         A.    No, weeds.
 6         Q.    -- heavy -- the weeded area --
 7         A.    Yeah, right.
 8         Q.    -- did you ever see Mr. Hampton with any
 9  weapons?
10         A.    No.
11         Q.    Did you ever see him with any baton in
12  his hand?
13         A.    No.
14         Q.    Did you ever see him assaulting the
15  officer?
16         A.    No.
17         Q.    Did you ever see him fighting the
18  officer?
19         A.    No.
20         Q.    Did he ever have an advantage or -- or
21  an edge, or did he ever have a gain in the fight?
22  Do you know what I'm saying?  Did he ever have an
23  advantage in -- in the -- what was going on down
24  here?
25         A.    No.  From the time I got up where I
```



1    could see them, the officer done had him facedown in

2    the weeds.  He got control of this guy before they

3    got up, and he had both hands behind his back

4    restrained by something.

5         Q.    Okay.

6         A.    To me I thought it was handcuffs by the

7    way he was -- was putting both hands behind his

8    back, but it could have been that little, you know,

9    plastic strip that they have that -- when they have

10   mass arrests that they restrain folks' hands with or

11   it could have been those black tactical handcuffs

12   that they use or it could have been the stainless

13   steel ones.  I wasn't able to tell you that.

14        Q.    Okay.  All right.  But you never saw

15   Mr. Hampton fighting or engaging in -- in any kind

16   of fight down here with the officer?

17        A.    Never.

18        Q.    Okay.  What happened after -- after you

19   were waved and after you decided to get in your car?

20        A.    I got in my car, went down to

21   Campbellton, turned left, and went up here to a

22   Chevron service station.  And I said, "I'm going

23   back to --"

24        Q.    Going back where?

25        A.    Back to the scene where I was when I saw

1    all this stuff going on to see what the police and
2    stuff was saying that happened if I get up there.
3    So when I got back into the parking lot, they had it
4    roped off with that yellow -- those yellow
5    streamers.  I don't know what they call it.  Crime
6    investigation tape or whatever they use.  That was
7    roped off, so I stopped.
8              And the police officer, "You can't come
9    any further.  This is a crime scene, and this is as
10   far as you can come," so I said, "Okay."  And I got
11   back in my car and left.
12        Q.    Where did you go?
13        A.    I went home.
14        Q.    Okay.  And what did -- what did you do,
15   if anything?
16        A.    When I got home, I said, "I've got to
17   tell somebody about what I just saw, but I don't
18   trust the Atlanta Police Department to do anything
19   about it."  So I have a good friend who is the -- a
20   fraternity brother who is the Chief Justice of the
21   Muscogee County Superior Court.  I said, "I'll call
22   Judge Allen," John Allen.
23        Q.    What's the name?  What's his name?
24        A.    John D. Allen.
25        Q.    Okay.

 1      A.    He's the Chief Judge of Muscogee County

 2 Superior Court.

 3      Q.    Okay.

 4      A.    So I called him and said, "John, I just

 5 saw a guy get shot down who was trying to get away

 6 from the officer.  He had no weapon.  He was just

 7 shot in the back."  And he said -- he told me, "Tell

 8 me a little more about it," so I told him the

 9 same -- the same way I just told you.

10           He said, "Well, you need to report it to

11 somebody."  He said, "Call and try to get a hold of

12 the Chief of Police or the Mayor of the City of

13 Atlanta."  I said, "No, I don't want to do that."

14 And he said, "Why?"  I said, "Because I think

15 they'll try and cover it up."

16           MS. TERRY:  Objection.

17           THE WITNESS:  He said -- he said,

18      "Well, okay.  But you've got to tell

19      somebody."  I said, "Tell you what I'm

20      going to do.  I'm going to watch the news

21      tonight and see what their version is of

22      what happened on the 10:00 o'clock news."

23           So at 10:00 o'clock that night, I

24      turned the news on.  I had -- I watched

25      Channel 11 and Channel 2.  And the

1         officer that they talked to, he said that

2         this officer had been pursuing this

3         suspect.

4         Q.    (By Mr. Richardson)   Okay.   Wait, wait,

5    wait, wait.   Slow down.   What -- what officer?   What

6    officer?   You said the --

7         A.    The police -- whoever was -- the

8    spokesman was for the Atlanta Police Department.

9         Q.    Okay.   There was a spokesman for them.

10        A.    On the TV.

11        Q.    Okay.   I'm sorry.   There was a -- there

12   was a --

13        A.    I'm watching TV.

14        Q.    -- police officer that was speaking on

15   behalf of this incident?

16        A.    Right.   I assume he was a police

17   officer.

18        Q.    Okay.

19        A.    So he was speaking for the City of

20   Atlanta Police Department, and he said that this had

21   been a chase and this -- this subject was pursued by

22   a City of Atlanta police officer.   During the --

23   during the arrest they got into a fight and this guy

24   got shot.

25             Well, I knew that wasn't true because I

```
 1   watched that, and that's why I chose not to go to
 2   the Atlanta Police Department to begin with.
 3              So I called Judge Allen and told him
 4   what I just heard on the radio and I saw it on both
 5   TVs -- I mean both channels, Channel 2 and
 6   Channel 11.  And he said, "Okay," said, "I know -- I
 7   have a contact with the G -- with the FBI there in
 8   Atlanta.  I will call him, have him contact you.  At
 9   least you will have made it known to some law
10   enforcement agency."
11              So I guess about a half hour, 45
12   minutes, some guy called, said he was -- and I
13   forget his name -- from the FBI, and I told him --
14       Q.    Was it Hosey?
15       A.    Not Hosty.
16       Q.    Okay.  I'm sorry.  Okay.
17       A.    And he said, "Somebody will be in
18   contact with you probably Tuesday."  He said, "This
19   is a long weekend, and most folks are going to be
20   out of pocket Friday, Saturday, and Sunday, and
21   we'll have -- I mean Monday, and we'll have somebody
22   get a hold of you on Tuesday."
23              And so Tuesday I got a call from Special
24   Agent Hosty, H-o-s-t-y, and he asked me if I could
25   come down to the FBI headquarters.  I said, "Yeah,"
```

1  and I agreed to go the next day down there to meet

2  them.

3          So I -- while I was home there, I wrote

4  up a statement of what I had witnessed and signed it

5  and left it undated because I was going to the FBI

6  and I was going to have them to notarize and copy

7  and all of that stuff.

8      Q.    Was that the state --

9      A.    And that's what I did.

10     Q.    I'm sorry.  Was that the statement dated

11  July 2nd, 2011?

12     A.    That's the statement that's dated July

13  the 2nd, which is the day I went down to talk to the

14  FBI, but I wrote that -- that statement up on the

15  31st, but I wrote the 2nd on there because I wanted

16  to get them notarized, and I didn't think they would

17  notarize one that's predated, so --

18     Q.    Okay.  So you --

19     A.    -- I took it.

20     Q.    So you prepared your statement the very

21  next day?

22     A.    I prepared it the very next day, yes.

23     Q.    And you took that statement with you

24  down to meet with Agent Hosty?

25     A.    Yes.

1     Q.    And you were going to have it notarized

2  by one of Agent Hosty's --

3     A.    Whoever their notary was.

4     Q.    -- representatives down there?

5     A.    Yes.

6     Q.    And that's why you dated it the 2nd,

7  because --

8     A.    Yes.

9     Q.    -- that's the day that you went down to

10 see Agent Hosty?

11    A.    That's exactly right.

12    Q.    Okay.  But it never did get notarized?

13    A.    They didn't -- he said they didn't need

14 it notarized because they wouldn't use my statement

15 exactly, so I said, "Okay."

16    Q.    Okay.

17    A.    And until -- I said, "Well, can I get a

18 copy of my statement?"  And he said, "Yes.  Put in a

19 Freedom of Information Act to get it."

20    Q.    Okay.  So then you've met with several

21 people, several different agencies since then and --

22 and have given statements; is that correct?

23    A.    Yes.

24    Q.    Okay.

25          At any point in time when you saw

1  Mr. Maurice Hampton running up the driveway and you

2  saw Mr. Maurice Hampton in the -- in the -- in the

3  bushes and in the field, did you ever see

4  Mr. Maurice Hampton with any weapons?

5       A.    Never.

6       Q.    Did you ever see Mr. Maurice Hampton at

7  any point in time with any objects or any devices or

8  anything in his hand that could be used as a weapon?

9       A.    Never.

10      Q.    Did you ever see him resist -- or -- or

11 you saw him running from the -- from the officer;

12 correct?

13      A.    Yes.

14      Q.    Did you ever see him strike the officer

15 with his fist?

16      A.    Never.

17      Q.    Did you ever see him strike the officer

18 with a baton?

19      A.    Never.

20      Q.    Did you ever see a baton in Maurice

21 Hampton's hand?

22      A.    Never.

23      Q.    And it's your testimony that when they

24 were on the ground, the officer was on top of

25 Maurice Hampton?



1     A.     Yes.

2     Q.     Trying to get control of his hands?

3     A.     Trying to get control of his right hand.

4  He already had the left one behind his back.

5     Q.     And then at some point in time, Maurice

6  Hampton and Officer Atzert got up from the ground;

7  is that correct?

8     A.     Yes.

9     Q.     And at some point in time after that,

10 Maurice Hampton took off running again?

11    A.     Yes.

12    Q.     And it was at that point in time when he

13 took off running that he was shot in the back?

14    A.     Yes.

15    Q.     Did you at any point in time ever on

16 that day see Maurice Hampton threaten Officer --

17 Officer Atzert?

18    A.     No.

19           MR. RICHARDSON:  I don't have any

20      other questions.

21           MR. MILLICAN:  LaShawn, do you want

22      to go, or do you want me to?

23           MS. TERRY:  I have a few, but I'll

24      let you go first.

25           MR. MILLICAN:  Okay.

1                    EXAMINATION

2  BY MR. MILLICAN:

3       Q.    All right.  Mr. Williams, my name's Josh

4  Millican.  I represent Thomas Atzert.

5       A.    You represent who?

6       Q.    The officer, Thomas Atzert.

7       A.    Okay.

8       Q.    So I've got some questions for you, some

9  follow-up questions.

10              I see you've got glasses on today?

11      A.    Yes.

12      Q.    Are those bifocals or --

13      A.    Yes, bifocals.

14      Q.    Can you -- do you -- what is your

15  vision?  Are you able to see distances, or do you

16  need glasses for distances, as well?

17      A.    I use the glasses for reading only.

18      Q.    Okay.  When is the last time you, I

19  guess, had an eye exam and had your vision checked?

20      A.    Last month.  Or you mean prior to this?

21      Q.    Yes.

22      A.    I had them checked annually.

23      Q.    Okay.  And so it's your testimony that

24  as of June 30th, 2011, you only needed glasses for

25  reading?



1       A.      Only for reading.

2       Q.      Did you have glasses on when you were

3  out --

4       A.      No.

5       Q.      -- getting to your car that night?

6       A.      No.

7       Q.      You're wearing glasses now.  I'm just

8  trying to figure this out.  Do you now need glasses

9  for anything other than reading?

10      A.      No.

11      Q.      You thought we might give you things to

12  look at and read?

13      A.      Yes.  I can look at -- I can read some

14  of that, but I'm saying I just --

15      Q.      I got you.

16      A.      -- wear them for reading.  I don't need

17  them for distant vision.

18      Q.      And how old are you, sir?

19      A.      Seventy-four.

20      Q.      So you would have been on June 30th,

21  2011, 72?

22      A.      Seventy-two.

23      Q.      And do you wear any hearing aids or

24  devices?

25      A.      I do.

1      Q.    And did you on June 30th, 2011, wear
2   hearing aids or devices?
3      A.    I wore them just like I wear them now.
4   When I need to hear everything that's said, I wear
5   hearings aids.  If I don't, I don't have them.  I
6   put these in outside.
7      Q.    Okay.  Well, when you -- when you saw
8   the incident that you're testifying about today, did
9   you have your hearing aids in?
10     A.    No.
11     Q.    And are you on any sort of medication
12  now that would affect your memory as to something
13  that happened a couple of years ago?
14     A.    I don't think so.
15     Q.    You seem to have a distrust of the
16  Atlanta Police Department.  Where -- where does that
17  stem from?
18     A.    I've been in Atlanta since 1987.  I've
19  seen lots of questionable actions by the Atlanta PD
20  when it came down to people being charged and not
21  charged or the stories differ.  I could say I've
22  seen any number of times when that happened that the
23  Atlanta Police Department didn't do what I thought
24  they should have done, and some of the stuff that
25  they came out just didn't make any sense.

1      Q.    And that's just based on your personal

2  opinion?  You've got --

3      A.    Yes.

4      Q.    -- nothing that's personally happened to

5  you?  You've just been a resident of Atlanta for 25

6  years or whatever?

7      A.    And read the paper.

8      Q.    Okay.

9      A.    And being a practicing lawyer, a lot of

10 that stuff I will read, like I was reading cases out

11 there today in the -- the legal paper for Fulton

12 County, the -- and I just -- over the years I just

13 had a distrust for police officers.  I've got three

14 or four friends that are Atlanta policemen.

15     Q.    Okay.

16     A.    And I tell them the same thing I'm

17 telling y'all:  I don't trust y'all to come out with

18 the truth when it involves a police person.

19     Q.    And do you -- is that a distrust you

20 have generally for law enforcement or just for

21 Atlanta Police Department?

22     A.    Just -- Atlanta PD is the first place

23 I've experienced -- well, not personally but have

24 read of things that the Atlanta PD did or said that

25 just -- just wasn't true.

1       Q.    And have you, yourself, had prior bad

2    experiences with law enforcement?

3       A.    No.

4       Q.    And -- and do you -- what relationship

5    do you have with the Fulton County DA's Office?

6       A.    None until this -- this thing came up.

7    And when you say relationship, I didn't have

8    anything then but tried to get word to him that

9    "Hey, I saw what happened, and why isn't somebody

10   doing something?"

11      Q.    Well, let's talk a little bit about what

12   you saw.  I believe you said -- and I'm going to

13   point you to this exhibit.

14            Did you see -- when you first saw, I

15   think you said, the officer chasing the subject,

16   they were about 50 or 60 feet away from you?

17      A.    Yeah.

18      Q.    Is that what you said?

19      A.    When I first saw them.

20      Q.    Did you see the -- did you see the

21   police car pull over another vehicle?

22      A.    No.

23      Q.    Did you see the police car or another

24   vehicle parked in the parking lot?

25      A.    Where?  Over here at the --

 1       Q.    When you first saw the subject, like I
 2  guess when you first saw them, did you see them
 3  coming from any vehicles?
 4       A.    No.  They were running.
 5       Q.    Okay.
 6       A.    Coming up the street from Campbellton
 7  Road, coming this way.
 8       Q.    Okay.  And what I'm saying is, in this
 9  parking lot you didn't see a -- a minivan with a
10  police -- a police car behind it?
11       A.    No.
12       Q.    Okay.  And --
13       A.    That happened over here.  There's
14  another building adjoins this one on Childress
15  Street; and both of them, Campbellton Road runs
16  right beside them.  There's another club.  It's had
17  a lot of names:  Cisco, the Savoy, and all of those.
18  That's it right here.  Now, where his van and stuff
19  got stopped was right here off of Childress Street
20  adjacent to this other building that sits up here
21  that used to be called Club Savoy.
22       Q.    That's what I'm asking.  How do you know
23  that?  Did you see that?
24       A.    Did I see that -- where the vehicle was
25  parked?

Case 1:13-cv-00584-TWT   Document 76   Filed 02/17/15   Page 47 of 87

47

```
 1        Q.     Yes.

 2        A.     No.

 3        Q.     Were you --

 4        A.     Somebody told me that's where it was.

 5        Q.     And that's what I'm trying to get at.

 6  You -- you didn't see that?  You didn't personally

 7  observe it?

 8        A.     Did not.

 9        Q.     Okay.

10        A.     The only thing I saw anything associated

11  with this, this guy was being chased for some

12  reason.  And I asked them, you know, "What did he

13  do?"  And they said, "Hey, the cop stopped him over

14  there for something, and he jumps out and started to

15  run."

16        Q.     Okay.  And I'm just asking what your

17  personal knowledge is --

18        A.     Okay.

19        Q.     -- and what you saw.  Okay?

20        A.     Okay.

21        Q.     So when you first saw them, they were

22  about 50 -- 50 or 60 feet away from you where you

23  were about to get back into your vehicle?

24        A.     That's right.

25        Q.     And was the officer in his APD uniform?
```

COURT REPORTING, LLC

1        A.     Yes.

2        Q.     And you -- I guess did you watch them

3   run towards you the entire time until they passed

4   you, or did you --

5        A.     I surely did, run -- run right past me

6   no more than 10 feet.  The officer looked over at --

7   at me.

8        Q.     Okay.  And when he looked over at you

9   and when he was chasing the subject, he did not have

10  his weapon drawn; is that correct?

11       A.     He did not.

12       Q.     Okay.  And I think you said that when

13  he -- when they ran by you, the officer looked at

14  you and was using his --

15       A.     He was talking to somebody on his phone,

16  yes.

17       Q.     On -- on his -- his radio attached to

18  his uniform?

19       A.     Yes.

20       Q.     And was he calling for backup?  Did you

21  hear what he was asking for?

22       A.     I couldn't -- I couldn't tell what he

23  was saying.  I just know he was talking to somebody.

24       Q.     You were unable to hear what he was

25  saying?

1      A.      Right.

2      Q.      Were you able to hear the officer say

3  anything to the subject as they were running by?

4      A.      No.  He didn't say anything to the

5  subject.

6      Q.      And for the entire 50 or 60 feet until

7  they got to you and passed by you, did you

8  witness -- did you witness or hear anything?

9      A.      No.

10      Q.      Okay.

11      A.      If you're talking about "halt," "stop,"

12  and that kind of thing, none of those kind of words

13  were uttered.

14      Q.      No.  I'm just asking you what you heard.

15      A.      No.

16      Q.      Okay.  But it's your testimony that you

17  didn't see them running from this other parking lot?

18  You have no idea what happened in that original

19  parking lot?

20      A.      Other than what I've been told.

21      Q.      Right.  And you have no idea -- how far

22  is it from this other parking lot to where you first

23  saw them?  A couple -- is it a hundred yards?  Two

24  hundred yards?

25      A.      You'd have to come down here to

50

1  Campbellton Road and come this way.

2       Q.    Okay.

3       A.    Okay?  I would say from here down to

4  Campbellton Road, 50 yards.

5       Q.    Okay.

6       A.    From Campbellton Road down here where he

7  could get up here, 75 yards, and from -- from there

8  over there is 75 yards.  You could be here where you

9  can come straight up that street.

10      Q.    So just to clarify, from where you

11  understand the original, I guess, traffic stop to

12  where you first saw the officer and subject was

13  about a hundred and twenty-five yards --

14      A.    Yes.

15      Q.    -- is that correct?  Okay.  And so you

16  have no idea what happened in that first hundred and

17  twenty-five yards?

18      A.    I do not have any idea what caused the

19  stop or this guy, the subject, to -- to come into

20  that parking lot there at Childress.

21      Q.    And you have no idea whether the officer

22  told him to stop or halt or anything like that

23  during that first hundred and twenty-five yards?

24      A.    I do not.

25      Q.    Okay.  All right.  So then they run by

1   you, and at that point how long was it before you

2   got to, I guess, the hill to where you could see

3   over the hill?  I think you said about ten to --

4        A.    Fifteen, twenty seconds.  The time it

5   would take me to lock my car, get out -- you know,

6   lock my car and walk over there to the edge of that

7   thing was no more than -- no more than 20 seconds.

8        Q.    Well, how -- how far was it from your

9   car to the edge of the thing?

10       A.    Probably 20, 25 feet.

11       Q.    And did you run over there, or did you

12  walk?

13       A.    I just took my time to walk because I

14  didn't know what was going on down there.  I wasn't

15  about to get shot.

16       Q.    Okay.  Well, you didn't see an APD

17  officer have a gun out, but you were worrying about

18  getting shot?

19       A.    Anytime you've got a gun, you could get

20  shot if you just stick your head out there or look

21  like you're coming to the aid of whoever they're

22  chasing or something.  I just took my time and made

23  sure I kept that Dumpster between me and what was

24  going on down there as best I could.

25       Q.    Okay.  But your -- you testified earlier

1  that the officer did not have his weapon drawn; is

2  that correct?

3       A.    He did not.

4       Q.    Okay.  But you still had a concern about

5  getting shot even though you didn't see a weapon

6  drawn?

7       A.    I always have when -- when cops and guns

8  and stuff around, I'm careful because I don't want

9  them confusing me with part of what's happening,

10  what is it that they're doing, so I don't just run

11  flying up there.  I made sure I had something I

12  could hide behind if I had to.

13      Q.    So there -- I guess -- are you -- is it

14  your testimony that you walked either 20 or 25 feet

15  after locking your car and then was -- were standing

16  behind a Dumpster?

17      A.    Beside the Dumpster, because here's the

18  Dumpster right there, and my car was here.  I just

19  walked right up to the edge of the Dumpster.

20      Q.    So you weren't behind the Dumpster?  You

21  weren't hiding for safety?

22      A.    I didn't get behind it -- I didn't get

23  behind the Dumpster until that officer fired that

24  shot at that guy from behind.

25      Q.    All right.  So you --

```
 1      A.    And that's why I left, because I didn't
 2 want him firing at me saying I was trying to help
 3 this guy.
 4      Q.    All right.  How far from the top of the
 5 hill down to where you first saw the officer and the
 6 subject on the ground, how far of a distance is
 7 that?
 8      A.    I would say it's a hundred feet.
 9      Q.    And I think you said when you first got
10 over there, you saw them on the ground, the officer
11 on the back of the subject; is that correct?
12      A.    Yes, that's right.
13      Q.    And they were facing away from you?
14      A.    Yes.
15      Q.    Okay.  So you were looking at their
16 feet?
17      A.    Yes.
18      Q.    Okay.
19      A.    But I could see their whole body.
20      Q.    Well -- and that's what I'm trying to
21 figure out.  If they were facing away from you --
22 were they facing away from you, or were they --
23      A.    No.  They were -- when they -- they were
24 laying -- when I got up, they were facedown in the
25 weeds.  Once they got up, they were coming back out
```

```
 1  this way.
 2       Q.    Okay.
 3       A.    That's when I could see --
 4       Q.    I'm just --
 5       A.    -- all of it.
 6       Q.    I'm just trying to break it down --
 7       A.    Okay.
 8       Q.    -- into sections.  Okay?
 9       A.    Okay.
10       Q.    So when you first saw them and they were
11  facedown in the weeds --
12       A.    Uh-huh.
13       Q.    -- their -- their heads were -- you were
14  staring down at their feet, basically, and their
15  heads were further away from you --
16       A.    That's right.
17       Q.    -- is that correct?  Okay.  And that was
18  about a hundred feet away?
19       A.    I'd say a hundred feet.
20       Q.    Okay.  And is that the time that you
21  said you saw the officer striking the subject with
22  the baton?
23       A.    Yes.
24       Q.    Okay.  And you, in fact, never saw what
25  ended up happening with that baton, did you?
```



```
 1      A.    I don't -- I don't know what happened to
 2 the baton.
 3      Q.    Right.  Like you -- you didn't see the
 4 officer put it back on his belt --
 5      A.    No.
 6      Q.    -- is that correct?  You didn't see the
 7 officer -- you didn't see what happened to it?  You
 8 have no idea where it ended up; is that correct?
 9      A.    I do not.
10      Q.    And then I believe you also in one of
11 your interviews had said, and you may not have said
12 it just now, that you did not see an OC, a pepper
13 spray, canister in the officer's hand; is that
14 correct?
15      A.    That's correct.
16      Q.    And that you did not see a hand -- any
17 handcuffs or a gun -- or a gun in the officer's
18 hand?
19      A.    What?  Now, what?  Separate those
20 questions.  At what point do you mean the gun?
21      Q.    We're just talking about when the
22 officer's on the -- on the back --
23      A.    Okay.
24      Q.    -- when they're laying facedown facing
25 away from you in the weeds.
```

```
1        A.     Okay.
2        Q.     Okay.  Well, actually, you know what?
3   You've -- you've made me ask a better question.  Did
4   you ever see any pepper spray at any time?
5        A.     No.
6        Q.     Okay.  Did you ever see any handcuffs at
7   any time?
8        A.     Not handcuffs that I -- as I recall.
9        Q.     Okay.
10       A.     But something was restraining the guy's
11  hands behind his back.
12       Q.     Well -- and we'll get to that.  You've
13  said that --
14       A.     Right.
15       Q.     -- a number of times, and I -- I'm just
16  trying to say you never specifically saw handcuffs
17  on him?
18       A.     I did not.
19       Q.     Okay.
20              I believe in one of your interviews you
21  said that the subject was too large compared to the
22  officer, and I'm talking about when the officer was
23  on his back.  Do you recall saying that?
24       A.     The officer -- said the officer was
25  bigger than the --
```

1      Q.    No, that the subject -

2      A.    That the subject was bigger than the

3 police officer?

4      Q.    Yes.

5      A.    Yes.

6      Q.    Okay.  And that -- that you observed the

7 subject rise to his knees on his own because the

8 officer could not have lifted him because the

9 subject was too large compared to the officer?

10     A.    Right, because the officer must have

11 told him, "Get up."  I didn't hear him say that, but

12 they got up.

13     Q.    What --

14     A.    And this officer had -- had his hands on

15 whatever was restraining him, and he helped him up.

16     Q.    Okay.  And my question is, is not what

17 you think or assumed happened because you said you

18 didn't hear it; right?  My question is, you observed

19 the subject rise to his knees on his own, meaning

20 the officer didn't pull him up; is --

21     A.    No.

22     Q.    -- that correct?

23     A.    That is not what happened.  The officer

24 had assisted him in getting up --

25     Q.    Well --

 1      A.     -- when he couldn't pick him up by

 2  himself, but he could help him get up.

 3      Q.     Did the officer tell him to get up or

 4  the officer picked him up?

 5      A.     I did not hear that.  I didn't hear the

 6  officer tell him that, but I could see the officer

 7  getting him up.

 8      Q.     Okay.  So -- and I'm just trying to

 9  clarify because you -- you -- you've given several

10  statements and interviews, and some of them were

11  clarifications of others and some of them have small

12  discrepancies, so I'm trying to make sure I

13  understand.

14      A.     Okay.  Well, the first thing, some of

15  those statements are still inaccurate.

16      Q.     And that's why we're -- that's why

17  you're being deposed.

18      A.     Okay.

19      Q.     But I -- until today I had never met

20  you.  I didn't have the luxury of -- of sitting down

21  with you.  I assume you've met Max before.  So I'm

22  just trying to clarify.

23             So when you first see the officer, he's

24  on top of the subject, and you said that they got

25  up, the officer didn't pull him up but the officer

```
 1   helped him up because the officer couldn't have
 2   pulled him up because he was a big -- larger guy; is
 3   that --
 4        A.    Yes.
 5        Q.    -- fair to say?
 6        A.    Yes.
 7        Q.    Okay.  And at that point their backs
 8   were still to you, but then they started to turn and
 9   come in this direction; is that correct?
10        A.    As they got up, yeah, they turned to
11   come -- to come out of the weeds where they were.
12        Q.    Okay.  So then when the officer stood up
13   and had the subject, your vantage point was the --
14   was the opposite, meaning they were walking directly
15   facing you; is that correct?
16        A.    Yes, coming toward me.  That's right.
17        Q.    And you could only see the front of the
18   subject?
19        A.    I could see the front of the subject and
20   the -- half of the side of the officer.
21        Q.    And that's something I'll get to because
22   from what I understand, the -- and I'm not going to
23   draw on this, but they started walking towards you
24   directly, vantage point was the front, and then they
25   turned a little bit so you could see the right side
```

1  of the officer?

2      A.    That's right.  They came out, and it was

3  just a gradual turn, if you will.

4      Q.    Right.  Okay.  So the initial -- the

5  initial vantage point when they started walking out,

6  though, was, you were facing the subject, but you --

7  and then -- and you were facing the subject head-on,

8  but they started to turn gradually, exposing part of

9  the right side of the officer and the subject; is

10 that correct?

11     A.    That's right.

12     Q.    Okay.  But you could not see the

13 subject's hands or what was happening or what was

14 keeping his hands behind his back?

15     A.    I could see his hands were restrained by

16 something behind his back, but I can't tell you if

17 they were handcuffs or a rope or a chain or a little

18 plastic strip.

19     Q.    Or the officer's hands?  You never

20 actually saw anything?  You just saw his hands

21 behind his back?

22     A.    I said something -- well, the officer

23 was holding something behind his back.

24     Q.    Okay.  But -- and that's what I'm trying

25 to clarify.  You didn't see what it was?  You're not

1  sure if there was an actual device restraining him

2  or if it was the officer's hands restraining him?

3       A.    That's true.

4       Q.    Okay.  You couldn't specifically see any

5  type of restraint?  You just saw that the hands were

6  behind his back?

7       A.    That something was holding his hands

8  behind his back, yes.

9       Q.    And -- but that something, you couldn't

10 tell what that something was?

11      A.    That's right.

12      Q.    And that you could see, I think you

13 said, the officer's right hand on the subject's

14 right shoulder; is that correct?

15      A.    Yes.

16      Q.    But you could not see if anything was

17 happening between the subject and the officer behind

18 the subject?

19      A.    No, because both hands were behind -- he

20 had both hands behind his back.

21      Q.    And you could not tell if the subject

22 had anything in his hands or that the officer had

23 anything in his left hand; is that correct?

24      A.    Nothing but whatever he was holding to

25 keep the guy's hands restrained behind his back.

```
 1        Q.    And you keep saying that, and I'm going
 2    to keep asking -- and that's fine.  You're
 3    clarifying.  I'm asking a very specific question.
 4        A.    And I'm going to give you the same
 5    answer.
 6        Q.    I understand that.
 7        A.    Okay.
 8        Q.    And I'm going to keep asking a very
 9    specific --
10        A.    Well, we'll get -- we'll get to the
11    point where you'll be tired of that in a little
12    while.
13        Q.    I'm just trying to make sure we clarify.
14        A.    Okay.  What is it that's not clear to
15    you?
16        Q.    Well, you keep making assumptions, and
17    you're entitled to make assumptions.  I'm trying to
18    clarify what your assumptions are versus what you
19    actually saw.
20        A.    Okay.  Tell me what assumptions that
21    I've made that you don't like.
22        Q.    It's not -- is it your testimony that
23    you could not tell if the subject had anything in
24    his hands?
25        A.    Yes.
```

 1      Q.    And is it your testimony that you could
 2 not tell that the officer had anything in his left
 3 hand?
 4      A.    Well, now, I'm going to have to explain
 5 that because when you say "had something in his left
 6 hand," he was holding whatever was restraining the
 7 subject's hands.
 8      Q.    Okay.
 9      A.    He had to have his hand on that because
10 he couldn't have -- he wouldn't have had any -- any
11 way to get this guy from over in here.
12      Q.    Okay.  But you --
13      A.    Stand up a minute.  Let me -- let me use
14 you.
15      Q.    I'll humor you.  Don't -- I've got a
16 bruised rib, so please don't touch me there.
17      A.    Okay.  Put both hands back here.  I
18 don't know what's in your hand.  Now, this is the
19 way they were coming out of the weeds
20 (demonstrating).
21      Q.    Okay.
22      A.    See?
23      Q.    And that's what I'm saying.  You
24 couldn't see the left hand?  You just saw that the
25 subject's hands were behind his back, and you're

1  assuming that he was being held by the left hand?

2       A.    And I'm saying the officer was behind

3  him with -- holding these two hands back there with

4  something.

5       Q.    Okay.

6       A.    And I don't think it was just his hand.

7       Q.    But that's what I'm saying.  You don't

8  know what it was?  You couldn't --

9       A.    That's right.

10       Q.    -- see?

11       A.    That's right.

12       Q.    It could have been his hand?  It could

13  have been -- although I -- it could have been

14  anything?  You just -- you're not sure?  It appeared

15  as though he was being held with the officer's left

16  hand?

17       A.    With what I thought was handcuffs, yes.

18       Q.    Okay.  But you never specifically saw

19  those?  That's what you assume?

20       A.    That's right.

21       Q.    Okay.

22       A.    I can unequivocally say that his hands

23  were restrained by something.

24       Q.    Right.  And then if -- I believe you

25  also -- isn't it true that if the subject was

1  grabbing at the officer or swinging something at the

2  officer behind his back, you would not have been

3  able to see that?

4       A.   No.  You're reading that stuff the FBI

5  guys put together.  I read over their stuff, and

6  that makes no sense.  I'm looking at somebody and

7  can't see if somebody's swinging something?

8       Q.   No.  Behind them, not from the front.

9  If somebody's walking towards you and their hands

10 are behind their back, you can't see what their

11 hands are doing?  You could just see --

12      A.   I've never been behind them.  They were

13 never in front of me where I couldn't see.  The only

14 thing I could see, from the front of them to the

15 side of them I have always been able to see.  But if

16 somebody was behind them, I've never -- was never

17 behind these guys.

18      Q.   When they first started walking this

19 direction, they were walking directly at you

20 head-on --

21      A.   Okay.

22      Q.   -- is that correct?  Before they started

23 to turn a little bit; is that --

24      A.   Yes.

25      Q.   -- correct?  Okay.  And at that point

1  you couldn't see if Mr. Hampton, if the subject was

2  fighting with his hands behind his back or grabbed

3  the baton?  You couldn't see what was going on

4  behind his back?  You just saw his hands were behind

5  his back; is that correct?

6      A.    But I've just watched these guys get

7  handcuffed.  They're laying on the ground.

8      Q.    And that's the assumption again, is, you

9  didn't see handcuffs?

10     A.    No.  He got his hands restrained while

11  he was laying there on the ground.

12     Q.    So you're assuming that his hands were

13  restrained with something other than the officer's

14  hand, and that's -- that's sort of the --

15     A.    Yes.

16     Q.    -- assumption that you keep making; is

17  that --

18     A.    Yes.

19     Q.    -- correct?

20     A.    Yes.

21     Q.    And -- but you didn't see the restraint?

22     A.    I did not see the device that was

23  restraining the hands, yes.

24     Q.    So under my question, you know, if it's

25  easier for me to pose it as a hypothetical to you,

1  let's assume hypothetically there was no restraint
2  on his hands, okay, meaning -- by restraint, I mean
3  no handcuffs, no ties, no anything like that.  Okay?
4  You -- are all -- and if they're walking towards
5  you, you can't see his hands if they're behind him;
6  is that correct?

7        A.    That's true.

8        Q.    So if his hands behind him are -- you
9  know, have a baton and are swinging a baton or
10 punching or whatever, you can't see what's going on
11 with his hands behind him at that point; is that
12 correct?

13       A.    That is correct.  I couldn't see that.
14 But if both hands were behind his back and this --
15 the officer doesn't have but two hands, one is
16 holding something behind his back and the other
17 one's on the guy's shoulder.  Now, actually I was
18 able to see that all of the time, so there was no --
19 there was no opportunity during that time for him to
20 have anything to hit with.

21       Q.    Well -- and that's the part that I'm
22 still not following.  If they're walking towards you
23 and your vantage point is straight on, you can't see
24 what's behind his back?  I mean, I'm not -- I don't
25 understand the fight we're having.  If there's -- if

```
 1  there's -- if you can't see behind someone's back,
 2  you can't testify as to what that person's hands was
 3  doing; is that correct?
 4       A.    Yeah, that's correct.  But you can also
 5  say, is it not reasonable to say that the guy's got
 6  to be hold -- the officer's got to be holding his
 7  hands with something, two hands as opposed to one
 8  hand or no hand?  The guy wasn't holding his hands
 9  behind his back voluntarily.
10       Q.    But that's an assumption.  You don't
11  know that.  You're assuming that.
12       A.    No, wait.
13       Q.    Is that correct?
14       A.    Okay.  You know, it's your -- it's your
15  deposition.  Ask whatever you want.
16       Q.    I am, and that's what I'm saying, is,
17  you're talking about what's reasonable, what you
18  think is reasonable.  I'm asking you what you saw,
19  not what you think happens.
20       A.    Okay.  Well, then don't put words in my
21  mouth.
22       Q.    Right.
23       A.    Okay.  Go ahead.
24       Q.    So I'm just trying to clarify that when
25  they were walking towards you, you could not see the
```

1  subject's hands behind his back?

2      A.    Right.

3      Q.    And you could not see if he was, for

4  lack of a better word, fighting with his hands

5  behind his back?  You assume he was not, but you

6  couldn't see that?

7      A.    No.  I couldn't see any fight going on

8  behind his back because he didn't have anything to

9  fight with.

10     Q.    But you wouldn't have been able to see

11 because of the vantage point?

12     A.    Okay.

13     Q.    Is that correct?

14     A.    Yes.

15     Q.    And then I believe you had said -- so

16 then at some point I believe you said that they

17 started walking and then the subject broke loose?

18     A.    They were walking from over in here.

19     Q.    Okay.

20     A.    (Indicating.)  From over in here.

21     Q.    Right.

22     A.    And I could see all of this.

23     Q.    Right.  How far did they walk, I guess,

24 from the time that they got -- he got --

25     A.    Ten --

```
 1      Q.    -- started walking back towards you?

 2      A.    Ten to fifteen feet --

 3      Q.    Okay.

 4      A.    -- before this guy broke loose.

 5      Q.    And then he broke loose.  And when he

 6 broke loose, were you watching the police officer or

 7 were you watching the subject break loose?

 8      A.    I'm watching the police officer.

 9      Q.    Okay.  So you didn't see the subject run

10 with his arms in front of him?

11      A.    Well, I don't particularly remember

12 seeing that, but I was watching what this police

13 officer was doing --

14      Q.    And you --

15      A.    -- because he had drawn his weapon.

16      Q.    And you didn't watch the subject running

17 with his hands handcuffed behind him, which would be

18 a --

19      A.    I saw him --

20      Q.    -- funny way to run?

21      A.    I could see him out of my peripheral

22 vision, but I couldn't tell you if he -- if his

23 hands were behind his back or not, but I know he was

24 running and the officer was pointing the weapon at

25 him.
```

```
 1        Q.    Okay.  And that's -- and that's my
 2   point, is, you saw him run away, but you were
 3   focused on the officer, not the subject at that
 4   point?
 5        A.    That's right.
 6        Q.    All right.  And -- let me back up.  I
 7   believe you said that when the guy ran by you, you
 8   noticed he had a round -- the subject ran by you,
 9   you noticed he had a round face?
10        A.    Yeah.  He was just a little round-faced
11   guy, and I started thinking about this.  "Did that
12   guy have Down's syndrome?"
13        Q.    Well, that's something that -- is that
14   something you just now thought about, or is that
15   something that you had thought about at the time?
16        A.    No.  I just -- not just -- when you mean
17   just thought about it now, I've had that thought run
18   through my mind some number of times.
19        Q.    But that's --
20        A.    It was something about this guy's face
21   that was different.
22        Q.    You have no -- I mean, you have no
23   knowledge that he had any -- that he had Down's
24   syndrome --
25        A.    No.
```

 1        Q.    -- or anything?  Okay.  That was just

 2   something that was in your -- in your mind?

 3        A.    Yeah.

 4        Q.    Okay.  And you had never -- as far as I

 5   could tell, I don't think you said that to anyone

 6   when you gave statements before; is that correct?

 7        A.    Not that I particularly recall saying

 8   that to anybody.

 9        Q.    Okay.

10        A.    But to ask me to describe the guy, you

11   know, I'd say he was so -- so many feet tall, so

12   many -- and weighed so many pounds, looked like to

13   me just had this little round face.

14        Q.    And then -- okay.  After -- and then

15   after -- so the guy breaks away, and you see the

16   officer draw his weapon, and you're watching the

17   officer at that point?

18        A.    Yes.

19        Q.    Okay.  Then you see a shot fired?

20        A.    Yes.

21        Q.    And then did you watch the subject?

22        A.    Sure.  I watched him go facedown as soon

23   as the shot was fired.

24        Q.    Okay.  And how far -- did he go forward

25   at all or he just -- you're saying he just fell

1  down?

2      A.     How far did he do what?

3      Q.     I guess how far did he go from where he

4  was shot?

5      A.     From the time he broke loose, he was

6  shot, I'd say, within 10 to 15 feet.

7      Q.     And then how far -- did he fall --

8      A.     He fell --

9      Q.     -- straight down?

10      A.     -- flat down.  He didn't run anymore.

11  He didn't make another step.

12      Q.     Okay.

13      A.     Bam, bam, just like that.

14      Q.     And this is -- and at this point it's

15  still about a hundred feet away that you're

16  witnessing --

17      A.     Yes.

18      Q.     -- these things?  Okay.  And then at

19  that point, you called down to the officer and said,

20  "Hey, do you need help?" or something, and you think

21  he said, "Hey, go away," but you saw him talking on

22  his --

23      A.     Yes.

24      Q.     -- radio?

25      A.     He was talking to somebody on his radio.

```
 1        Q.    And when you were still there, is that
 2   when you saw -- you were still at the top and you
 3   had just witnessed what you saw, is that when you
 4   saw these two other officers arriving?
 5        A.    Yes.  After the officer had told me to
 6   get away, I started to turn and leave, but I kept
 7   watching.  I see these guys come down the hill over
 8   there.
 9        Q.    Okay.  And I guess --
10        A.    And I kept going on back here to my car.
11        Q.    Well, I think -- I'm sorry.  I skipped a
12   part.  I think you said that the officer then put
13   his gun down, approached the subject, and, you said,
14   touched him for a second or two?
15        A.    He walked into the weeds with his gun
16   down to his side --
17        Q.    Okay.
18        A.    -- and reached over and touched this
19   guy.
20        Q.    Did he check a pulse, or could you tell
21   from what it was -- what you were seeing?
22        A.    No.  He just walked over and touched him
23   and then put his weapon back in his hand, turned
24   around, and walked out talking to somebody on his
25   little -- what do you call that?  I call it a little
```

1  handheld microphone that's attached to his uniform.

2      Q.    And you -- so then he -- okay.  You

3  talked about that already.

4          And you did not observe that officer

5  reapproach the subject after that, did you?

6      A.    No, I did not.

7      Q.    And then you also saw these other

8  officers coming?

9      A.    Two, two of them.

10     Q.    Okay.  And you didn't see any officer --

11 you didn't see Officer Atzert go back to the subject

12 and plant the -- the ASP baton in his hands?

13     A.    I didn't see -- I didn't see any of

14 that.

15     Q.    And you didn't see any other officers

16 plant any weapons on the -- on the subject?

17     A.    I did not.

18     Q.    Okay.  You didn't see anyone go back

19 over to the subject is what I'm saying?

20     A.    The time that before I left at the

21 police officer's doing like this, the only two --

22 there were two other persons who could have seen him

23 as he was over here, you know, because he was

24 away -- he had walked away from the body --

25     Q.    Okay.

1      A.    -- back out here, kind of out in the

2 clearing.  When -- when I hollered at him, he looked

3 directly at me and said -- like that.  Well, then I

4 turned to come back.  Like he had said, I see these

5 two officers come down the hill over there.  Now, if

6 he went back to the body, it was after they had

7 gotten down there.

8      Q.    Okay.  And that's what I'm saying, is,

9 you never saw Officer Atzert go back to the body?

10     A.    No.

11     Q.    Okay.  And you said these two officers,

12 you said one was like in a like special -- like a

13 black special forces --

14     A.    Yeah.

15     Q.    -- like Red Dog uniform or something

16 like that?

17     A.    Yes.

18     Q.    And one was in a state trooper uniform?

19     A.    Looked like a state trooper to me.

20     Q.    And how far away were these officers

21 from where you were?

22     A.    Those guys, they -- they would be 200,

23 300 feet.

24     Q.    Okay.  So they were further away?

25     A.    Yes.

```
 1      Q.    Is it possible they were actually in --
 2 in regular APD uniforms?
 3      A.    No.
 4      Q.    Okay.
 5      A.    That special-purpose guy, he may have
 6 been -- that may have been APD, but the regular
 7 police uniform, no.
 8      Q.    Okay.  And then the other one was in a
 9 uniform --
10      A.    State trooper.
11      Q.    -- that looked different, the state
12 trooper uniform?
13      A.    Uh-huh.
14      Q.    Okay.  And I believe you said that the
15 subject fell into some deeper brush?
16      A.    Yes, uh-huh.
17      Q.    So you weren't -- you wouldn't be able
18 to see from your vantage point about a hundred feet
19 away or so if anything was in his hands --
20      A.    No.
21      Q.    -- at that point?
22      A.    Would not have been able to see that.
23      Q.    Okay.  And you wouldn't have been able
24 to see if he was handcuffed or anything at that
25 point?
```

```
 1        A.    No.  I couldn't have told that from
 2  where I was.
 3        Q.    Okay.
 4              MR. MILLICAN:  I think that's it.
 5        Q.    (By Mr. Millican)  I'm sorry.  You said
 6  that -- that you were -- what kind of -- just out of
 7  curiosity, you said you did employment
 8  discrimination?
 9        A.    I used to do that kind of law work, yes.
10        Q.    Civil rights stuff or --
11        A.    Yeah.
12        Q.    -- what kind of work?
13        A.    Employment discrimination, if somebody
14  get a job when somebody was better qualified and
15  didn't get it, one was white and one was black or
16  one was male and one was female, all that kind of
17  stuff.
18        Q.    Okay.  You have a lot of education.
19              MR. MILLICAN:  I think that's all
20        the questions I have.
21              THE WITNESS:  All right.  Are you
22        next?
23              MS. TERRY:  Yes.
24              THE WITNESS:  Okay.
25              MS. TERRY:  I just wanted to
```



```
 1        clarify one thing that you said.
 2               THE WITNESS:  Okay.
 3                        EXAMINATION
 4  BY MS. TERRY:
 5        Q.    You said that you waited to see the
 6  story on the news the next day; correct?
 7        A.    No, that night.
 8        Q.    The same night?
 9        A.    Yes.
10        Q.    And you said there was a representative
11  from the Atlanta Police Department telling their
12  version of the story?
13        A.    He was talking to the news reporters,
14  yes.
15        Q.    Okay.  Now, you had not given any
16  information to the APD or anyone regarding what you
17  saw at that time; correct?
18        A.    Had not.
19        Q.    So the only information that the APD
20  would have gotten would have been from the officer;
21  correct?
22        A.    That's right.
23        Q.    So they only had one version of the
24  story?
25        A.    Well, I'm just saying there was one
```



1  person that -- Channel 2 and Channel 11, all of them

2  was there, and -- and I watched both things because

3  they played it again later on at 11:00 o'clock.

4        Q.    Correct.

5        A.    And this -- whoever this one person was,

6  that was -- that was the statement that he made.

7        Q.    Right.  But at that time if you didn't

8  give them a statement, the Atlanta Police Department

9  only had the officer's version --

10       A.    That's right.

11       Q.    -- of the story; correct?

12       A.    That's exactly right.

13       Q.    So that was the only version they could

14  have given at that time?

15       A.    That's right.

16       Q.    Okay.  That's all I have.

17       A.    But the version they had was -- was

18  inaccurate.

19       Q.    But -- that's correct.  But they didn't

20  know it was inaccurate because it's the only --

21       A.    That's right.

22       Q.    -- version they had; correct?

23       A.    You're right.

24       Q.    They didn't have your version yet?

25       A.    That's right.



```
 1        Q.    All right.  So they didn't refuse to
 2   give your version?  They just did not have your
 3   version; correct?
 4        A.    But some of the things they said didn't
 5   make sense.
 6        Q.    I understand that.  But --
 7        A.    Okay.
 8        Q.    -- they didn't have your version;
 9   correct?
10        A.    They did not have my version.
11        Q.    Okay.
12        A.    They didn't even know I existed.
13              MS. TERRY:  All right.  That's all
14        I've got.
15              THE WITNESS:  Yeah.
16              MR. MILLICAN:  Thank you.
17              THE WITNESS:  You're welcome.
18              MR. RICHARDSON:  Okay.
19              (Deposition concluded at 1:42 p.m.)
20
21
22
23
24
25
```



```
 1              CERTIFICATE OF COURT REPORTER

 2

 3   STATE OF GEORGIA:

 4   COUNTY OF COBB:

 5

 6              I hereby certify that the foregoing

 7         transcript was reported as stated in the

 8         caption and the questions and answers

 9         thereto were reduced to typewriting by

10         me; that the foregoing 81 pages represent

11         a true, correct, and complete transcript

12         of the evidence given on November 8,

13         2013, by the witness, Carold D. Williams,

14         who was first duly sworn by me.

15              This, the 18th day of November

16         2013.

17

18

19

20

21

22

23         JOHN P. PAYNE
           Certified Court Reporter
24         Georgia Certificate A-1006

25
```



1          DISCLOSURE OF NO CONTRACT

2
        I, John P. Payne, Certified Court Reporter,
3  do hereby disclose pursuant to Article 10.B. of the
   Rules and Regulations of the Board of Court
4  Reporting of the Judicial Council of Georgia that I
   am a Georgia Certified Court Reporter; I was
5  contacted by the party taking the deposition to
   provide court reporting services for this
6  deposition; I will not be taking this deposition
   under any contract that is prohibited by O.C.G.A. §§
7  15-14-37(a) and (b) or Article 7.C. of the Rules and
   Regulations of the Board; and I am not disqualified
8  for a relationship of interest under O.C.G.A. §
   9-11-28(c).
9
        There is no contract to provide reporting
10 services between myself or any person with whom I
   have a principal and agency relationship nor any
11 attorney at law in this action, party to this
   action, party having a financial interest in this
12 action, or agent for an attorney at law in this
   action, party to this action, or party having a
13 financial interest in this action.  Any and all
   financial arrangements beyond my usual and customary
14 rates have been disclosed and offered to all
   parties.
15
        This, the 18th day of November 2013.
16

17

18

19

20

21

22
                    _____
23                  JOHN P. PAYNE
                    Certified Court Reporter
24                  Georgia Certificate A-1006

25

PAYNE
COURT REPORTING, LLC

```
 1          DEPOSITION OF CAROLD D. WILLIAMS

 2       I do hereby certify that I have read all
    questions propounded to me and all answers given by
 3  me on November 8, 2013, taken before John P. Payne,
    and that:

 4
          1)   There are no changes noted.
 5    ✓   2)   The following changes are noted:

 6       Pursuant to Rule 30(e) of the Federal Rules of
    Civil Procedure and/or the Official Code of Georgia
 7  Annotated 9-11-30(e), both of which read in part:
    Any changes in form or substance which you desire to
 8  make shall be entered upon the deposition...with a
    statement of the reasons given...for making them.
 9  Accordingly, to assist you in effecting corrections,
    please use the form below:
10

11  Page No. 13  Line No. 12  should read: TO LOCK MY CAR
    AND WALK 10 TO 15 FEET WHERE I COULD
12
    Page No. 17  Line No. 4  should read: WAS THE
13  SUBJECT AND MR. ATZERT COMING FROM

14  Page No. 17  Line No. 10  should read: THEY CAME
    UP THE DRIVEWAY
15
    Page No. 24  Line No. 11  should read: BEHIND
16  THE SUBJECT'S BACK

17  Page No. 24  Line No. 23  should read: TO ME HE
    WAS RESTRAINING BOTH HANDS BEHIND THE SUBJECTS BACK.
18
    Page No. 25  Line No. 16  should read: LEFT HAND
19  LOOSE

20  Page No. 25  Line No. 18  should read: THE
    SUBJECT'S TROUSERS
21
    Page No. 25  Line No. 23  should read: HAND LOOSE.
22  THE OFFICER THEN TOOK HIS HAND OFF HIS

23  Page No. 25  Line No. 24  should read: SHOULDER
    AND PUT IT ON HIS SIDE, THE SIDE
24
    Page No. 26  Line No. 2  should read: SAW HIS
25  RIGHT ARM JERK. AND THE OFFICER THEN PULLED THE
```

```
1        DEPOSITION OF CAROLD D. WILLIAMS

2
   Page No. _26_ Line No. _4_ should read: AND IT LOOKED
3  _LIKE TO ME HE TRIED TO TAKE_____

4  Page No. _26_ Line No. _5_ should read: HIS RIGHT ARM
   _LOOSE FROM BEHIND HIS BACK_____
5
   Page No. _27_ Line No. _14_ should read: HAVE HIM
6  _SHOOTING AT ME, SO I STAYED BESIDE THIS_____

7  Page No. _27_ Line No. _16_ should read: BECAUSE I
   _COULD HARDLY BELIEVE WHAT I HAD SEEN I YELLED AT HIM_
8
   Page No. _28_ Line No. _10_ should read: LITTLE PHONE
9  _THAT THE CARRY ON THEIR UNIFORMS._____

10 Page No. _37_ Line No. _15_ should read: 1ST, BUT I
   _WROTE THE 2ND ON THERE BECAUSE I WANTED_____
11
   Page No. _66_ Line No. _6_ should read: BUT I'VE
12 _JUST WATCHED THIS GUY GET_____

13 Page No. _66_ Line No. _7_ should read: HAND CUFFED,
   _HE WAY LAYING ON THE GROUND_____
14

15 If supplemental or additional pages are necessary,
   please furnish same in typewriting annexed to this
16 deposition.

17
                   _____
18                     CAROLD D. WILLIAMS

19 Sworn to and subscribed before me,
   This the _20_ day of _December_, 201_3_.
20

21 Notary Public
   My commission expires: _12/14/15_
22

23 Please forward corrections to:

24              Payne Court Reporting, LLC
                4811 Galloways Farm Court
25               Acworth, Georgia 30101
                   (770) 596-0804
```



ANNEX TO THE DEPOSITION OF CAROLD D.  WILLIAMS

Page No.  74  Line No. 5  Should Read:  Yes, After the officer motioned for me to

Page No. 74 Line No. 23 Should read: And then put his weapon back in its holster, turned

COA/HAMP00136